# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ORAN ALMOG,<br>ORLY ALMOG,<br>ADI ALMOG,<br><br>RONEN BEN CHAIM,<br><br>GILA AFRIAT,<br><br>MICHAL LOUISE RAVEH,<br>DANIEL RAVEH,<br>RUTH RAVEH,<br><br>TOBI SHEILA HADAD,<br><br>GILA ITZKOVITZ,<br>IRA MARVIN SCHNALL,<br>FRANCES NETTIE SCHNALL,<br>MORDECHAI MENACHEM SCHNALL,<br>ADINA FRID,<br>ALLAN SCHNALL,<br><br>SARAH MORDECHAI-LEVY,<br>SHIMON MORDECHAI,<br>SHIRIN MORDECHAI,<br>DAVID MORDECHAI,<br>RUTH NACHMANI,<br>YITCHAK MORDECHAI,<br>CHANNAH MORDECHAI,<br>JONATHAN MORDECHAI,<br>BENYAMIN MORDECHAI,<br>DEBORAH KALFA,<br>PNINA GREEN,<br><br>SHIFRA STEINDLER,<br>GERALD LOUIS MARKOWITZ,<br>ESTATE OF DEBORAH ESTHER MARKOWITZ,<br>MICHAEL YITCHOK MARKOWITZ,<br>RACHAEL MARKOWITZ,<br>ELIMELECH YISRAEL MARKOWITZ,<br><br>ORA NECHAMA NAVEH,<br>MITCHELL JAY RUBINOFF,<br>AVIVA CHAVA RUBINOFF,<br>CHANANEL YITZCHAK RUBINOFF,<br>YOSEF YAIR RUBINOFF,<br>ELIEZER ZALMAN RUBINOFF,<br>SHOSHANA LEAH ABRAMOVICH, | **No. 26-cv-2989** |

| | |
|---|---|
| YISSACHAR ZVI LEBOWITZ,<br>SIMON BLOCH LEBOWITZ,<br>ROSALYN PEARL LAST LEBOWITZ,<br><br>BARUCH YEHUDA ZIV BRILL,<br>CHAYA BEILI,<br>SHABTAI SHABI BRILL,<br>BATYA CARMIT YEHOSHUA,<br>ABRAHAM AHARON NIV BEILI,<br>NOAM LEV BEILI,<br><br>HAGAI ALMOG,<br>EFRAYIM GAVRIEL BEN-SHOCHET,<br>MOSHE MENDEL BEN-SHOCHET,<br><br>AYALA ALMOG,<br><br>ALI SAFIULIN,<br>RAVIL RASIM SAFIULLIN,<br><br>YAARA CHERNIAK,<br><br>ANDREW PHILIP PILANT,<br>REBECCA PHILLIPS GOLDMAN,<br>SHLOMIT CHAYA PILANT,<br>YOSEF MORDECHAI PILANT,<br>DAVID MENACHEM PILANT,<br>LEVI ISAAC PILANT,<br>RACHEL SHOSHANA CONNORS,<br>ELIZABETH ANNE HASTINGS PILANT,<br>ROBERT ELLIOTT HASTINGS PILANT,<br>SAMUEL PHILIPS HASTINGS PILANT,<br>WALTER JOHN HASTINGS PILANT,<br><br>AVROHOM EICHENTHAL,<br><br>JOSEPH COHEN,<br><br>RONEN COHEN,<br>DANIEL COHEN,<br><br>AKIVA ANACHOVICH,<br><br>SHLOMO HUDJA,<br>FREIDA ALMA HUDJA,<br>BATYA HUDJA,<br>CHANA FITUSI,<br>RACHEL LEAH NEHEMIA,<br>SARA UZAN, | |

| | |
|---|---|
| SHABTAI HUDJA,<br>ESTHER HUDJA,<br>MICHAL HUDJA,<br>YAEL HUDJA,<br>SHMUEL HUDJA,<br>ESTATE OF NADIA CANFI,<br>NATHAN HUDJA,<br>TSIONA GERASSI HUDJA,<br>ZION HUDJA,<br>HERZEL HUDJA,<br><br>YEHEZKEL AGABABA,<br>MENACHE AGABABA,<br>YEHUDA AGABABA,<br><br>JOSEPH NEIL CARLIN,<br>DINA HANNA DAINES,<br>ADAM JONATHAN CARLIN,<br><br>ESTHER DESTA,<br>NECHAMA RINA SAID,<br>SHIFRA BOSMAT DESTA,<br><br>ESTATE OF ARON PAUL STERN,<br>RON JOSEPH STERN,<br><br>EYAL CHAIM NEEMAN,<br>TOBY ETTA NEEMAN,<br>NAAMAH BRACHA BARSHAI,<br>MENACHEM TZVI NEEMAN,<br>YAIR NEEMAN,<br>RONIT NE'EMAN-CHEN,<br>YISHAI NEEMAN,<br>ORIT NEEMAN,<br><br>NAPHTALI GOLDBERG,<br>SHULAMIT MORIYA GOLDBERG,<br>TAMAR SHALEM GOLDBERG,<br>AMIZUR SHLOMO GOLDBERG,<br>GILAD GOLDBERG,<br>NERIYA GOLDBERG,<br>RONALD GOLDBERG,<br>LIBBY GOLDBERG,<br>CHAIM GOLDBERG,<br>CHAYA RIVKA TSOUR,<br>AVROHOM YITZCHOK GOLDBERG,<br>SARA SHIFRA FRIEDMAN,<br>MOSHE GOLDBERG,<br>PERETZ GOLDBERG,<br>DEVORA HADAS NAGER-GOLDBERG, | |

| | |
|---|---|
| BARUCH YITSCHAK YELIN,<br>ORLY YELIN,<br>KFIR YELIN,<br>MORIYA YELIN,<br>HADAR YELIN,<br>NAAMA YELIN,<br>AVITAL YELIN LIWANAG,<br>SHLOMIT YELIN-ARBER,<br><br>ESTATE OF AYAL CHAIM NOKED,<br>EINAT NOKED,<br>NETA NECHAMA COHEN,<br>BARUCH NOKED,<br>AVISHAG NITZAN,<br>BINYAMIN ELKANA NOKED,<br>ATARA ETINGER,<br>TALYA LOULAI,<br>EVELYN LOURIE,<br>SHANI LOURI,<br>TAMAR RACHEL BEINHACKER,<br>SHAI LOURIE,<br><br>MICHAL AMSELI,<br><br>JACKY LEVI,<br>BAT-ZION LEVI,<br><br>RACHEL OSHRAT SHAKED,<br><br>GAL GANZMAN,<br>ARIE GANZMAN,<br>ZVIA GANZMAN,<br>ASSAF GANZMAN,<br>ALMA GANZMAN EITAN,<br><br>JOSHUA GABE FAUDEM,<br>ARLENE FAUDEM,<br>EMILY BETH FAUDEM,<br>MICHELE FAYE FAUDEM ERSHLER,<br><br>ORLY COFFEY,<br><br>BRUCE HOWARD MAZER,<br><br>ZOHAR SAAR,<br><br>JUDITH EILEEN BUCHMAN-ZIV,<br><br>ADINA DABACH, | |

FAIGA ZVIA LIEBERMAN,

NIMMER MATTAR,

NILI CHOMAN,

GABRIEL ASSOULINE,

SIMCHA RIVLIN,
ASSAF RIVLIN,
GILAD BARUCH RIVLIN,

MATAN ELIAV NACHMANI,
ARIEL BENAYA NACHMANI,
RACHEL RIVKA RAZ,
AMICHAI TZION NACHMANI,
TALIA BRACHA NACHMANI,

TAL TAMARI LEVY,

(Addresses to be filed under seal with permission)

*Plaintiffs,*

v.

ISLAMIC REPUBLIC OF IRAN,

ISLAMIC REVOLUTIONARY GUARD CORPS,

IRANIAN MINISTRY OF INTELLIGENCE & SECURITY,

BANK MELLI IRAN,

BANK SADERAT,

SYRIAN ARAB REPUBLIC,

HARAKAT AL-MUQAWAMA AL-ISLAMIYA (A/K/A HAMAS),

PALESTINIAN ISLAMIC JIHAD,

HEZBOLLAH,

*Defendants.*

## TABLE OF CONTENTS

NATURE OF THE CASE .......... 10
JURISDICTION AND VENUE .......... 13
THE PARTIES .......... 14
FACTUAL ALLEGATIONS .......... 20
I. The Islamic Republic of Iran .......... 20
II. Origins of the Axis of Resistance .......... 24
A. Syria: Iran's Principal State Ally .......... 24
B. Founding of Hezbollah .......... 25
C. Establishment of the Quds Force .......... 27
D. Iran and Syria's Continued Support to Hezbollah .......... 28
III. Expansion of the Axis of Resistance to Palestinian Terrorist Organizations .......... 33
A. Palestinian Islamic Jihad (PIJ) .......... 38
B. Hamas .......... 44
C. Fatah and the Al-Aqsa Martyrs Brigade (AAMB) .......... 52
IV. Defendants' Material Support Proximately Caused the Terrorist Attacks and Plaintiffs' Injuries .......... 63
A. Iran Built and Sustained Hamas, PIJ, Hezbollah, and Fatah/AAMB's Operational Capacity to Commit the Terrorist Attacks .......... 64
B. Syria's Territorial and Logistical Support was Essential to Hamas, PIJ, Hezbollah, and Fatah/AAMB's Capacity to Operate .......... 64
C. The Bank Defendants' Financial Services Increased the Resources Available to Fund Hamas, PIJ, Hezbollah, and Fatah/AAMB .......... 65
D. The Terrorist Attacks and Plaintiffs' Injuries were the Reasonably Foreseeable Consequence of the FSIA Defendants' Support .......... 66
THE PLAINTIFFS AND THE TERRORIST ATTACKS .......... 67
I. THE BEIT LID JUNCTION BOMBING – JANUARY 22, 1995 .......... 67
A. Plaintiff Ronen Ben Chaim .......... 68
B. Plaintiff Gila Afriat .......... 68
II. THE RAMAT ESHKOL BUS BOMBING – AUGUST 21, 1995 .......... 69
A. Plaintiffs The Raveh Family .......... 69
III. THE KFAR DAROM BUS BOMBING – NOVEMBER 20, 2000 .......... 70

A. Plaintiff Tobi Sheila Hadad ..... 70
IV. THE FRENCH HILL BUS #25 SHOOTING – NOVEMBER 4, 2001 ..... 71
A. Plaintiffs The Itzkovitz Family ..... 71
B. Plaintiffs The Mordechai-Levy Family ..... 73
C. Plaintiffs The Steindler Family ..... 74
D. Plaintiffs The Naveh Family ..... 75
E. Plaintiffs The Lebowitz Family ..... 77
V. THE BEN YEHUDA STREET BOMBINGS – DECEMBER 1, 2001 ..... 77
A. Plaintiffs The Brill Family ..... 78
B. Plaintiffs The Almog Ben-Shochet Family ..... 79
C. Plaintiff Ayala Almog ..... 80
VI. THE HAIFA BUS NO. 16 BOMBING – DECEMBER 2, 2001 ..... 81
A. Plaintiffs The Safiullin Family ..... 81
VII. THE NISANIT-ELI SINAI ROAD SHOOTING – DECEMBER 2, 2001 ..... 82
A. Plaintiff Yaara Cheniak ..... 82
VIII. THE EMMANUEL BUS AMBUSH – DECEMBER 12, 2001 ..... 82
A. Plaintiffs The Pilant Family ..... 83
B. Plaintiff Avrohom Eichenthal ..... 85
IX. THE CAFÉ MOMENT BOMBING – MARCH 9, 2002 ..... 86
A. Plaintiff Joseph Cohen ..... 86
X. THE MATZUVA HIGHWAY AMBUSH – MARCH 12, 2002 ..... 86
A. Plaintiffs The Cohen Family ..... 87
XI. THE PARK HOTEL PASSOVER BOMBING – MARCH 27, 2002 ..... 87
A. Plaintiff Akiva Anachovich ..... 88
XII. THE MAHANE YEHUDA MARKET BOMBING – APRIL 12, 2002 ..... 88
A. Plaintiffs The Hudja Family ..... 89
XIII. THE SHEFFIELD CLUB BOMBING – MAY 7, 2002 ..... 91
A. Plaintiffs The Agababa Family ..... 91
XIV. THE MEGIDDO JUNCTION BUS BOMBING – JUNE 5, 2002 ..... 92
A. Plaintiffs The Carlin Family ..... 92
XV. THE FRENCH HILL JUNCTION BUS STOP BOMBING – JUNE 19, 2002 ..... 93
A. Plaintiffs The Desta Family ..... 93
XVI. THE DAN BUS NO. 4 BOMBING – SEPTEMBER 19, 2002 ..... 94
A. Plaintiffs The Stern Family ..... 95

XVII. THE SONOL GAS STATION BOMBING – OCTOBER 27, 2002 .................. 96
A. Plaintiffs The Neeman Family .................. 96
XVIII. THE WORSHIPPERS' WAY AMBUSH – NOVEMBER 15, 2002 .................. 97
A. Plaintiffs The Goldberg Family .................. 98
B. Plaintiffs The Yelin Family .................. 100
C. Plaintiffs The Noked Family .................. 101
D. Plaintiff Michal Amseli .................. 103
XIX. THE BEIT SHE'AN ELECTION ATTACK – NOVEMBER 28, 2002 .................. 103
A. Plaintiffs The Levi Family .................. 104
XX. THE HAIFA BUS NO. 37 ATTACK – MARCH 5, 2003 .................. 105
A. Plaintiff Rachel Oshrat Shaked .................. 106
XXI. THE MIKE'S PLACE BOMBING – APRIL 30, 2003 .................. 106
A. Plaintiffs The Ganzman Family .................. 107
B. Plaintiffs The Faudem Family .................. 108
C. Plaintiff Orly Coffey .................. 109
D. Plaintiff Bruce Howard Mazer .................. 110
E. Plaintiff Zohar Saar .................. 110
F. Plaintiff Judith Eileen Buchman-Ziv .................. 111
XXII. THE EGGED BUS NO. 6 BOMBING – MAY 18, 2003 .................. 112
A. Plaintiff Adina Dabach .................. 112
XXIII. THE SHMUEL HANAVI BUS BOMBING – AUGUST 19, 2003 .................. 112
A. Plaintiff Faiga Zvia Lieberman .................. 113
XXIV. THE MAXIM RESTAURANT BOMBING – OCTOBER 4, 2003 .................. 113
A. Plaintiffs The Almog Family .................. 113
B. Plaintiff Nimmer Mattar .................. 115
XXV. THE EGGED BUS NO. 19 BOMBING – JANUARY 29, 2004 .................. 115
A. Plaintiff Nili Choman .................. 115
XXVI. THE ASHDOD PORT BOMBINGS – MARCH 14, 2004 .................. 116
A. Plaintiff Gabriel Assouline .................. 116
XXVII. THE MORAG ROADSIDE AMBUSH – JANUARY 12, 2005 .................. 117
A. Plaintiffs The Rivlin Family .................. 117
XXVIII. THE AYTA ASH-SHAAB MISSILE ATTACK – AUGUST 2, 2006 .................. 117
A. Plaintiffs The Nachmani Family .................. 118
XXIX. THE HERMESH ROAD SHOOTING – MAY 30, 2023 .................. 119

A. Plaintiff Tal Tamari Levy ..........120
CLAIMS FOR RELIEF ..........120
PRAYER FOR RELIEF ..........128

## NATURE OF THE CASE

1. Plaintiffs bring this Complaint under the terrorism exception to the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605A, against the Islamic Republic of Iran ("Iran"), the Islamic Revolutionary Guard Corps ("IRGC"), including its Quds Force ("IRGC-QF"), the Iranian Ministry of Intelligence and Security ("MOIS"), Bank Melli Iran, ("Bank Melli"), Bank Saderat, and the Syrian Arab Republic ("Syria"), (jointly and severally, the "FSIA Defendants") and (2) under the civil-damages provision of the Anti-Terrorism Act, 18 U.S.C. § 2333(a) ("ATA"), as amended by the Justice Against Sponsors of Terrorism Act, 18 U.S.C. § 2333(d) ("JASTA"), against the following U.S.-designated foreign terrorist organizations ("FTOs"):[1] Islamic Resistance Movement–Harakat al-Muqawama al-Islamiya ("Hamas"), Palestinian Islamic Jihad ("PIJ"), and Hezbollah, jointly and severally (collectively, the "FTO Defendants").

2. This action arises from a series of terrorist attacks (the "Terrorist Attacks") perpetrated by Hamas, PIJ, Hezbollah (a/k/a Hizballah or Hizb'Allah), and Fatah, including its Al Aqsa Martyrs Brigade ("AAMB"),[2] in Israel, the West Bank, the Gaza Strip, and Lebanon between 1995 and 2023 (the "Relevant Period").

3. The Terrorist Attacks were part of a systematic and widespread campaign of suicide bombings, mass shootings, and other murderous attacks against the Israeli civilian population and involved the intentional use of explosives, incendiary weapons, firearms, and other lethal devices in public places, government facilities, and public transportation systems.

[1] FTO is an acronym for "Foreign Terrorist Organization"— a designation made by the U.S. government pursuant to Section 219 of the Immigration and Nationality Act and the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), as amended, codified at 8 U.S.C. § 1189. Section 219 of the AEDPA provides the U.S. Secretary of State with the authority to designate foreign organizations that engage in terrorism that threatens the security of the United States or U.S. nationals, which has the effect of freezing their assets and prohibiting most contact with them.

[2] AAMB is a Palestinian terrorist group affiliated with the Palestinian political party Fatah. It has been designated as an FTO by the U.S. Department of State since March 27, 2002.

4. Each of the Terrorist Attacks included an act of extrajudicial killing within the meaning of 28 U.S.C. § 1605A.

5. Each of the Terrorist Attacks was a violent act, dangerous to human life, that violated the criminal laws of the United States, including 18 U.S.C. §§ 2332, 2332a, 2332b, 2332d, 2332f, 2339A, 2339B, 2339C and 2339D, and was intended to intimidate or coerce a civilian population, influence the policy of a government by intimidation or coercion, or affect the conduct of a government by mass destruction, assassination, or kidnapping within the meaning of § 2331(1).

6. Plaintiffs are United States nationals injured in the Terrorist Attacks and the immediate family members of persons injured and killed in the Terrorist Attacks.

7. The FTO Defendants and AAMB/Fatah perpetrated, planned, and executed the following Terrorist Attacks:

| Terrorist Attack | Hamas | PIJ | AAMB/Fatah | Hezbollah |
|---|---|---|---|---|
| Beit Lid Junction Bombing | | x | | |
| Ramat Eshkol Bus Bombing | x | | | |
| Kfar Darom Bus Bombing | | | x | |
| French Hill Bus #25 Shooting | | x | | |
| Ben Yehuda Street Bombings | x | | | |
| Haifa Bus # 16 Bombing | x | | | |
| Nisanit-Eli Sinai Road Shooting | x | | | |
| Emmanuel Bus Ambush | x | | | |
| Café Moment Bombing | x | | | |
| Matzuva Highway Bombing | | x | | x |
| Park Hotel Passover Bombing | x | | | |
| Mahane Yehuda Market Bombing | | | x | |
| Sheffield Club Bombing | x | | | |
| Megiddo Junction Bombing | | x | | |
| French Hill Bus Stop Bombing | | | x | |
| Dan Bus #4 Bombing | x | | | |
| Sonol Gas Station Bombing | x | | | |
| Worshippers' Way Ambush | | x | | |
| Beit She'an Election Attack | | | x | |
| Haifa Bus #37 Attack | x | | | |
| Mike's Place Bombing | x | | | |
| Egged Bus #6 Bombing | x | | | |
| Shmuel Hanavi Bus Bombing | x | | | |
| Maxim Restaurant Bombing | | x | | |

| | | | | |
|---|---|---|---|---|
| Egged Bus No. 19 Bombing | | | x | |
| Ashdod Port Bombings | x | | x | |
| Morag Roadside Ambush | | x | | |
| Ayta Ash-Shaab Missile Attack | | | | x |
| Hermesh Road Shooting | | x | x | |

8. Throughout the Relevant Period, the FSIA Defendants knowingly and intentionally provided the FTO Defendants and Fatah/AAMB with substantial material support and resources that enabled the Terrorist Attacks.

9. As detailed below, Iran directed, financed, armed, trained, and coordinated a regional network of terrorist organizations, including the FTO Defendants and Fatah/AAMB. Acting through the IRGC, the IRGC-QF, MOIS, and other instrumentalities of the Iranian state, Iran provided the FTO Defendants and Fatah/AAMB with funding, weapons, training, intelligence, logistical support, and strategic direction, enabling them to carry out the Terrorist Attacks that injured and killed Plaintiffs and their family members.

10. Iran built this network — commonly referred to as the “Axis of Resistance” — over more than three decades, beginning with the creation of Hezbollah in Lebanon in the 1980s and extending the same model of proxy warfare to Palestinian terrorist organizations beginning in the late 1980s and 1990s. Syria served as an indispensable partner in this strategy throughout the Relevant Period, providing the territorial corridor, safe haven, and logistical infrastructure without which Iran's support to the FTO Defendants and Fatah/AAMB could not have reached them.

11. Iran funneled millions of U.S. dollars to the FTO Defendants and Fatah/AAMB through its state-owned and state-controlled financial institutions, including Defendants Bank Melli and Bank Saderat. Bank Melli and Bank Saderat knowingly provided banking and financial services that facilitated Iran's transfer of funds to the FTO Defendants and Fatah/AAMB, enabling them to finance and carry out their terrorist operations.

12. The Terrorist Attacks perpetrated by the FTO Defendants and Fatah/AAMB were the direct and proximate cause of Plaintiffs' and their family members' deaths and injuries. The material support knowingly provided by the FSIA Defendants was a substantial factor in bringing about those attacks, and the resulting deaths and injuries were the reasonably foreseeable consequence of that support.

## JURISDICTION AND VENUE

13. This Court has jurisdiction over this matter and over the FSIA Defendants pursuant to 28 U.S.C. §§ 1330(a) and 1605A(a), which create subject-matter and personal jurisdiction for civil actions for personal injury against State Sponsors of Terrorism and their officials, employees, and agents.

14. The Foreign Sovereign Immunities Act ("FSIA"), at 28 U.S.C. § 1605A, provides jurisdiction for private rights of action for personal injury or death against a foreign state — and any official official, employee, or agent of that foreign state while acting within the scope of his or her office, employment, or agency — that was a State Sponsor of Terrorism at the time of the terrorist acts at issue, or was designated as a result of that act, and either remains so designated when the claim is filed or was so designated within the six-month period preceding the filing of the claim.

15. Defendants Iran and Syria were continuously designated State Sponsors of Terrorism throughout the Relevant Period and remained so designated within the six-month period preceding the filing of this action, and are therefore subject to the Court's jurisdiction under 28 U.S.C. § 1605A(a).

16. As alleged below, the IRGC and MOIS are political subdivisions of Iran, and Banks Melli and Saderat are agencies and instrumentalities of Iran. Accordingly, for all

relevant purposes, these Defendants are also considered the foreign state of Iran under 28 U.S.C. § 1603(a).[3]

17. Venue is proper in this District as to the FSIA Defendants pursuant to 28 U.S.C. § 1391(f)(4), which provides that a civil action against a foreign state, its political subdivisions, and/or any agency or instrumentality of a foreign state may be brought in the United States District Court for the District of Columbia.

18. FTO Defendants Hamas, PIJ, and Hezbollah are all designated Foreign Terrorist Organizations.

19. This Court has subject matter jurisdiction over the FTO Defendants pursuant to 28 U.S.C. § 1331, as a civil action arising under the laws of the United States, specifically the Anti- Terrorism Act, 18 U.S.C. § 2333, as a civil action brought by citizens of the United States and/or their estates, survivors, or heirs, who have been injured by reason of acts of international terrorism.

20. Venue is proper in this District as to the FTO Defendants pursuant to 28 U.S.C. §§ 1391(b)(3).

## THE PARTIES

21. Plaintiffs are described in detail below in "Plaintiffs and the Terrorist Attacks." They include U.S. nationals (including estates) and their close family members, who suffered direct and foreseeable injuries as a result of the Terrorist Attacks committed by Hamas, PIJ, Hezbollah, and Fatah/AAMB with the FSIA Defendants' substantial material support.

[3] 28 U.S.C. § 1603(a) defines "foreign state" to include "a political subdivision of a foreign state or an agency or instrumentality of a foreign state." The statute defines an "agency or instrumentality of a foreign state as any entity - (1) which is a separate legal person, corporate or otherwise, and (2) which is an organ of the foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by the foreign state or political subdivision thereof, and (3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (e), nor created under the laws of any third country." 28 U.S.C. § 1603(a)–(b).

22. ***Iran.*** Iran is, and was at all relevant times, a foreign state as defined by the FSIA, 28 U.S.C. § 1603(a). Since 1984, Iran has been designated by the United States as a State Sponsor of Terrorism pursuant to Section 6(j) of the Export Administration Act of 1979, previously codified at 50 U.S.C. § 4605(j), Section 620 of the Foreign Assistance Act, 22 U.S.C. § 2371, and Section 40(d) of the Arms Export Control Act, 22 U.S.C. § 2780(d). At all relevant times, Iran provided Hamas, PIJ, Hezbollah, and Fatah/AAMB with substantial material support, including training, weapons, money, and resources for acts of extrajudicial killings as that term is used in the FSIA, 28 U.S.C. § 1605A(a)(1), that enabled Hamas, PIJ, Hezbollah, and Fatah/AAMB to be terrorist organizations capable of recruiting terrorists and committing terroristic violence, like the attacks that injured Plaintiffs.

23. ***IRGC (and the Quds Force).*** The IRGC is a subdivision of the state of Iran and is, for all relevant purposes, treated as Iran itself.[4] The IRGC functions as an intelligence organization and paramilitary force whose role is to defend the Islamic fundamentalist revolution within Iran and to export the revolution's principles throughout the world, including through acts of terrorism. As this Court has held, the IRGC "is the military arm of a kind of shadow government answering directly to the Ayatollah and the mullahs who hold power in Iran. It is similar to the Nazi party's SA organization prior to World War II."[5]

24. The IRGC also holds a controlling number of positions in the Iranian government and its economy. IRGC veterans have served as governors of many of Iran's thirty-one provinces. The IRGC also controls many companies spanning a wide range of industries, including petroleum production, construction, nuclear power, banking, and others—some of

---

[4] *See, e.g., Henkin v. Islamic Republic of Iran, No. 18-cv-1273 (RCL), 2021 WL 2914036, at *17 (D.D.C. July 12, 2021); Fritz v. Islamic Republic of Iran, 320 F. Supp. 3d 48, 77, 85 (D.D.C. 2018); Akins v. Islamic Republic of Iran, 332 F. Supp. 3d 1, 33 (D.D.C. 2018); Bluth v. Islamic Republic of Iran, 203 F. Supp. 3d 1, 19 n.15 (D.D.C. 2016); Rimkus v. Islamic Republic of Iran, 575 F. Supp. 2d 181, 194 (D.D.C. 2008).*

[5] *Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40, 47 (D.D.C. 2006).

the proceeds from which the IRGC uses for illicit purposes, including funding terrorism. On October 13, 2017, the United States designated the IRGC as a Specially Designated Global Terrorist ("SDGT") under Executive Order 13224, and the IRGC remains so-designated.[6] On April 15, 2019, the United States designated the IRGC as an FTO pursuant to AEDPA § 219, codified at 8 U.S.C. § 1189, and the IRGC remains so-designated.

25. The Quds Force is a branch of the IRGC and is Iran's primary tool for exporting the Iranian Islamic revolution beyond Iran's borders. The Quds force does so by setting up and operating armed terrorist cells, establishing educational systems for indoctrination, and otherwise acting to subvert secular, pro-Western Arab-Muslim regimes. It also provides material support to terrorist organizations. In October 2007, the Quds Force was designated an SDGT pursuant to Executive Order 13224—which authorizes the U.S. government to designate and block the assets of foreign individuals and entities that commit, or pose a significant risk of committing, acts of terrorism—and remains designated to this day. The Quds Force was also included in the April 15, 2019, designation of the entire IRGC as an FTO.

26. ***MOIS.*** MOIS is the Iranian intelligence service. It is the part of the Iranian government's security apparatus responsible for the assassination of Iranian political dissidents, and supports Iran's international terrorist activities by providing resources and intelligence for acts of extrajudicial killing. This Court has consistently found MOIS to be a political subdivision of Iran for purposes of liability and damages under the FSIA.[7] In 2012, the United States designated MOIS as a terrorist organization under E.O. 13224 (and two other

[6] Executive Order 13224, as amended, has the effect of blocking the assets of and transactions with certain identified terror groups and individuals. It also provides the Secretary of State with the authority to (1) designate additional individuals or entities that have committed or pose a significant risk of committing terrorist acts and (2) identify individuals or entities controlled or owned by terrorist groups or individuals. An entity or individual designated under E.O. 13224, as amended, is referred to as an SDGT.

[7] *See, e.g.*, *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 721-722 (D.D.C. 2010); *Bennett v. Islamic Republic of Iran*, 507 F. Supp.2d 117, 125 (D.D.C. 2007) ("Defendant MOIS is considered to be a division of state of Iran, and is treated as a member of the state of Iran itself."); *Salazar v. Islamic Republic of Iran*, 370 F.Supp.2d 105, 116 (D.D.C. 2005).

executive orders specific to human rights abuses in Iran and Syria, E.O. 13553 and E.O. 13572, respectively), stating, "we are designating the MOIS for its support to terrorist groups, including al Qa'ida, al Qa'ida in Iraq, Hizballah and HAMAS, again exposing the extent of Iran's sponsorship of terrorism as a matter of Iranian state policy."[8]

27. ***Bank Melli.*** Bank Melli is Iran's largest commercial bank. It was established in 1927 by order of the Iranian Parliament. Following the Iranian Revolution in 1979, all banks in Iran were nationalized, and, as discussed below, have since been effectively controlled by the Iranian regime. Bank Melli describes itself as "a powerful arm of the government."[9] Bank Melli most notably provides banking services to entities involved in Iran's nuclear and ballistic missile programs. It also provides banking and financial services to the IRGC and the Quds Force, and is one of Iran's main conduits for funding terrorist organizations. Accordingly, Bank Melli is an agency or instrumentality of Iran.[10] In October 2007 and throughout the remainder of the relevant period, Bank Melli Iran was designated as an SDN pursuant to Executive Order 13382, and included on the Office of Foreign Assets Control's SDN list.

28. ***Bank Saderat.*** Bank Saderat was established in 1952 and became a commercial state-owned bank of Iran in 1979 after the revolutionary government nationalized the bank. It has approximately 3,200 branch offices, and has been used by the Government of Iran to channel millions of U.S. dollars to terrorist organizations. October 25, 2007, the Treasury Department designated Bank Saderat under E.O. 13224 as a terrorist financier, specifically noting that the reason for the designation was Bank Saderat's provision of financial services to

[8] U.S. Treasury Department, *Treasury Designates Iranian Ministry of Intelligence and Security for Human Rights Abuses and Support for Terrorism* (Feb. 16, 2012), https://www.treasury.gov/press-center/press-releases/Pages/tg1424.aspx.

[9] Bank Melli Iran, *History of Bank Melli Iran*, http://bmi.ir/En/BMIHistory.aspx?smnuid=10011

[10] Bank Melli Iran, *History of Bank Melli Iran*, http://bmi.ir/En/BMIHistory.aspx?smnuid=10011

Hezbollah and Hamas. Although Bank Saderat claims to have been "privatized" in 2009, this Court has since held that Bank Saderat is still an agency or instrumentality of Iran.[11]

29. ***Syria.*** Syria is, and was at all relevant times, a foreign state as defined by the FSIA, 28 U.S.C. § 1603. In 1979, Syria was designated by the United States as a State Sponsor of Terrorism pursuant to Section 6(j) of the Export Administration Act of 1979, previously codified at 50 U.S.C. § 4605(j), and remained so designated within the six-month period preceding the filing of this action until August 24, 2026, when the Secretary of State formally rescinded its designation. Syria has long provided Hamas, Hezbollah, PIJ, and AAMB with material support, training, weapons, money, safe-haven, and other resources for acts of extrajudicial killings and hostage taking as those terms are defined in the FSIA, 28 U.S.C. § 1605A(a)(1). Syria's deep and long-standing support enabled the FTO Defendants to be the cohesive, organized, and deadly organizations that they are today, capable of conducting terror campaigns, including the Terrorist Attacks.

30. ***Hamas.*** Hamas is an acronym of the Arabic "Harakat al-Muqawama al-Islamiya"—Islamic Resistance Movement—but its name also means, in Arabic, enthusiasm, courage, and zeal for battle. It is the most prominent terrorist organization operating in Palestinian-controlled territory and is the de facto ruling government of Gaza. Established in 1987, Hamas's stated core purpose is eliminating Israel, and it seeks that end through violence and terror, including rocket attacks, bombings, suicide bombings, shootings, stabbings, hostage taking, and more. At all relevant times, Hamas received substantial material support from Iran and Syria including financing, weapons, ammunition, training, and other resources for acts of torture, extrajudicial killing, and hostage taking, as those terms are used in the FSIA, 28 U.S.C. § 1605A(a)(1), that enabled Hamas to be a terrorist organization capable of recruiting terrorists

[11] *Shoham v. Islamic Republic of Iran,* 2017 WL 2399454, at *8 (D.D.C. June 1, 2017) (holding that Bank Saderat is an instrumentality of Iran), *appeal dismissed*, 2019 WL 1270405 (D.C. Cir. Feb. 25, 2019).

and carrying out terrorist acts like those that injured or killed Plaintiffs and their family members. On January 23, 1995, pursuant to Executive Order 12947, the United States designated Hamas as a Specially Designated Terrorist ("SDT").[12] On October 8, 1997, Hamas was designated an FTO and remains so designated. On October 30, 2001, Hamas was also designated as an SDGT under E.O. 13224 and remains so designated.

31. ***PIJ.*** The Palestinian Islamic Jihad ("PIJ") is another prominent terrorist group operating in Palestinian-controlled territory. It too has as its core purpose destroying Israel through terrorism and violence. PIJ was established in 1981 and has committed numerous acts of terrorism since, including suicide bombings, small arms attacks, and mortar and rocket attacks. At all relevant times, PIJ received substantial material support from Iran and Syria, including military and logistics training, weapons, money, logistical and intelligence support, and other resources for acts of torture, extrajudicial killing, and hostage taking, as those terms are used in the FSIA, 28 U.S.C. § 1605A(a)(1), that enabled PIJ to be a terrorist organization capable of recruiting terrorists and committing terrorist acts like those that killed or injured Plaintiffs and their family members.[13] On January 23, 1995, pursuant to E.O. 12947, the United States designated PIJ as an SDT. On October 8, 1997, PIJ was designated an FTO and remains so designated. On October 31, 2001, PIJ was designated as an SDGT under E.O. 13224 and remains so designated.

32. ***Hezbollah.*** Hezbollah is an Arabic word meaning "the party of God." It is one of the world's largest and deadliest terrorist organizations. Hezbollah first emerged during the Lebanese Civil War in the early 1980s as a militia recruited by the IRGC and comprising Shi'a

[12] Executive Order 12947 preceded E.O. 13224 and was narrower. It provided the Secretary of the Treasury with the authority to freeze the assets of and prohibit transactions with entities or persons designated as "foreign terrorists that disrupt the Middle East peace process," as opposed to all terrorist entities or individuals. Entities or individuals designated under E.O. 12947, as amended by E.O. 13099, are referred to as SDTs. On September 9, 2019, E.O. 12947 was revoked and replaced by E.O. 13886, which amended E.O. 13224.

[13] *See, e.g.*, *Ben-Yishai v. Syrian Arab Republic*, 642 F. Supp. 3d 110, 121 (D.D.C. 2022); *Force v. Islamic Republic of Iran*, 464 F. Supp. 3d 323, 341 (D.D.C. 2020).

followers of Iran's Supreme Leader, Ayatollah Ruhollah Khomeini. From Hezbollah's inception, it has always served as an instrument of Iran. Hezbollah has committed numerous high-profile and deadly terrorist attacks against U.S. citizens and others. At all relevant times, Hezbollah received substantial material support from Iran and Syria, including military and logistics training, weapons, money, logistical and intelligence support, and other resources for acts of torture, extrajudicial killing, and hostage taking, as those terms are used in the FSIA, 28 U.S.C. § 1605A(a)(1), that enabled Hezbollah to be a terrorist organization capable of recruiting terrorists and committing terrorist acts. On January 23, 1995, pursuant to E.O. 12947, the United States designated Hezbollah as an SDT. On October 8, 1997, Hezbollah was designated an FTO and remains so designated. On October 30, 2001, Hezbollah was designated as an SDGT under E.O. 13224 and remains so designated.

## FACTUAL ALLEGATIONS

### I. The Islamic Republic of Iran

33. The Islamic Republic of Iran was established following the 1979 Iranian Revolution, which overthrew Iran's secular monarchy and replaced it with an Islamic republic.

34. Since the Revolution, Iran has been organized around the principle of *velayet-e faqih,* under which the ultimate authority over the country rests with a single religious leader, the "Supreme Leader." Ayatollah Ruhollah Khomeini held that position at the time of the Revolution. In 1989, he was succeeded by Ayatollah Ali Khamenei, who served as Supreme Leader until his assassination in February 2026.

35. Iran's political structure is bifurcated into a formal governmental apparatus and a parallel revolutionary apparatus, both of which answer to the Supreme Leader. The Supreme Leader serves as the commander-in-chief of Iran's military, intelligence, and security services, with the power to appoint and dismiss heads of the armed forces, judiciary, state media, and

other major institutions. Although Iran elects a president and parliament, both remain subordinate to the Supreme Leader.

36. From its inception, the Islamic Republic conceived of the Revolution not merely as a political transformation within Iran, but as the beginning of a broader Islamic revolutionary movement. After overthrowing the Shah, Iran's former monarch, Khomeini declared: "[w]e will export our revolution to the four corners of the world because our revolution is Islamic, and the struggle will continue until the cry of 'there is no God but Allah, and Muhammad is his Messenger' prevails throughout the world."[14]

37. The Islamic Republic viewed the United States and its secular, liberal values as a principal threat to its revolutionary project. Khomeini maintained that the social freedoms introduced under the Shah had been "dictated by the West in order to corrupt [Iranian] youth"[15] and emphasized the need to purge Iran of this American cultural influence. The new regime accordingly imposed Islamic restrictions aimed at eliminating what it perceived as manifestations of Western moral corruption, including liberalized norms governing dress, sexual conduct, and gender relations.

38. Khomeini likewise portrayed Jews as enemies of Islam and the Revolution, declaring that "[f]rom its very inception, Islam has been afflicted by the Jews" and that "the Jews and their foreign masters are plotting against Islam and preparing the way for the Jews to rule over the entire planet."[16]

39. Khomeini fused these perceived threats – Western secular and moral corruption, embodied by the United States, and a purported Jewish conspiracy against Islam, embodied by Israel – into a revolutionary worldview in which the U.S. and Israel became the Islamic

[14] Khomeini's September 30, 1979 speech

[15] *Id.*

[16] Khomeini, Ruhollah. *Islamic Government: Governance of the Jurist.* Translated by Hamid Algar, Alhoda UK. (Original work published 1970).

Republic's principal enemies. Supreme Leaders Khomeini and Khamenei have both described the U.S. as the "Great Satan" and Israel as the "Little Satan" to be defeated. The violent slogan "Death to America! Death to Israel!" is repeated by Iranian demonstrators on the streets of Tehran every year on November 4 to mark the anniversary of the 1979 takeover of the U.S. Embassy in Tehran.[17]

40. To defend and advance Iran's revolutionary objectives, Khomeini founded the IRGC shortly after the Revolution as an elite branch of Iran's armed forces, charged with protecting the Islamic system from internal opposition and with extending the Revolution's influence abroad. The IRGC considers itself an agent of the Supreme Leader and answers directly to him.

41. Since its founding, the IRGC has served as an instrument for carrying the Islamic Republic's revolutionary policies, including its policies directed against the U.S. and Israel. Former IRGC commander Hossein Salami, for example, declared the IRGC's intent to "break America, Israel, and their partners and allies" and "cleanse the planet from the filth of their existence."[18]

42. In pursuing these objectives, Iran has long relied on international terrorism as an instrument of state policy to pursue its objectives. Iran's support for terrorist organizations is directed and approved at the highest levels of government. The Supreme Leader exercises ultimate authority over these activities, while the MOIS provides intelligence, operational support, and target selection for terrorist operations conducted through Iranian embassies, consulates, commercial entities, charitable foundations, and cultural centers abroad.

---

[17] *"Death to Israel, death to America": Iran marks anniversary of 1979 embassy takeover*, TIMES OF ISRAEL, Nov. 4, 2023, *available at* https://www.timesofisrael.com/death-to-israel-death-to-america-iran-marks-anniversary-of-1979-embassy-takeover/; *Iranian MPs chant 'Death to America' on anniversary of US embassy takeover,* IRAN INTERNATIONAL, Nov. 4, 2025, *available at* https://www.iranintl.com/en/202511042838.

[18] https://english.alarabiya.net/News/middle-east/2019/09/05/Iran-s-IRGC-head-claims-that-its-military-is-invincible-

43. On January 19, 1984, the U.S. designated Iran a State Sponsor of Terrorism, a designation has remained continuously in force throughout the Relevant Period.

44. The U.S. State Department has described Iran as "the leading state sponsor of terrorism, facilitating a wide range of terrorist and other illicit activities around the world."[19]

45. U.S. officials have likewise described the Iranian regime as the world's "central banker of terrorism."[23]

46. Iran devotes substantial state resources to supporting terrorist organizations, maintaining a nine-figure line item in its national budget for that purpose and funneling hundreds of millions of dollars each year to terrorist organizations through state-controlled banks, front companies, and intermediaries.

47. The Central Bank of Iran ("CBI") has used Iranian commercial banks, including Bank Melli and Bank Saderat, as conduits for this funding. According to the U.S. Treasury Financial Crimes Enforcement Network, and as affirmed by Congress:

> The Central Bank of Iran, which regulates Iranian banks, has assisted designated Iranian banks by transferring billions of dollars to these banks in 2011. In mid-2011, the CBI transferred several billion dollars to designated banks, including Saderat, Mellat, EDBI and Melli, through a variety of payment schemes. In making these transfers, the CBI attempted to evade sanctions by minimizing the direct involvement of large international banks with both CBI and designated Iranian banks.

48. Bank Melli, which describes itself as "a powerful arm of the government," provides banking and financial services to the IRGC and to Iranian-backed terrorist organizations.

49. Bank Saderat has similarly been used to channel funds to Iranian-backed terrorist organizations.

[19] *Country Reports on Terrorism* at 4, U.S. DEP'T OF STATE, *available at* https://www.state.gov/wpcontent/uploads/2023/11/Country_Reports_on_Terrorism_2022-v3.pdf.

50. The IRGC also generates substantial revenue through its control of companies spanning industries including petroleum, construction, and banking, proceeds from which it has used to fund terrorism.

51. In addition to Iran's own designation as a State Sponsor of Terrorism, the United States has separately designated each of the IRGC, MOIS, Bank Melli, and Bank Saderat for their respective roles in supporting international terrorism.

## II. Origins of the Axis of Resistance

52. Following the 1979 Iranian Revolution, Iran sought to translate its revolutionary ideology into a durable regional strategy by cultivating a network of allied states and proxy militias capable of projecting Iranian influence and waging armed struggle against Israel and the West without exposing Iran to direct retaliation.

53. This network of Iranian-backed state and non-state actors became known as the "Axis of Resistance."

### A. Syria: Iran's Principal State Ally

54. Syria became Iran's first and most important regional state partner in the Axis of Resistance.

55. At the time of the Iranian Revolution and throughout the Relevant Period, Syria was governed by the Ba'ath Party under the Assad regime, which was headed by President Hafez al-Assad until 2000 and thereafter by his son, President Bashar al-Assad.

56. Although the Assad regime was avowedly secular, Syria and Iran forged a strategic alliance based on shared geopolitical interests, including their mutual hostility toward the United States, Israel and Saddam Hussein's regime in Iraq.

57. Following the Iranian Revolution, Syria quickly extended diplomatic support to the newly established Islamic Republic. Iran, in turn, praised Syria's firm opposition to the "enemies" of Islam, including the U.S. and Israel.[20]

58. Iraq's invasion of Iran in 1980 further cemented the alliance. Syria was the only Arab state to support Iran during the Iran-Iraq war, providing political and strategic backing to the Islamic Republic. Their cooperation expanded to intelligence and security operations, including a joint Syrian-Iranian operation that destroyed the Iraqi Embassy in Beirut on December 15, 1981.[21]

59. The Lebanese Civil War still further deepened the Syrian-Iranian partnership. By the early 1980s, Syria had established a substantial military presence in Lebanon, and the conflict increasingly drew in Israel as well. Lebanon thus became the principal arena in which Syria and Iran could advance their shared opposition to Israel, creating the conditions for Iran to organize, train, and support proxy militias with Syrian cooperation.

**B. Founding of Hezbollah**

60. In 1982, following the Israeli invasion of southern Lebanon, a high-level Iranian military delegation led by senior IRGC officials arrived in Syria to discuss how Iran could export its revolution to Lebanon. The commander of the IRGC at the time, Mohsen Razaee, stated that: "The delegation came to Syria in order to study the problem (in Lebanon) and to fulfill the true principles of Jihad for which our people had waited for many years and for teaching the Zionists a lesson."[22]

[20] https://www.ict.org.il/UserFiles/karmon-iran-syria-hizbollah.pdf (pg 19)

[21] https://www.ict.org.il/UserFiles/karmon-iran-syria-hizbollah.pdf (pg 19)

[22] Shapira, Shim'on- Hizballah between Iran and Lebanon

61. Shortly after this meeting, Iran deployed between 1,500 and 5,000 IRGC personnel to Syria, with the purpose of recruiting, training, arming, and ideologically indoctrinating Lebanese Shia militants to fight Israel.

62. Syria provided IRGC personnel with passage through its territory into the Syrian-controlled Bekaa Valley in Lebanon. There, Syria permitted the IRGC to establish bases and training camps for Lebanese Shia youth.

63. This led to the emergence of Hezbollah, a Lebanese Shi'a militia comprised of followers of Khomeini. As explained by Na'im Qasem, one of the founders of Hezbollah: "upon its foundation, Hezbollah saw a possibility for achieving its goals and aspirations through the backing and reinforcement expressed by the Islamic Republic of Iran. This was manifested through the dispatch of the Islamic Revolutionary Guards to Lebanon in the wake of the Israeli invasion with a mission to train and recruit Lebanese youth willing to combat Israel."

64. Syria allowed Hezbollah leaders and operatives to move freely through Syrian-controlled territory, giving Hezbollah a secure environment to recruit and train its first cadres.

65. Hezbollah's terror apparatus, the Islamic Jihad Organization ("IJO"), was created, nurtured, and deployed by the IRGC in order to serve Iran's objectives.

66. Hezbollah pursues these objectives through violent terrorist activity including suicide bombings, assassinations, hostage takings, hijackings, and rocket, mortar, and missile attacks, leading to its SDGT and FTO designations.

67. Throughout the 1980s, Hezbollah committed infamous and deadly terrorist attacks targeting U.S. citizens in Lebanon, including the April 18, 1983, car bomb attack on the U.S. Embassy in Beirut, which killed 63 Americans and injured 120 others; the October 23, 1983, truck bomb attack on the U.S. Marine barracks in Beirut, which killed 241 and injured

128 others; and the September 20, 1984, car bomb attack on the U.S. Embassy annex in Beirut, which killed 24 Americans and injured 90 others.

68. Hezbollah's success as an Iranian proxy demonstrated the effectiveness of Iran's model of cultivating, training, and directing non-state militant organizations to advance Iranian strategic objectives abroad.

**C. Establishment of the Quds Force**

69. Building on Hezbollah's model, Iran established the Quds Force in 1990 as an elite branch of the IRGC responsible for coordinating clandestine operations abroad and managing Iran's growing network of regional proxy organizations.

70. The Quds Force (also referred to as the "IRGC-QF") identifies, establishes, cultivates, and directs ideologically aligned foreign militia organizations to project Iranian influence and advance Iran's objectives against Israel and the West. It provides these organizations with funding, weapons, training, intelligence, and logistical support while relying on local organizations to recruit fighters and conduct operations.

71. The leader of the IRGC-QF reports directly to the Supreme Leader.

72. Although the IRGC-QF coordinated Iran's overseas terrorist operations, it relied heavily on Hezbollah to implement them. Hezbollah possessed years of operational experience in conducting terrorist attacks and confronting modern military forces, and shared the Arabic language background of many of the organizations Iran sought to recruit. Accordingly, the IRGC-QF has long used Hezbollah as its principal partner in developing other Iranian proxies.

73. Through the IRGC-QF and Hezbollah, Iran cultivated a network of ideologically aligned terrorist organizations, including Hamas, PIJ, and later Fatah/AAMB, that operated locally while receiving Iranian funding, training, weapons, and strategic direction.

74. According to the U.S. State Department's 2022 *Country Reports on Terrorism*, "the Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF) and the Ministry of

Intelligence and Security remained Iran's primary actors involved in supporting terrorist recruitment, financing, and plotting across Africa, Asia, Europe, and the Americas."[23]

75. Qassem Soleimani was the commander of IRGC-QF from 1998 until 2020, during which time he served as "key architect" and "chief executor" of Iran's campaign of terrorism, including directing support to Shiite militias responsible for the killing of hundreds of Americans serving in Iraq.[24] As observed by former Secretary of State Mike Pompeo, "[t]here is no terrorist except Usama bin Laden who has more American blood on his hands than did Qassem Suleimani." Soleimani was designated as a SDGT in 2005 by the United States and sanctioned by the United Nations and the European Union for attacks against Americans and others outside of Iran prior to his assassination on January 3, 2020.

76. The current commander of the IRGC-QF, Esmail Qaani, has publicly stated: "We tell everyone, be patient and see the dead bodies of Americans all over the Middle East."[25]

**D. Iran and Syria's Continued Support to Hezbollah**

77. From Hezbollah's inception to the present, it has maintained an uninterrupted agency relationship with Iran, receiving Iranian funding, weapons, training, and tactical and strategic direction.

78. The U.S. State Department's most recent *Country Reports on Terrorism* states that "Hizballah continues to receive most of its funding, training, weapons, and explosives - as well as political, diplomatic, monetary, and organizational aid – from Iran. Iran's annual

---

[23] *Country Reports on Terrorism 2022* at 5, U.S. DEP'T OF STATE, *available at* https://www.state.gov/wpcontent/uploads/2023/11/Country_Reports_on_Terrorism_2022-v3.pdf.

[24] https://s3.documentcloud.org/documents/21012045/redacted-olc-memo-justification-of-soleimani-strike.pdf

[25] https://www.theguardian.com/world/2020/jan/03/iran-vows-revenge-for-us-trump-killing-of-top-general-qassem-suleimani

financial backing to Hizballah, estimated to be hundreds of millions of dollars, accounts for the overwhelming majority of the group's budget."[26]

79. According to expert testimony relied upon by this Court in a related case, it is estimated that Iran provides Hezbollah with as much as $700 million–$1 billion per year, in the form of cash, training, intelligence, and weapons.[27]

80. During the 1990s until at least 2008, the IRGC's activities in Lebanon and Iran's military assistance to Hezbollah were financed via a Bank Melli branch in Baalbek.[28]

81. According to a U.S. Treasury Department press release from 2007, Bank Melli was used to send at least $100 million to the Quds Force from 2002 to 2006.[29]

82. Bank Melli also facilitated Iran's terrorist operations beyond the Middle East. For example, the bank transferred $150,812 to Iranian official Mohsen Rabbani to finance the 1994 bombing of the Argentine Israelite Mutual Association, Argentina's central Jewish community center, an attack orchestrated by Iran through Hezbollah that killed 85 people.[30]

83. Bank Saderat has also facilitated transfers to Hezbollah, including $50 million from the Central Bank of Iran to Bank Saderat's branch in Beirut for the benefit of Hezbollah fronts in Lebanon between 2001 and 2006.[31]

---

[26] *Country Reports on Terrorism 2024*, U.S. DEP'T OF STATE, *available at* https://www.state.gov/reports/country-reports-on-terrorism-2024/

[27] *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 60 (D.D.C. 2018) (quoting expert testimony of Dr. Matthew Levitt).

[28] Jerusalem Center for Public Affairs: *The Nexus Between Iranian National Banks and International Terrorism Financing,* Shimon Shapira, Vol. 7, No. 31, 14 February 2008; Matthew Levitt, *Iranian and Hezbollah Operations in South America: Then and Now,* PRISM 5, No. 4, pg 122.

[29] U.S. Department of the Treasury, Press Release, "Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism," October 25, 2007, https://www.treasury.gov/press-center/press-releases/Pages/hp644.aspx

[30] See "Report: Requests for Arrests, District Attorney's Unit in Charge of the Investigation of the AMIA Attack, Pursuant to the Decree Issued 8 February 2005 by Judge Rodolfo Canicoba Corral," Buenos Aires, Argentina.

[31] U.S. Department of the Treasury, Press Release, *Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism* (Oct. 25, 2007), https://www.treasury.gov/press-center/press-releases/pages/hp644.aspx; *see also* Treasury and State Department Iran Designations Identifier

84. During this time, Syria continued to facilitate the passage of Iranian weapons, funds, and personnel to Hezbollah and other terrorist organizations operating in Lebanon. This took place with the knowledge, encouragement, and aid of the Syrian Military Intelligence, Syrian Armed Forces, and the Syrian Ministry of Defense.

85. Syria also permitted Iran to use military and civilian airfields in Syria. Civilian and military flights from Iran flew to Damascus International Airport delivering weapons on civilian transport to the Lebanese border, where they were handed over to Hezbollah and later dispersed throughout Lebanon, including to Hamas.

86. In 2000, after the death of Syrian President Hafez al-Assad, his son, Bashar al-Assad, upgraded relations with Hezbollah and began providing Syrian weapons directly to the terrorist organization, removing controls that had been imposed by his father.

87. Between 2000 to 2005, when Israel was preoccupied with the Al-Aqsa Intifada ("Second Intifada"), a Palestinian uprising marked by widespread suicide bombings, shootings, and other murderous attacks against Israeli civilians and military personnel,[32] Hezbollah significantly expanded its arsenal, acquiring large quantities of Iranian rockets and anti-tank missiles.

88. On July 12, 2006, Hezbollah launched a coordinated assault consisting of a missile barrage into northern Israel and a cross-border ambush that resulted in the deaths of three Israeli soldiers and abduction of two others, sparking the Second Lebanon War.

89. Over the next thirty-four days, intense fighting took place between Israel and Hezbollah. Hezbollah deployed the Iranian rockets and anti-tank missiles it had acquired during

---

Information (Oct. 25, 2007), https://www.treasury.gov/press-center/press-releases/Documents/hp644report.pdf; U.S. Department of the Treasury, *Treasury Cuts Iran's Bank Saderat Off From U.S. Financial System* (Sept. 8, 2006), https://www.treasury.gov/press-center/press-releases/Pages/hp87.aspx.

[32] The Arabic word "intifada" means "shaking off." In political contexts, the Intifadas refer to two widespread violent campaigns orchestrated by Palestinian armed groups: the First Intifada from 1987 until 1993, which killed 160 and injured over 3,100 others, and the Second Intifada (also called the Intifada Al Aqsa) from 2000 until 2005, which killed 1,053 Israelis and citizens of other countries, and injured over 5,600 others.

the Second Intifada, along with other weapons that were supplied by Iran and transported largely through Syrian-controlled territory in Syria and Lebanon.

90. Iran's Beirut-based Chief of Staff armed forces Major General Mohammad Bagheri confirmed in an interview that Hezbollah had employed Iranian-made missiles manufactured in Aleppo, Syria during this war.

91. On July 22, 2006, then-President George W. Bush stated in his weekly Saturday radio address that "For many years, Syria has been a primary sponsor of Hezbollah and it has helped provide Hezbollah with shipments of Iranian-made weapons."

92. Years later, during a 2014 interview with senior editors from the pro-Hezbollah Lebanese daily *Al Akhbar*, Hassan Nasrallah, Hezbollah's then-Secretary-General, praised Damascus for continuing to supply weapons during the 2006 war.

93. According to U.S. intelligence estimates, following the 2007 arrest of Hezbollah's senior operative in Iraq, the IRGC-QF provided Hezbollah and one of its local trainers up to $3 million in U.S. currency every month.

94. Following the Second Lebanon War, Iran established the Iranian Committee for the Reconstruction of Lebanon, which served as a channel for financial, material, and technical assistance to Hezbollah. Syria and Iran helped replenish Hezbollah's military capabilities. Iranian weapons continued to flow through Syrian territory in Lebanon despite U.N. Security Council Resolution 1701 ordering Hezbollah's disarmament and Israeli interdiction efforts.

95. The U.S. Treasury Department estimated that Iran moves between $100-200 million per year to Hezbollah through its Quds Force, much of which was used for Hezbollah's re-armament following the war.[33]

[33] U.S. Department of the Treasury, Press Release, "Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism," October 25, 2007, https://www.treasury.gov/press-center/press-releases/Pages/hp644.aspx

96. Hezbollah maintained strong ties to Syria in the decades that followed. In 2011, when the Syrian civil war began, Hezbollah provided advisory and logistical support to the Assad regime and other pro-Assad forces fighting against Sunnis, including by helping to facilitate training by the IRGC-QF.

97. On August 10, 2012, the United States sanctioned Hezbollah under E.O. 13582— an Executive Order specifically related to the Syrian civil war—for "providing training, advice and extensive logistical support to the Government of Syria's increasingly ruthless efforts to fight against the opposition." The press release also stated that Hezbollah "coordinated its support to the Government of Syria with the IRGC-QF…which serves as a conduit for Iran's material support to the Syrian General Intelligence Directorate."

98. In early 2013, Hezbollah's participation in the Syrian civil war intensified. In April 2013, Hassan Nasrallah made two trips to Tehran where he met with Soleimani, then head of the IRGC-QF, Ayatollah Khamenei, and other senior Iranian officials, who pressed Nasrallah to deepen Hezbollah's participation in Syria.

99. That same month, Hezbollah led a ground assault in coordination with the Syrian Army to recapture part of the Syrian city of Al-Qusayr.

100. By 2014, Hezbollah was deployed across Syria and opened training camps there, taking an active role in preventing Al-Nusra Front and Islamic State penetration into Lebanon.

101. Until Hezbollah partially withdrew from Syria in 2019, Hezbollah forces continued to fight directly on behalf of pro-Assad forces, including in Homs, Aleppo, and Damascus—in addition to continuing to provide training, advice, and logistical support and facilitating the IRGC-QF's role.

102. Through decades of Iranian funding, training, and strategic direction — and sustained Syrian logistical and military support — Hezbollah became the most capable and

battle-tested member of the Axis of Resistance and the principal operational arm through which Iran has projected power across the region.

103. This Court has repeatedly held Iran, as well as the IRGC and MOIS, liable for damages arising from Hezbollah attacks in Israel and Lebanon.[34]

104. Furthermore, this Court has specifically held Iran and Syria liable for damages arising from Hezbollah attacks during the Second Lebanon War.[35]

## III. Expansion of the Axis of Resistance to Palestinian Terrorist Organizations

105. Having established and sustained Hezbollah into its principal proxy, Iran — primarily through the IRGC — extended this same model to Palestinian terrorist organizations. Iran sought to encircle Israel with what the IRGC has termed a "Ring of Fire," composed of armed proxy organizations arrayed along Israel's borders to coordinate attacks against Israel and advance Iran's objective of destroying the Jewish state.

106. Although the destruction of Israel had been an official policy of the Islamic Republic since its founding, Iran initially devoted relatively little attention to the Palestinian arena. In the first decade following the Revolution, Iran focused primarily on expanding its influence in Lebanon and fighting the Iran-Iraq War.

107. Nevertheless, the Supreme Leader Khomeini consistently called for Israel's destruction. On August 9, 1979, Khomeini called on Muslims and governments worldwide to declare the last Friday of Ramadan as "Quds (Jerusalem) Day" in order to reflect their desire

[34] See, e.g., *Brewer v. Islamic Rep. of Iran*, 664 F. Supp. 2d 43 (D.D.C. 2009); *Peterson v. Islamic Republic of Iran*, 264 F. Supp. 2d 46 (D.D.C. 2003); *Kaplan v. Central Bank of the Islamic Republic of Iran*, 55 F. Supp. 3d 189 (D.D.C. 2014).

[35] See *Kaplan v. Central Bank of the Islamic Republic of Iran*, 55 F. Supp. 3d 189 (D.D.C. 2014); *Lelchook v. Syrian Arab Republic,* No. 16-01550 (RC/RMM), 2019 U.S. Dist. LEXIS 88658 (D.D.C. Jan. 31, 2019).

to destroy Israel.[36] And on May 20, 1980, Khomenei called Israel a "cancerous tumor" and warned that the only option is to annihilate it and establish Palestine in its place.[37]

108. On June 16, 1982, Khomeini encouraged Palestinian leaders to stop seeking diplomatic solutions to the conflict with Israel and turn their efforts to armed conflict until Israel is destroyed: "I advise the Palestinian leaders to stop your [diplomatic] visits, rely on God, the Palestinian nation, and your weapons, and fight Israel until its death."[38]

109. The conclusion of the Iran-Iraq War in 1988, together with the outbreak of the First Intifada, created an opportunity for Iran to redirect attention and resources toward the Palestinian arena.

110. Beginning in the late 1980s and early 1990s, Iran expanded its strategy of cultivating proxy organizations by providing Palestinian terrorist groups carrying out attacks against Israeli civilians with funding, weapons, training, and logistical support through the IRGC and Hezbollah.

111. As it had done in Lebanon, Iran relied on Syria to facilitate this support by providing a safe haven, logistical assistance, and a secure geographic corridor through which Iranian personnel, weapons, and other resources could reach Palestinian terrorist organizations operating throughout the Levant.

112. Iran also institutionalized its support for the Palestinian cause. On May 9, 1990, the Iranian parliament enacted the "Law for the Support of the Islamic Revolution of the Palestinian People," directing Iranian organizations to provide material and spiritual assistance to the families of Palestinian "martyrs," prisoners, and others engaged in the struggle to "liberate Palestine."[39] The law further established a coordinating committee composed of

---

[36] http://emam.com/posts/view/1850

[37] http://www.ghadeer.org/Book/1213/182823

[38] Farsi.rouhollah.ir/library/sahifeh?volume=16&page=382

[39] http://rc.majlis.ir/fa/law/show/91785?keyword=فلسطين

representatives from MOIS, the IRGC, the Iranian Martyr Foundation, and other government ministries to organize and implement Iranian support for Palestinians.

113. In October 1991, the Madrid Peace Conference marked the beginning of a political shift toward peace negotiations between Israel and Palestinian representatives.

114. Iran rejected the negotiations as fundamentally incompatible with its objective of eliminating Israel. On October 19, 1991, days before the conference opened, Iran hosted the International Conference for the Support of the Islamic Revolution of the People of Palestine, bringing together Palestinian terrorist groups opposed to negotiations with Israel, including Hamas and PIJ. The conference declared Israel an "illegitimate and artificial entity," called for its destruction, and reaffirmed support for armed struggle to establish a Palestinian state encompassing all of Israel.

115. During the early 1990s, as negotiations between Israel and the Palestinians gained momentum, Iran and Syria increasingly supported Palestinian terrorist organizations committed to armed struggle rather than peace negotiations.

116. On September 13, 1993, Israel and the Palestine Liberation Organization ("PLO") signed the Declaration of Principles on Interim Self-Government Arrangements, commonly known as the Oslo Accords. Iran and Syria viewed the Accords as a threat to their objective of eliminating Israel, and sought to undermine the peace process by strengthening their political, financial, and logistical support for Palestinian organizations opposed to the peace process.

117. As part of this effort, Syria permitted Palestinian terrorist organizations to establish operational headquarters, training camps, and logistical bases on Syrian territory while facilitating the movement of Iranian weapons, funds, and personnel to those organizations.

118. Iran and Syria viewed the Second Intifada as an opportunity to intensify armed resistance against Israel and derail any remaining prospects for peace negotiations. Accordingly, both governments increased their support to Palestinian terrorist groups engaged in attacks against Israelis, including Hamas, PIJ, and Fatah/AAMB, using the IRGC, Hezbollah, and Syria to coordinate funding, training, weapons transfers, and strategic guidance.

119. Supreme Leader Ayatollah Khamenei publicly encouraged the escalation of terrorist attacks. On October 4, 2000, Khamenei declared:

> I salute the entire Palestinian nation - particularly those who engage in jihad and follow the path of Intifada. I would like to tell you that your movement will receive increasing support from Muslims and revolutionaries. And by Allah's favor, you will eventually overwhelm the occupiers. ***The Islamic Republic of Iran will proudly continue to support this holy movement*** and the most pious people of Iran will continue to pray for your success. 'If you help (the cause of) Allah, He will help you and make your foothold firm [The Holy Quran, 47:7].'[40]

120. Two weeks later, Khamenei announced on Iranian television:

> "We regard Palestinians as an organ of our body, and the support of the Palestinian nation is pride for the Iranian people…The Palestinian people must continue the blessed Jihad and its standing against the enemies of Islam…The Hamas, Islamic Jihad and Fatah forces must continue the struggle in a united way…But, indeed, the only solution [to the crisis in the region] is the elimination of the root of the crisis, which is the Zionist regime imposed on the region."

121. From 2001 through the end of the Second Intifada, Iran hosted annual meetings under the banner of "The International Conference for the Support of the Second Intifada" with senior representatives from Hamas, PIJ, Fatah/AAMB, and other Palestinian Terrorist groups. Iran coordinated the terrorist activities of these organizations and urged the continuation and escalation of attacks against Israel.

---

[40] *Palestine; Selected Statements by Ayatollah Khamenei about Palestine* 102 (Islamic Revolution Publishers) (2012).

122. The following month, Syria established the Popular Arab Syrian Committee for Supporting the Intifada and Resisting the Zionist Plan to collect financial donations in support of the Palestinian uprising.

123. Throughout the Second Intifada, Iran and Syria funneled millions of dollars, weapons, training, and other material support to Palestinian terrorist organizations responsible for attacks against Israeli civilians.

124. In 2007, the U.S. Treasury designated the Iran-based Martyrs Foundation, including its U.S. branch, and described it as "an Iranian parastatal organization that channels financial support from Iran to several terrorist organizations in the Levant…To this end, the Martyrs Foundation established branches in Lebanon…"[41]

125. Following the conclusion of the Second Intifada, Iran and Syria continued to provide political, financial, military, and logistical support to Hamas, PIJ, and other Palestinian terrorist organizations committed to the destruction of Israel.

126. Iranian officials continued to publicly reject any negotiated settlement with Israel and repeatedly called upon Palestinian terrorist organizations to continue armed attacks. On September 9, 2015, Khamenei urged Palestinians to resume terror attacks and reject any accommodation with Israel, stating that "in 25 years, Israel would no longer exist." He expressed his readiness to back terror attacks against Israel until its expected destruction by declaring that "during this period, the fighting Jihadi Islamic spirit will not give the Zionists even a single moment of quiet."[42]

---

[41] U.S. Department of the Treasury, Press Release, "Twin Treasury Actions Take Aim at Hizballah's Support Network," July 24, 2007, https://www.treasury.gov/press-center/press-releases/Pages/hp503.aspx

[42] Middle East Media Research Institute, Iranian Supreme Leader Khamenei: "*In 25 Years, There Will Be No Such Thing as the Zionist Regime*" (Sept. 9, 2015), *available at* https://www.memri.org/tv/iranian-supreme-leader- khamenei-25-years-there-will-be-no-such-thing-zionist-regime/

127. Throughout this period, the United States continued to identify Iran as the leading state sponsor of terrorism, reporting that Iran provided funding, weapons, training, and other material support to Palestinian terrorist organizations through the IRGC-QF while continuing to view armed Palestinian groups as central components of its regional strategy.

128. Iran extended this support first, and most extensively, to the PIJ, its earliest and most ideologically aligned Palestinian proxy.

**A. Palestinian Islamic Jihad (PIJ)**

129. PIJ was founded in 1981 by Fathi Shiqaqi and Abd al-Aziz Awda (also known as Sheikh Obdeh), two Gazan activists who were deeply influenced by the 1979 Iranian Revolution and the ideology of Ayatollah Khomeini.

130. Seeking to replicate Khomeini's revolutionary model, Shiqaqi and Awda established PIJ as a militant Islamist alternative to both Fatah's secular Palestinian nationalism and the Muslim Brotherhood's gradual approach to Islamic reform. From its inception, PIJ rejected negotiations with Israel and embraced armed jihad as the sole means of achieving its objectives.

131. PIJ seeks "the establishment of an Islamist Palestinian state and the destruction of the state of Israel. The Islamic Jihad believes Palestinian liberation and the seizure of Jerusalem for the Islamic world would serve as a catalyst for a wider Islamic revolution across the Arab and Muslim world."[43]

132. Consistent with these objectives, PIJ has carried out numerous terrorist attacks targeting Israeli civilians, including suicide bombings, mass shootings, and other murderous acts.

[43] "Palestinian Islamic Jihad (Islamic Jihad)," attachment to "Palestinian Islamic Jihad Listed as a Terrorist Organization," Office of the Australian Attorney General, Media Release 055/2004, May 3, 2004.

133. The United States designated PIJ as an SDT in 1995 under E.O. 12947; an FTO in 1997 under 8 U.S.C. § 1189; and an SDGT in 2001 under E.O. 13224.

Iran Provided Material Support to PIJ

134. Iran has provided material support to the PIJ since the late 1980s.

135. After the start of First Intifada in December 1987, PIJ openly and loudly proclaimed the need for terrorist attacks on Israeli civilians. Consequently, the Israeli government expelled Shiqaqi and Awda to Lebanon in 1988, where they formed close relationships with Hezbollah and held press conferences with Iranian officials.

136. Since 1988, scores of PIJ operatives from the Palestinian Territories have received Iranian military training at bases run by the IRGC in Lebanon and in Iran itself. Iran has provided PIJ with explosives and weapons, as well as the training required to use them.

137. By 1990, PIJ established its external headquarters in Damascus. From its Syrian headquarters, PIJ maintained regular, direct coordination with Iranian officials and the IRGC.[44]

138. In Lebanon, PIJ operatives trained alongside Hezbollah under the supervision of the IRGC-QF and carried out joint operations with Hezbollah against Israeli forces in south Lebanon during the 1990s.

139. Khomeini directly met with Shiqaqi on multiple occasions. In one meeting, he provided Shiqaqi with religious permission to conduct suicide attacks, despite suicide generally being forbidden in Islam.[45] In another meeting, he gave Shiqaqi permission to kill Jewish civilians in Israel, stating that: "Jews in Palestine, armed or not, are all considered robbers and enemies."[46]

---

[4444] https://www.washingtoninstitute.org/policy-analysis/sponsoring-terrorism-syria-and-islamic-jihad

[45] http://www.rajanews.com/news/462

[46] http://emam.com/posts/view/4747

140. In 1993, Shiqaqi acknowledged that he received Iranian funding and channeled it to operatives in Gaza and the West Bank. "Iran gives us money and supports us," he said in an interview with *Newsday,* "then we supply the money and arms to the occupied territories and support the families of our people. Just about all of it goes there because that's where most of our organization is."[47]

141. By 1996, Iran's support for PIJ was at least several million dollars per year, if not more, and increased in the years since, despite the organization's relatively small size.

142. In the late 1990s, following Shiqaqi's assassination, PIJ had become almost obsolete. This changed after the outbreak of the Second Intifada in September 2000, when PIJ experienced a resurgence coinciding with a substantial increase in Iranian aid.

143. According to U.S. officials, Iran began paying PIJ millions of dollars in cash bonuses for each attack against Israel.

144. Bank Melli was a principal Iranian financial pipeline for PIJ during the Second Intifada, transferring most of Iran's financial aid to the PIJ through Bank Melli branches in Damascus and Amman.[48]

145. During the Second Intifada, meetings between Iranian high-ranking officials and PIJ leaders were held in Iran and in Damascus on a regular basis. In June 2002, PIJ leader Ramadan Abdullah Shallah met with Ayatollah Khamenei, who reportedly pledged to increase funds by 70 percent in order to finance recruitment of young Palestinians for suicide bombings. "The Palestinian Islamic Jihad is another fruit of the Ayatollah Khomeini's fructuous tree," Shallah reportedly said during his visit to Tehran.

---

[47] "Terrorism Inc.: Islamic Jihad Founder Admits Funding by Iran," NEWSDAY, Apr. 11, 1993.

[48] Jerusalem Center for Public Affairs: *The Nexus Between Iranian National Banks and International Terrorism Financing,* Shimon Shapira, Vol. 7, No. 31, 14 February 2008.

146. From November 4, 2001 through October 2003, PIJ carried out more than 440 terrorist attacks, including suicide bombings, killing over 130 people and wounding more than 880.

147. Iranian support to PIJ continued after the Second Intifada. In 2012, Iran supplied PIJ with Fajr-5 rockets, delivered to Gaza via Egypt. PIJ's deputy chairman publicly thanked Iran for the shipment, and PIJ spokesmen later confirmed that Iran supplied the "large majority" of weapons and financing reaching Gaza militants, including PIJ.[49]

148. Iran continued to host PIJ's leadership and publicly affirm its support. In 2013, PIJ relocated its headquarters from Damascus to Tehran due to the Syrian civil war. In February 2014, a PIJ delegation met with Iranian President Hassan Rouhani and other Iranian leaders, during which the PIJ credited Iran as "Iran has always been the main supporter of the Palestinian nation's cause and goals."[50]

149. PIJ continued launching rocket attacks against Israel with Iranian-supplied weapons throughout the early 2020s, including attacks in February 2020, May 2021, and August 2022. Following the May 2021 attacks, a PIJ official publicly credited Iran, stating that PIJ militants were "trained by the IRGC" and that "Iranian money was used to buy weapons for the armed factions in Gaza and Lebanon."[51]

---

[49] Asmaa al-Ghoul, *Palestinian Islamic Jihad: Iran Supplies All Weapons in Gaza*, AL-MONITOR, May 14, 2013, *available at* http://www.almonitor.com/pulse/originals/2013/05/gaza-islamic-jihad-and-iranian-arms.html.

[50] Adam Kredo, Iran Hosts Palestinian Islamic Jihad Leaders, FREE BEACON, Feb. 5, 2014, available at http://freebeacon.com/national-security/iran-hosts-palestinian-islamic-jihad-leaders/.

[51] Middle East Media Research Institute, Hamas, Islamic Jihad Officials: Iran Provides Our Missiles, Weapons, Funds, And Food, Our Gunmen "Were Trained By Our Brothers In The IRGC"; Without Iran's Assistance, We Wouldn't Be Able To Fire Rockets At Tel Aviv; Qassem Soleimani Personally Oversaw Transfer Of Rockets To Gaza (May 12, 2021), available at https://www.memri.org/reports/hamas-islamic-jihad-officials-iran-provides-our-missiles-weapons-funds-and-food-our-gunmen.

150. During Israel's May 2023 Operation Shield and Arrow, Iranian officials publicly coordinated with and encouraged PIJ, and reportedly promised additional financial rewards tied to continued attacks in Israel.

151. This Court has repeatedly held Iran, as well as MOIS and IRGC, liable for damages arising from PIJ attacks in Israel and the Palestinian Territories.[52]

Syria Provided Material Support to PIJ

152. Beginning in 1990, Syria permitted PIJ to establish its external headquarters in Damascus, which became the organization's principal command-and-control center outside the Palestinian Territories. PIJ's senior leadership resided in Damascus and directed the organization's external operations from Syrian territory. Throughout the 1990s and the Second Intifada, PIJ's terrorist attacks against Israelis were routinely planned, directed, and financed through this headquarters.[53]

153. Syria also provided PIJ operatives with training camps. From the late 1990s through the mid-2000s, PIJ operatives from the West Bank and Gaza routinely traveled to Syria and the Syrian-controlled Bekaa Valley for training with the knowledge and facilitation of Syrian authorities, who used pre-approved lists provided by PIJ and Syrian intelligence to escort trainees to the camps.[54] There, PIJ operatives received instruction from IRGC-funded trainers in small arms, improvised explosives, and explosive-charge assembly.[55]

---

[52] See, e.g., *Flatow v. Islamic Republic of Iran,* 999 F. Supp. 1 (D.D.C. 1999); *Wultz v. Islamic Republic of Iran,* No. 1:2008cv01460 (D.D.C. 2012); *Przewozman v. Islamic Republic of Iran*, 754 F. Supp. 3d 1 (D.D.C. 2024); *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8 (D.D.C. 2009*); Force v. Islamic Republic of Iran,* 464 F. Supp. 3d 323 (D.D.C. 2020); *Ben-Yishai v. Syrian Arab Republic*, 642 F. Supp. 3d 110 (D.D.C. 2022).
[53] See Terror from Damascus: The Palestinian Terrorist Presence in Syria (Part I), May 7, 2003 https://www.washingtoninstitute.org/policy-analysis/terror-damascus-part-i-palestinian-terrorist-presence-syria; Sponsoring Terrorism_Syria and Islamic Jihad-Levitt-Nov-Dec 2003

[54] https://www.washingtoninstitute.org/policy-analysis/palestinian-islamic-jihad-getting-little-help-its-friends; https://www.hrw.org/reports/2002/isrl-pa/ISRAELPA1002-06.htm

[55] https://www.gov.il/en/pages/iran-and-syria-as-strategic-support-for-palestinian-terrorism

154. Since at least 1998, Syria was providing financial support to PIJ and serving as a conduit through which funds were transferred from Damascus to PIJ operatives in the Palestinian Territories.[56]

155. A May 1, 2000 memorandum from the Palestinian Authority Preventative Security office in Bethlehem reported that PIJ funding in the Bethlehem area originated from Damascus and was transferred monthly.[57]

156. During the Second Intifada, large sums of money were similarly transferred from Syria to PIJ cells in the West Bank. These funds were used to finance suicide bombings as well as payments to the families of deceased and imprisoned PIJ terrorists.[58]

157. Despite repeated U.S. demands that Syria expel PIJ leader Fathi Shiqaqi from Damascus, President Hafez al-Assad refused to do so.[59]

158. After succeeding his father in June 2000, President Bashar al-Assad further strengthened Syria's relationship with PIJ, expanding the organization's freedom to operate on Syrian territory.

159. In 2002, Syria reportedly offered PIJ aid in exchange for increased terrorist attacks in Israel.

160. In April 2003, following pressure from the U.S. and Israel, Syrian President Bashar al-Assad pledged to close down the offices and restrict the communications of PIJ in Syria. The promise was never fulfilled.

161. In 2009, the U.S. State Department found that the Syrian government made no effort to restrict the movement or operations of PIJ leaders or members within its territory,

---

[56] https://www.hrw.org/reports/2002/isrl-pa/ISRAELPA1002-06.htm

[57] https://www.hrw.org/reports/2002/isrl-pa/ISRAELPA1002-06.htm

[58] https://www.gov.il/en/pages/iran-and-syria-as-strategic-support-for-palestinian-terrorism

[59] https://www.washingtoninstitute.org/policy-analysis/sponsoring-terrorism-syria-and-islamic-jihad

reporting that "Syria allows terrorist groups resident in its territory to receive and ship goods, including weapons, in and out of the country."[60]

162. As mentioned above, PIJ maintained its external headquarters in Damascus until 2013, when the Syrian civil war forced the organization to relocate its principal leadership to Tehran. PIJ nonetheless continued to maintain a presence in Damascus, coordinated closely with Hezbollah and Iran from Syrian territory, and supported the Assad regime during the conflict.

163. In August 2015, PIJ operatives still operating from Syria launched rockets into northern Israel.

164. PIJ's own leadership has publicly credited Syria as an indispensable partner in this arms pipeline. In a December 2020 interview, PIJ Secretary-General Ziad al-Nakhalah stated that PIJ had possessed Kornet anti-tank missiles since 2012, adding that "[a]ll the conventional weapons reached [Gaza] via...Hezbollah, and Syria, and the entire [resistance] axis played a part in transporting them..."[61]

165. This Court has repeatedly held Syria liable for damages arising from PIJ attacks in Israel and the Palestinian Territories.[62]

**B. Hamas**

166. Hamas was founded in the Gaza Strip in December 1987 by Sheikh Ahmed Yassin and six others as an outgrowth of the Muslim Brotherhood. From its founding, Hamas has declared its goals to be the global expansion of Islam through violent jihad, the elimination of Israel, and the establishment of an Islamist state encompassing present-day Israel, the Gaza Strip, and the West Bank.

---

[60] https://2009-2017.state.gov/j/ct/rls/crt/2009/index.htm

[61] https://www.memri.org/reports/hamas-islamic-jihad-officials-iran-provides-our-missiles-weapons-funds-and-food-our-gunmen#_edn8

[62] See, e.g., *Wultz v. Islamic Republic of Iran,* No. 1:2008cv01460 (D.D.C. 2012); *Force v. Islamic Republic of Iran*, 464 F. Supp. 3d 323 (D.D.C. 2020); *Ben-Yishai v. Syrian Arab Republic*, 642 F. Supp. 3d 110 (D.D.C. 2022).

167. Hamas's original 1988 charter declares that "[t]here is no solution to the Palestinian problem except by Jihad" and openly calls for the annihilation of Jews in the land.

168. Hamas's founders and early leadership publicly echoed this genocidal claim: in October 1988, Sheikh Yassin's aide, Khalil al-Quqa, told the Kuwaiti newspaper *al-Anbaa* that "Allah gathered the Jews in Palestine not for them to have a homeland, but with the intent that it will become their mass grave." Nearly a decade later, Yassin himself reaffirmed that, "Hamas's goal is to establish an Islamic state on the ruins of Israel."

169. Hamas's military wing, the Izz ad-Din al-Qassam Brigades ("al-Qassam Brigades") was formed in the early 1990s and has since carried out the organization's terrorist attacks throughout Israel, the West Bank, and the Gaza Strip. The Qassam Brigades operate under and answer to Hamas's political leadership.

170. Hamas has publicly and repeatedly embraced violence against civilians as central to its strategy, both to terrorize the Israeli population and to influence government policy in Israel and the United States. Since its founding, Hamas has carried out bombings, suicide attacks, rocket and mortar attacks, shootings, stabbings, and vehicular attacks against Israeli civilians and, on occasion, U.S. nationals.

171. Because of this record, the U.S. designated Hamas as an SDT in 1995, under E.O. 12947; an FTO in 1997, under 8 U.S.C. § 1189; and an SDGT in 2001, under E.O. 13224.

172. In 2006, Hamas won a parliamentary majority in Palestinian Authority ("PA") elections, and in 2007 it seized full control of the Gaza Strip in a violent coup, expelling Palestinian Authority ("PA") security forces from the territory. Since that takeover, Hamas has maintained absolute political and military control over Gaza.

173. Hamas has used its control of Gaza both to entrench its terrorist infrastructure and to indoctrinate and recruit the next generation of operatives. It has directed the mosques, schools, orphanages, medical clinics, sports leagues, and summer camps under its authority

toward radicalizing and recruiting young Palestinians and inciting violence against Israelis and Jews. Hamas has likewise exploited civilian institutions and infrastructure for military purposes, using residential areas, schools, and medical facilities to store weapons, shield combatants, and launch attacks against Israel.

174. Since seizing control of Gaza, Hamas has fired tens of thousands of rockets and mortars at Israeli civilian population centers, killing and wounding scores of civilians, including U.S. citizens.

175. Hamas's campaign of violence against Israeli civilians culminated on October 7, 2023, when Hamas launched a coordinated assault into southern Israel, killing approximately 1,200 people and taking more than 250 hostages in a single day.

Iran Provided Material Support to Hamas

176. Iran began expanding its support to Hamas in the early 1990s. Hamas's prominent role in suicide bombings against Israelis during the First Intifada drew the attention of Iranian officials, who viewed Hamas as a force capable of undermining the Arab-Israeli peace negotiations and advancing Iran's campaign against Israel and Western influence in the region.

177. By October 1990, Hamas had established an official representative in Tehran.

178. Hamas played an active role in establishing Iran's International Conference for the Support of the Islamic Revolution of the People of Palestine in October 1991.

179. In February 1992, Hamas opened a permanent office in Tehran. Hamas's representative in Tehran, Imad al-Alami, described Iran as Hamas's strategic ally.

180. Later that year, in October 1992, senior Hamas leaders met with Supreme Leader Ayatollah Khamenei and the commander of the IRGC. During these meetings, Iran and Hamas agreed to oppose the Arab-Israeli peace negotiations, and Iran agreed to provide Hamas

with approximately $30 million in annual financial support, as well as train approximately 3,000 Hamas members would train in Iran and at Hezbollah camps in Lebanon.[63]

181. Two months later, in December 1992, Israel deported hundreds of Hamas operatives to southern Lebanon, where they received military training from Hezbollah and the IRGC, further strengthening the operational relationship between Hamas and Iran.

182. In addition to the Lebanon-based training camps, the IRGC trained Hamas operatives directly in Iran. For example, Hamas commander Hasan Abdul Rahman Hasan Salamah received approximately three months of military training from Iranian instructors at an IRGC facility near Tehran before returning to the Palestinian Territories to orchestrate the 1996 suicide bombing campaign that killed more than fifty Israelis.

183. Throughout the early and mid-1990s, the U.S. State Department consistently reported that Iran was providing Hamas and other Palestinian groups with funding, training, weapons, and military training.

184. In May 1998, Hamas's founder Sheikh Yassin traveled to Iran and met with Khamenei, who reaffirmed Iran's commitment to supporting Hamas and rejected any political pressure to halt it.[64]

185. Iran's commitment to Hamas was formalized at the highest levels. A document seized by the U.S. Army from the Iraqi embassy in Amman, dated August 1, 1998, records that Iranian officials agreed to provide Hamas with $15 million per month, train Hamas operatives to conduct terrorist operations and assassinations, supply commando teams for overseas operations, and establish a front organization known as "Hezbollah-Felastin" to shield Hamas from responsibility for its most sensitive operations.

---

[63] Al Wasat, *Has Hamas Become the Military Branch of Iran and the Gate Through Which the Iranian Revolution Tries to Enter the West Bank, Gaza and the Palestinian Arena in General?* Pg 199

[64] https://farsi.khamenei.ir/news-content?id=11421

186. By the end of the 1990s, Iran was financial rewarding Hamas for carrying out terrorist attacks. Documents seized by the PA during raids of Hamas al-Qassam Brigade facilities in February 1999 showed that Iran had transferred approximately $35 million to Hamas in connection with terrorist attacks.

187. Iran's material support for Hamas continued and expanded during the Second Intifada. According to a February 2004 report by the Congressional Research Service, Iranian assistance accounted for approximately ten percent of Hamas's annual operating budget during this period.[65]

188. Hamas, in turn, carried out a sustained campaign of terrorist attacks against Israelis. Between September 2000 and March 2004, Hamas was responsible for 425 terrorist attacks, including 52 suicide bombings, which killed 377 people and wounded more than 2,000 others.[66]

189. Iran financed Hamas through its state-controlled banking system. Bank Melli served as the principal Iranian financial pipeline for Hamas, transferring most of Iran's funding through its branches in Damascus and Amman.[67]

190. Iran's support for Hamas continued well after the Second Intifada came to an end. Following Hamas's electoral victory in Gaza, Hamas Prime Minister Ismail Haniyeh traveled to Tehran in December 2006 to meet with Khamenei and President Mahmoud Ahmadinejad. During this visit, Iran reportedly pledged to provide Hamas with $250 million.[68]

---

[65] Congressional Research Service, *Foreign Terrorist Organizations* at 28-29 (Feb. 6, 2004), *available at* https://fas.org/irp/crs/RL32223.pdf.

[66] Matthew Levitt, *HAMAS: Politics, Charity, and Terrorism in the Service of Jihad* (2006).

[67] Jerusalem Center for Public Affairs: *The Nexus Between Iranian National Banks and International Terrorism Financing,* Shimon Shapira, Vol. 7, No. 31, 14 February 2008.

[68] Jonathan Schanzer Vice President for Research Foundation for Defense of Democracies Hearing before the House Committee on Foreign Affairs Subcommittee on the Middle East and North Africa Subcommittee on Terrorism, Nonproliferation, and Trade, "Hamas's Benefactors: A Network of Terror", September 9, 2014, p. 10, http://docs.house.gov/meetings/FA/FA13/20140909/102629/HHRG-113-FA13-Wstate-SchanzerJ-20140909.pdf

191. After Hamas's violently seized control of the Gaza Strip in 2007, Iran further increased its support, including by supplying more sophisticated rocket systems and additional financial assistance. Hamas Political Bureau Chief Khaled Mashal publicly credited Iran's role, stating that "the victory of the people of Gaza was a miracle of God, and the Islamic Republic definitely has a share in this victory."[69]

192. The U.S. Treasury Department determined that Hamas maintained substantial assets at Bank Saderat by at least 2005 and that the bank transferred several million dollars to Hamas between 2006 and 2007.[70]

193. In late May 2008, reports indicated that Iran increased its financial support to Hamas to $150 million for the second half of the year and that those funds were transferred to Hamas through Bank Melli's Damascus branch.

194. Although relations between Iran and Hamas temporarily cooled after the outbreak of the Syrian civil war in 2011, the alliance was soon restored. Since at least 2012, the IRGC-QF has provided Hamas with Fajr-5 rockets, among other munitions. By 2017, Hamas leaders publicly described Iran as the organization's largest financial and military backer.

195. According to the U.S. Department of State, Iran has continued to provide Hamas with funding, weapons, training, and other material support, including through the IRGC-QF, which remains Iran's primary mechanism for cultivating and directing foreign terrorist organizations.

---

[69] Wilson Center, *Iran, Hamas & Palestinian Islamic Jihad*, Oct. 11, 2023, *available at* https://www.wilsoncenter.org/article/iran-hamas-and-palestinian-islamic-jihad.

[70] U.S. Department of the Treasury, Press Release, *Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism*, (Oct. 25, 2007), https://www.treasury.gov/press-center/press-releases/pages/hp644.aspx

196. This Court has repeatedly held Iran, as well as MOIS and IRGC, liable for damages arising from Hamas attacks in Israel and the Palestinian Territories.[71]

197. This Court has further found Bank Melli and Bank Saderat liable for damages arising from a 2015 Hamas attack in the West Bank.[72]

Syria Provided Material Support to Hamas

198. Following the Oslo Accords, Hamas increasingly aligned itself with Syria, whose rejection of the Arab-Israeli peace process mirrored Hamas's own. In 1994, Hamas delegations met with senior Syrian officials in Damascus, marking the beginning of a formal relationship between Hamas and the Assad regime.

199. During the early 1990s, Hamas's political leadership operated primarily from Amman, Jordan, because of its proximity to the West Bank and Gaza. After Jordan signed a peace treaty with Israel and strengthened relations with the PA, however, Jordan began restricting Hamas's activities. In 1997, Jordan expelled senior Hamas leaders, prompting them to relocate to Damascus.

200. Syria thereafter became Hamas's principal external sanctuary. Damascus emerged as the organization's political and operational headquarters, while Syria and Syrian-controlled Lebanon became major conduits for Iranian funding, weapons, explosives, and personnel destined for Hamas operatives in the West Bank and Gaza.[73]

201. In May 2000, five months before the outbreak of the Second Intifada, Syria hosted a meeting in Damascus attended by Iranian ambassador, senior Hamas leaders, and PIJ

[71] See, e.g., *Braun v. Islamic Republic of Iran,* 228 F.Supp. 3d 64 (D.D.C. 2017); *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379 (D.D.C. 2015); *Henkin v. Islamic Republic of Iran*, No. 1:18-cv-1273-RCL, 2021 U.S. Dist. LEXIS 129541 (D.D.C. July 12, 2021); *Force v. Islamic Republic of Iran*, 464 F. Supp. 3d 323 (D.D.C. 2020); *Przewozman v. Islamic Republic of Iran*, 754 F. Supp. 3d 1 (D.D.C. 2024).

[72] *Henkin v. Islamic Republic of Iran*, No. 1:18-cv-1273-RCL, 2021 U.S. Dist. LEXIS 129541 (D.D.C. July 12, 2021).

[73] https://www.ict.org.il/UserFiles/karmon-iran-syria-hizbollah.pdf (pg 33)

General Secretary, during which Hamas and PIJ were encouraged to intensify attacks against Israel.

202. In 2001, Hamas formally relocated its external headquarters to Damascus. Throughout the Second Intifada, Hamas's external leadership directed terrorist operations in the West Bank and Gaza from its Damascus office.

203. Syria enabled Hamas's operations by permitting Hamas to train on Syrian territory and in the Syrian-controlled Bekaa Valley, facilitating the movement of Hamas recruiters, couriers, and coordinators, allowing fundraising and financial coordination from Damascus, and serving as a conduit for Iranian funds and weapons destined for Hamas.

204. The Syrian Ministry of Information became the venue for Hamas's exiled political leadership to hold press conferences.[74]

205. During the Second Intifada, Hamas transferred funds from its Damascus headquarters to Hamas operatives in the West Bank and Gaza to fund terrorist operations and pay families of dead and imprisoned Hamas terrorists.[75]

206. In 2002, Syria reportedly offered Hamas additional assistance in exchange for escalating terrorist attacks against Israel.

207. In April 2003, following pressure from the U.S. and Israel, President Bashar al-Assad pledged to close down Hamas's offices in Syria and restrict the organization's communications. Syria never implemented those promises.

208. Instead, Syria continued to permit Hamas to operate openly from Damascus. In July 2006, Hamas Political Bureau Chairman Khaled Mashal directed the kidnapping of Israeli soldier Gilad Shalid from Damascus.[76] Mashal subsequently held a press conference in a

---

[74] https://www.stimson.org/2024/why-syria-is-so-silent-about-hamas/

[75] https://www.gov.il/en/pages/iran-and-syria-as-strategic-support-for-palestinian-terrorism

[76] https://www.ict.org.il/UserFiles/karmon-iran-syria-hizbollah.pdf (pg 5)

Damascus hotel, broadcast live on multiple Arab media including Syrian state television, which experts have cited as evidence that the Assad regime had shifted from tacit to explicit support for Hamas.[77]

209. Hamas maintained its external headquarters in Damascus until 2012, when disagreements over the Syrian civil war prompted the organization to relocate much of its leadership to Qatar. Despite that temporary political rupture, Syria had for nearly two decades served as Hamas's principal external base of operations, facilitating the organization's relationship with Iran and Hezbollah and enabling the transfer of funding, weapons, personnel, and operational guidance into the Palestinian Territories.

210. This Court has repeatedly held Syria liable for damages arising from Hamas attacks in Israel and the West Bank.[78]

### C. Fatah and the Al-Aqsa Martyrs Brigade (AAMB)

211. Al-Fatah ("Fatah") was formally established in 1965 by Yasser Arafat as a secular Palestinian nationalist organization committed to the armed struggle against Israel and the establishment of a Palestinian state encompassing Israel, the West Bank, and the Gaza Strip.

212. Following the 1967 Arab-Israeli War, Fatah emerged as the dominant Palestinian militant organization. By 1969, Arafat had become Chairman of the Palestine Liberation Organization ("PLO"), the principal organization representing the Palestinian national movement and an umbrella group encompassing various Palestinian political and militant factions. Fatah remained the PLO's largest and most influential faction throughout the Relevant Period.

---

[77] https://www.washingtoninstitute.org/policy-analysis/syria-hamas-and-gaza-crisis

[78] See, e.g., *Braun v. Islamic Republic of Iran,* 228 F.Supp. 3d 64 (D.D.C. 2017); *Roth v. Syrian Arab Republic*, No. 1:14-cv-01946-RCL, 2018 U.S. Dist. LEXIS 168244 (D.D.C. Sep. 28, 2018). *Henkin v. Islamic Republic of Iran*, No. 1:18-cv-1273-RCL, 2021 U.S. Dist. LEXIS 129541 (D.D.C. July 12, 2021); *Force v. Islamic Republic of Iran*, 464 F. Supp. 3d 323 (D.D.C. 2020).

213. Over the following decades, Fatah established an extensive military and political infrastructure throughout the Palestinian Territories and neighboring Arab states, including Jordan, Lebanon, Syria, and Tunisia, from which it conducted numerous attacks against Israeli military and civilian targets throughout the 1970s and 1980s.

214. Fatah played a leading role in the First Intifada, organizing and directing the uprising through its local leadership in the West Bank and Gaza. Fatah operatives carried out shootings, stabbings, grenade attacks, firebombings, and other violent attacks against Israeli civilians while coordinating demonstrations, strikes, and civil unrest.

215. Following the end of the Lebanese Civil War in 1990, Arafat sought to normalize relations with the Lebanese government and reduce the autonomy of Fatah's armed factions operating in Lebanon. Those efforts generated opposition among several Lebanon-based Fatah commanders. In 1991, Fatah commander Munir al-Maqdah and other commanders broke with Arafat's loyalists and seized control of Fatah checkpoints in Ain al-Hilweh, a Palestinian refugee camp in Lebanon, establishing an independent anti-Arafat faction.

216. Divisions within Fatah deepened after Arafat embraced negotiations with Israel. In 1993, the PLO, under Fatah's leadership, signed the Oslo Accords with Israel, ending the First Intifada and establishing the Palestinian Authority (PA) as the governing authority in parts of the West Bank and Gaza.

217. Maqdah and other Lebanon-based commanders rejected the agreement, regarding it as a betrayal of Fatah's longstanding commitment to armed struggle, Maqdah publicly called for Arafat's execution and organized a breakaway force known as the "Black 13 September Battalion" composed of Fatah dissidents.[79] In response, the PLO cut off financial support to Fatah's Lebanon-based factions and Palestinian refugees in Lebanon.

[79] https://www.wrmea.org/1994-september-october/lebanon-s-new-fatah-revolution-within-a-revolution.html

218. Despite the split, Maqdah never renounced Fatah. He retained his rank within the organization and continued to identify himself as a Fatah commander. In a December 1998 interview with Lebanese news *Al-Watan al-Arabi*, Maqdah stated: "I have not quit the Fatah Movement; I remain an officer in the movement and am bound by its militant agenda, which calls for the destruction and elimination of the Zionist entity."

219. As the Israeli-Palestinian peace process deteriorated during the late 1990s, Arafat sought to rebuild relations with the Lebanon-based Fatah factions. The PLO-controlled PA resumed providing financial support to those factions, and Maqdah and other commanders reestablished ties with Fatah's central leadership.

220. By restoring ties with the Lebanon-based Fatah factions, Arafat reunited the PA's political leadership with dissident Fatah commanders, including Maqdah. By the outbreak of the Second Intifada in September 2000, the Lebanon-based Fatah factions had become well-armed and closely connected to Fatah's leadership.

221. Following the outbreak of the Second Intifada, armed elements of Fatah — including the Fatah Tanzim militia and fighters associated with the Lebanon-based Fatah factions — began operating under the name al-Aqsa Martyrs Brigades ("AAMB"), which rapidly became one of the principal perpetrators of terrorist attacks against Israeli civilians.

222. The AAMB formally emerged on January 1, 2001. Documents captured by the Israel Defense Forces during Operation Defensive Shield indicate that AAMB functioned as a pseudonym for Fatah, allowing Fatah and Tanzim militia to publicly claim responsibility for terrorist attacks while obscuring Fatah's direct involvement. Several documents bore the joint letterhead and seal of both Fatah and the AAMB.

223. Consistent with this relationship, the U.S. Department of State's 2001 *Patterns of Global Terrorism* report described Tanzim as comprising loosely organized militant cells

drawn from the grassroots membership of Fatah and noted that some Tanzim militants were also active in the AAMB.

224. Yasser Arafat, Marwan Barghouti, and other senior PA and Fatah officials were identified as directing and financing AAMB's terrorist activities.

225. Maqdah likewise played a prominent role in the emergence and operations of the AAMB. In a 2003 interview, Maqdah stated that he had formed the original "Al Aqsa Brigade" in Ain al-Hilweh in 1997, naming it after the Al-Aqsa Mosque.[80] Jordanian newspaper *Al-Dustour* likewise referred to Maqdah as "the leader and founder of the Al-Aqsa Martyrs Brigades," and intelligence and press reports attributed to him a leading role in organizing and directing AAMB operations through collaborators in the West Bank.

226. Although the AAMB initially claimed it would target only Israeli soldiers and settlers in the West Bank and Gaza Strip, it quickly expanded its campaign to include suicide bombings, shootings, and other terrorist attacks targeting Israeli civilians throughout Israel. Throughout the Second Intifada, Fatah frequently carried out these attacks under the name "Al-Aqsa Martyrs Brigades." By August 18, 2002, the AAMB had carried out 1200 terrorist attacks, killing 176 Israelis.

227. The Fatah-controlled PA governed the West Bank and Gaza Strip for the entirety of the Second Intifada. In 2007, PA security forces were ousted from Gaza following Hamas's coup, but the PA maintains authority over the West Bank to this day.

228. On 23 September 2001 the US Department of State officially designated the AAMB as a Foreign Terrorist Organization, and designated on 31 October 2001 as a SDT pursuant to Executive Order 13224.

---

[80] https://www.csmonitor.com/2003/0708/p01s02-wome.html

Iran Provided Material Support to Fatah and AAMB

229. Following the 1979 Iranian Revolution, Yasser Arafat became the first foreign leader to visit Tehran, where he was received with honor. As a symbolic demonstration of its support for the Palestinian cause, the newly established Islamic Republic transferred Israel's former embassy in Tehran to Fatah and the Fatah-controlled PLO.

230. Despite this early gesture, Iran’s relationship with Fatah quickly deteriorated. Ayatollah Khomeini criticized Fatah’s secular nationalist orientation and urged Arafat to remodel the organization along the principles of the Islamic Revolution, which Arafat declined to do. Relations deteriorated further when Arafat aligned with the broader Arab world in supporting Iraq during the 1980–1988 Iran-Iraq War.

231. Rather than abandoning its efforts to cultivate influence within Fatah, Iran shifted its support to factions and commanders opposed to Arafat's leadership and rejection of Iran's revolutionary agenda.

232. Beginning in the early 1990s, Iran developed a close relationship with Munir al-Maqdah. Through Hezbollah and the IRGC-QF, Iran provided Maqdah and his dissident Fatah forces with funding and training.

233. Iran expanded this strategy more broadly by supporting other Fatah dissident factions in Lebanon that opposed the peace process. Beginning in 1993, Iran reportedly provided approximately $60 million annually to these groups after the PLO cut off their funding following the Oslo Accords.[81]

234. Although Iran formally severed relations with Arafat after the Oslo Accords, informal channels of communication persisted. Imad Mughniyeh[82]—a senior Hezbollah

[81] https://www.nytimes.com/1994/06/15/world/iran-aids-foes-of-plo.html

[82] Mughniyeh was directly involved in the kidnapping and torture of numerous Americans, as well as the 1983 bombings of the U.S. Embassy and Marine Barracks in Beirut. U.S. intelligence officials regarded Mughniyeh

commander and former Fatah leader who previously served as Arafat's bodyguard—maintained relationships with both Iranian officials and Arafat, serving as an intermediary between them.[83]

235. Those communication channels ultimately enabled Iran to reestablish influence within Fatah itself. During the late 1990s, as Arafat quietly reconciled with several dissident factions, he made his first visit to Iran in nearly two decades for the 1997 Organization of Islamic Conference summit in Tehran.[84] With Arafat's approval, Mughniyeh subsequently helped strengthen operational ties between Fatah and Hezbollah. In 1998, he facilitated contacts between Fatah members with Hezbollah ties and operatives in Gaza, while also helping smuggle weapons from Lebanon into the Palestinian territories, at times concealing arms in Arafat's own vehicle and presidential aircraft.[85]

236. The funding, training, and operational networks Iran had built through Maqdah and his Fatah dissident faction survived Maqdah's reconciliation with Arafat. Those networks became part of the infrastructure through which Iran supported Fatah's armed elements during the Second Intifada.

237. As the Second Intifada approached, Arafat wrote to Mughniyeh expressing his intention to ignite a new uprising, instructing Fatah's cadres to "work quietly and calmly [with Hezbollah]" and stating that he "[didn't] want your activities discovered."[86]

238. Even before the Second Intifada began, Iran, acting through Hezbollah, had started preparing Fatah's armed elements for renewed conflict with Israel. Hezbollah trained

---

as responsible for more U.S. deaths than any other terrorist prior to September 11, 2001. He was assassinated in a joint CIA-Mossad operation on February 12, 2008.

[83] United Against Nuclear Iran, *Iran and the Palestinian National Movement*

[84] Iran Primer, UIP, *Iran and the Palestinians*

[85] United Against Nuclear Iran, *Iran and the Palestinian National Movement*

[86] United Against Nuclear Iran, *Iran and the Palestinian National Movement*

future AAMB operatives at camps in Lebanon under Iranian supervision. One such operative later testified at his trial in Israel that he had been transported to Lebanon in an Iranian diplomatic vehicle and trained for two months at a Hezbollah camp near Baalbek — training Hezbollah officials have on multiple occasions publicly acknowledged providing.

239. The outbreak of the Second Intifada in September 2000 marked a turning point in Iran's relationship with Fatah. Having abandoned the peace process and joined the armed uprising against Israel, Fatah became a valuable addition to Iran's network of proxy organizations. Iran accordingly expanded its funding, training, weapons transfers, and operational support to Fatah-aligned militants.

240. As a gesture of solidarity with the uprising, Arafat released Hamas and PIJ operatives held by the PA. Iran publicly praised Arafat and Fatah for this show of resistance.[87]

241. Iran's Second Intifada conference drew senior Fatah and PA officials, including Faisal Husseini, the PA's minister for Jerusalem affairs, and Salim Za'noun, chairman of the Palestinian National Council.[88]

242. Iran quickly moved to arm Fatah's fighters. In October 2000, Adel Mughrabi, the PA's principal arms-procurement agent, contacted Hezbollah and Iranian officials to arrange a weapons-smuggling operation on the PA's behalf; in exchange, the PA agreed to allow the IRGC to establish a foothold in Gaza and the West Bank.

243. In May 2001, the Israeli Navy intercepted the *Santorini* fishing vessel smuggling weapons from Lebanon to Gaza in an operation Israeli authorities attributed to Hezbollah on the PA's behalf.

244. On January 3, 2002, Israeli naval commandos seized the Karine A in the Red Sea, carrying approximately fifty tons of Iranian-supplied weapons — including Katyusha

[87] https://www.pbs.org/wgbh/pages/frontline/tehranbureau/2010/10/iran-primer-iran-and-the-palestinians.html

[88] https://www.washingtoninstitute.org/policy-analysis/iran-more-fuel-israeli-palestinian-fire

rockets, mortars, C-4 explosives, anti-tank missiles, rifles, and ammunition — purchased with funds from Fuad Shubaki, Arafat's financial advisor and the head of finance for the PA's General Security Service. The ship had been loaded near Iran's Kish Island under IRGC and Hezbollah supervision for delivery to the PA in Gaza. Shubaki later confirmed in an interview that AAMB and Fatah-Tanzim used weapons supplied through the PA security services with Arafat's knowledge, and that the IRGC and Hezbollah financed and directed the Karine A smuggling operation.

245. Iran's support extended beyond weapons to direct, sustained financing of AAMB's operational infrastructure. With the PA under international blockade and financial freeze, Maqdah began funneling Iranian funds to arm Fatah's forces in the West Bank. Interrogations of arrested AAMB commanders in 2001 and 2002 confirmed that Maqdah transferred money used to purchase weapons and bomb-making materials and to pay the militants who carried out attacks.[89]

246. This financing reached AAMB's operational cells directly. Nasser Aweis, commander of the al-Aqsa Martyrs Brigades in the West Bank and the perpetrator of a series of attacks that killed and wounded dozens of Israelis, disclosed after his arrest that Maqdah had transferred Iranian funds to support Fatah, Tanzim, and AAMB terrorists across the West Bank.

247. Jamal Mustafa Huweil, AAMB's treasurer for the Jenin area, arrested during Operation Defensive Shield, corroborated this relationship, describing approximately $5,000 transferred every month or two from Maqdah to Aweis's account in Nablus, and stating that he reported directly to Maqdah on AAMB's attacks in the Jenin area.

248. A separate financing channel was uncovered with the 2003 arrest of three brothers — Fadi Nazmi Hamdi Abdu, a senior Fatah/Tanzim/AAMB operative, and his

---

89 https://archive.aawsat.com/details.asp?article=105571&issueno=8582#.YOvg2RMzZpQ

brothers Hamdi and Shadi — who had routed approximately NIS 1,000,000 (roughly $300,000) through Jordan, nominally raised for social welfare activities, to fund terrorist operations, including the April 2003 attack at the Kfar Saba railway station. Fadi Abdu's interrogation further identified Fouad Balbisi, a Fatah activist based in Amman, as the coordinator linking Fatah to Iran, funneling funds through Hezbollah bank accounts in Beirut.

249. By 2004, AAMB's and Fatah's own leadership had acknowledged its relationship with Iran. A senior AAMB official stated on August 3, 2004, that "some active operatives of our organization are financed and encouraged by interested parties... operatives who are financed by Hezbollah and Iran."[90] Days later, on August 9, 2004, Arafat himself confirmed that AAMB operatives "receive money from Iran through an officer named Munir al-Maqdah" — though he sought to distance Fatah from AAMB by claiming Maqdah had left Fatah years earlier.[91]

250. This funding sustained AAMB's operational capacity throughout the Intifada, including its recruitment of operatives as young as fifteen for suicide bombings, with payments promised to their families after attacks were carried out. According to Israeli Foreign Ministry reports, Iran transferred tens of millions of dollars annually — largely through Hezbollah — to Palestinian terrorist organizations including PIJ and AAMB, materially enhancing their operational capabilities and encouraging continued attacks against Israel.

251. Iran also directly trained Fatah operatives through the IRGC. IRGC instructors in Lebanon provided Fatah members with basic military training, followed in some cases by advanced instruction in Iran itself. One such course, conducted at the Janta Base in Lebanon's Bekaa Valley, trained twenty Fatah and Hamas operatives in the use of SA-7 shoulder-launched

---

[90] Intelligence and Terrorism Information Center at the Center for Special Studies, August 2004

[91] Al-Khaleej, UAE, August 9, 2004 (quoted in Intelligence and Terrorism Information Center at the Center for Special Studies, August 2004)

anti-aircraft missiles; graduates went on to receive further specialized training near Qom, Iran, before returning to the Palestinian territories. The IRGC's coordinating officer for this program, Ali Reza Hamiz, worked directly with Maqdah, who served as the program's liaison officer from his base in the Ayn al-Hilweh refugee camp near Sidon.

252. This Court has previously found that Iran and Bank Saderat "provided substantial support to Hezbollah, Fatah Tanzim, and AAMB through the provision of money, weapons, organizational support, and training…"[92]

Syria Provided Material Support to Fatah and AAMB

253. Syria's relationship with Fatah largely paralleled Iran's. During the 1970s, the Assad regime viewed Arafat and the PLO as important allies against Israel. Syria and Fatah opposed Egypt's peace initiatives following President Anwar Sadat's opening to Israel, rejected the Camp David Accords, and maintained close political ties, with Arafat frequently visiting Damascus.

254. That relationship deteriorated during the Lebanese Civil War as Syria cultivated anti-Arafat Palestinian factions to weaken Arafat's control over Fatah and expelled him from Damascus in 1983.

255. Relations gradually improved beginning in 1988, when Libya and Algeria brokered a meeting between President Hafez al-Assad and Arafat following the assassination of Khalil al-Wazir ("Abu Jihad"). Although the meeting did not resolve their differences, it ended the complete rupture in Syrian-Fatah relations.

256. In the early and mid-1990s, as the peace process unfolded, Syria recognized that Arafat and the mainstream Fatah leadership would remain the dominant actors in Palestinian politics and maintained high-level contacts with Arafat despite its opposition to the

[92] *Shoham v. Islamic Republic of Iran*, No. 12-cv-508 (RCL), 2017 U.S. Dist. LEXIS 84119 (D.D.C. June 1, 2017) (dismissed on other grounds).

negotiations. In 1991, Arafat returned to Damascus to coordinate a response to the U.S.-led Madrid peace process, and again in 1993 during the Oslo negotiations.

257. Syria simultaneously continued to cultivate Fatah dissident factions opposed to the negotiations. Working alongside Iran, Syria supported Maqdah's dissident faction financially. According to Fatah officials, Maqdah maintained "very good ties with Syria and Iran," which provided him "millions of dollars" that he used to arm militants and build independent centers of power within Fatah.[93]

258. In 1996, after the peace process stalled, Arafat returned to Damascus once more and restored official channels between Syria and Fatah. Syria facilitated the renewed cooperation between Fatah factions leading up to the Second Intifada, allowing future AAMB operatives to travel through Syria to Hezbollah training camps near Baalbek in Lebanon. One AAMB operative testified in Israeli court that he crossed from Syria into Lebanon and received two months of terrorist training at a Hezbollah camp under Iranian supervision.[94]

259. During the Second Intifada, additional Fatah and AAMB operatives traveled through Jordan into Syria, where Syrian officials escorted them to training camps south of Damascus operated by the PFLP-GC, a Syrian and Iranian-backed Palestinian terrorist organization that provided training and other support to Palestinian militant groups,before they returned to the West Bank.[95]

260. Syria's territory also served as a venue where representatives of Palestinian terrorist organizations, Hezbollah, and Iranian officials could meet and coordinate operations outside the reach of Israeli authorities. During the Second Intifada, PIJ's leadership, operating from its Damascus headquarters, coordinated joint attacks with Fatah and AAMB operatives

[93] https://www.washingtoninstitute.org/policy-analysis/syrian-sponsorship-global-terrorism-need-accountability

[94] https://www.washingtoninstitute.org/policy-analysis/syrian-sponsorship-global-terrorism-need-accountability

[95] https://www.washingtoninstitute.org/policy-analysis/syrian-sponsorship-global-terrorism-need-accountability

in the Palestinian territories. Funds were transferred from the PIJ in Damascus to West Bank operatives to finance joint AAMB-PIJ operations, compensate the families of deceased Fatah militants, and bribe PA security officers. [96]

261. This cross-organizational coordination is demonstrated in captured documents reflecting attempted transfers routed from Damascus, including $31,000 for the remaining expenses of the Afula suicide bombing and $127,000 for the families of deceased and imprisoned terrorists.[97]

262. Syria likewise facilitated the smuggling of weapons destined for Fatah and the PA. As described above, in May 2001, the Israeli Navy intercepted the *Santorini* as it attempted to smuggle approximately forty tons of weapons to the PA in Gaza. The vessel itself had been purchased off the Syrian coast by the PFLP-GC and subsequently registered as a Lebanese vessel, while the weapons were transported separately from Damascus through Syria into Lebanon, where they were loaded aboard for shipment to Gaza.

263. On May 11, 2004, President George W. Bush imposed economic sanctions on Syria, citing, among other things, Syria's continued support for terrorist organizations targeting Israel and its failure to prevent the movement of terrorists and weapons through Syrian territory into Iraq.

264. Syria continued providing material support to Fatah and the AAMB throughout the remainder of the Second Intifada, until the uprising concluded in 2005.

## IV. Defendants' Material Support Proximately Caused the Terrorist Attacks and Plaintiffs' Injuries

[96] https://www.gov.il/en/pages/iran-and-syria-as-strategic-support-for-palestinian-terrorism

[97] https://www.gov.il/en/pages/iran-and-syria-as-strategic-support-for-palestinian-terrorism

265. The FSIA Defendants' material support for Hamas, PIJ, Hezbollah, and AAMB was a substantial factor in the sequence of events that led to the Terrorist Attacks and Plaintiffs' resulting injuries.

### A. Iran Built and Sustained Hamas, PIJ, Hezbollah, and Fatah/AAMB's Operational Capacity to Commit the Terrorist Attacks

266. As alleged above, Iran – acting through the IRGC, the IRGC-QF, and MOIS – provided the FTO Defendants and Fatah/AAMB with funding, weapons, training, and strategic direction that materially supported and enabled their terrorist operations and capabilities, including their ability to organize, recruit, arm, and deploy the terrorist cells responsible for the Terrorist Attacks.

267. Iran's support was not incidental or humanitarian; it was built to create and maintain organizations capable of carrying out sustained campaigns of suicide bombings, shootings, and other lethal attacks against Israeli civilians. Iran trained thousands of Hamas, PIJ, and Fatah/AAMB operatives at IRGC and Hezbollah facilities, supplied the weapons and explosives used in the Terrorist Attacks, and financed the salaries, "martyr" payments, and operational budgets that allowed these organizations to recruit and retain operatives before and throughout the Relevant Period.

268. Without Iran's support, the FTO Defendants and Fatah/AAMB would have had reduced access to weapons, explosives, trained operatives, and the financial resources necessary to sustain a terrorist infrastructure capable of carrying out the Terrorist Attacks.

### B. Syria's Territorial and Logistical Support was Essential to Hamas, PIJ, Hezbollah, and Fatah/AAMB's Capacity to Operate

269. Syria complemented Iran's support by providing the territorial corridor, safe haven, and logistical infrastructure without which Iran's support to the FTO Defendants and Fatah/AAMB could not have reached them, as alleged above.

270. Syria facilitated the passage of Iranian personnel, funding, and weapons through its territory for the benefit of Hezbollah and Palestinian terrorist organizations. Syria further permitted the FTO Defendants and Fatah/AAMB to establish and operate training camps, headquarters, and logistical bases on Syrian and Syrian-controlled territory, and permitted senior operatives to direct terrorist operations from Damascus.

271. Absent Syria's provision of this territorial and logistical support, Iran's weapons, funds, and personnel could not have reached the FTO Defendants and Fatah/AAMB in the volume, and with the reliability, that allowed those organizations to sustain the campaign of violence described herein.

### C. The Bank Defendants' Financial Services Increased the Resources Available to Fund Hamas, PIJ, Hezbollah, and Fatah/AAMB

272. As alleged above, Bank Melli and Bank Saderat supplied the financial infrastructure through which Iran transferred funds to the IRGC, the IRGC-QF, and the FTO Defendants.

273. These services did more than provide generalized economic support to Iran. For example, Bank Melli's transfer of at least $100 million to the IRGC-QF between 2002 and 2006, and Bank Saderat's transfer of approximately $50 million to Hezbollah-controlled fronts in Lebanon between 2001 and 2006, directly increased the financial resources available to the entities within Iran's terrorist-support apparatus responsible for funding, training, and arming the FTO Defendants and Fatah/AAMB during the periods in which the Terrorist Attacks alleged herein occurred.

274. These were not routine banking services. Bank Melli and Bank Saderat knew, or reasonably should have known, that the funds and financial services they provided to the IRGC, the IRGC-QF, and other Iranian entities were being used to finance organizations that Iran had built for the purpose of carrying out terrorist attacks against Israeli and American civilians. Their efforts to obscure Iranian participants in international transactions further

support the inference that they understood the nature and consequences of the activities they were facilitating.

275. The Bank Defendants' financial support was therefore a substantial factor in the chain of material support that sustained the FTO Defendants and Fatah/AAMB's capacity to plan and carry out the Terrorist Attacks, and the deaths and injuries resulting from those attacks were reasonably foreseeable consequences of that support.

### D. The Terrorist Attacks and Plaintiffs' Injuries were the Reasonably Foreseeable Consequence of the FSIA Defendants' Support

276. The FSIA Defendants knew that Hamas, PIJ, Hezbollah, and Fatah/AAMB were dedicated to attacking Israeli civilians, and, in the case of Hezbollah's attacks in the 1980s and thereafter, American citizens as well.

277. Iran's own public statements — including Supreme Leader Khamenei's repeated calls for continued and escalating attacks during the Second Intifada, as alleged above — confirm that Iran intended and anticipated that its support would be used to carry out attacks of the kind that killed and injured Plaintiffs and their family members.

278. Syria likewise knowingly continued to provide safe haven, logistical support, and freedom of operation to these organizations despite repeated warnings and demands from the United States and the international community that it cease supporting terrorist groups operating from Syrian territory.

279. Defendants therefore knew, or reasonably should have known, that strengthening the financial, logistical, and operational capacity of the FTO Defendants and Fatah/AAMB created a substantial and foreseeable risk of death or serious injury to civilians in Israel, the West Bank, Gaza, and Lebanon, including United States nationals present in those locations.

280. The Terrorist Attacks and Plaintiffs' resulting injuries were natural and reasonably foreseeable consequences of Defendants' sustained material support for

organizations whose stated and demonstrated purpose was to carry out an armed terrorist campaign against Israeli civilians.

## THE PLAINTIFFS AND THE TERRORIST ATTACKS

281. During the Relevant Period, the FTO Defendants and Fatah/AAMB carried out the Terrorist Attacks described below against U.S. citizens and their immediate family members in Israel, the West Bank, the Gaza Strip, and Lebanon.

282. As a direct and proximate result of the Terrorist Attacks, Plaintiffs present at the attack suffered severe and permanent injuries, including physical and emotional pain and suffering, mental anguish, and economic harm. Other Plaintiffs are immediate family members of those injured and killed in the Terrorist Attacks, and as a result, have experienced emotional pain and suffering, mental anguish, loss of solatium, loss of services, and economic loss.

## I. THE BEIT LID JUNCTION BOMBING – JANUARY 22, 1995

283. On January 22, 1995, at approximately 9:20 a.m., a PIJ suicide bomber disguised as an Israeli soldier approached the crowded Beit Lid Junction bus stop and detonated an explosive vest. As first responders arrived at the scene, a second PIJ suicide bomber, also disguised as an Israeli soldier, detonated a second explosive device. Twenty-two people were killed, and 69 others were injured.

284. The attack was perpetrated by PIJ. The suicide bombers were identified as Anwar Muhammad Sukar and Salah Shaker, members of PIJ's al-Quds Brigades. PIJ claimed responsibility for the attack and published a video of both suicide bombers reading their final statements before carrying out the attack.

285. The day after the attack, President Bill Clinton signed Executive Order 12947 designating PIJ as a Specially Designated Terrorist ("SDT") organization. The U.S. Department of the Treasury specifically cited the "appalling bombing at Beit Lid" in announcing the designation.

**A. Plaintiff Ronen Ben Chaim**

286. Plaintiff Ronen Ben Chaim is a citizen of the United States and a resident of Israel.

287. On January 22, 1995, Ronen, then 20 years old, was serving in the Israeli Defense Force and waiting at the Beit Lid Junction bus station for transportation to his military base. The first suicide bomber detonated his explosive device, striking Ronen with shrapnel throughout his body and damaging his eardrums. He was transported to the hospital, where he underwent emergency surgery to remove shrapnel from his face, jaw, and neck. Additional shrapnel lodged in his thigh could not be removed due to its proximity to a major artery.

288. As a direct and proximate result of the January 22, 1995 Terrorist Attack, Plaintiff Ronen Ben Chaim suffered severe and permanent physical and psychological injuries, and as a result, he has past and future noneconomic damages, including physical and emotional pain and suffering, mental anguish, and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

**B. Plaintiff Gila Afriat**

289. Plaintiff Gila Afriat is a citizen of the United States and a resident of Israel.

290. On January 22, 1995, Gila, age 20, was serving in the Israeli Defense Force and waiting at the Beit Lid Junction bus stop for transportation to her military base. The explosion ruptured Gila's left eardrum, requiring surgery to repair. Gila continues to suffer from bilateral tinnitus as a result of her injuries.

291. As a direct and proximate result of the January 22, 1995 Terrorist Attack, Plaintiff Gila Afriat suffered severe and permanent physical and psychological injuries, and as a result, she has past and future noneconomic damages, including physical and emotional pain and suffering, mental anguish, and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

## II. THE RAMAT ESHKOL BUS BOMBING – AUGUST 21, 1995

292. On August 21, 1995, at approximately 8:00 a.m., a Hamas suicide bomber boarded Egged bus No. 26 in the Ramat Eshkol neighborhood of Jerusalem and detonated an explosive device. The explosion killed five people and injured over 100 others.

293. The attack was perpetrated by Hamas. Hamas claimed responsibility for the attack and identified the suicide bomber as Sufian Salem Jabarin in its official publications describing the operation.

### A. Plaintiffs The Raveh Family

294. Plaintiff Michal Louise Raveh is a citizen of the United States and a resident of Israel.

295. On the morning of August 21, 1995, Michal was riding Egged bus No. 26 to work when the Hamas suicide bomber detonated his explosive device. The force of the blast threw Michal to the floor and shattered the bus's windows, covering the ground with broken glass. Despite extreme pain in her legs, she forced herself to her feet and walked through the shattered glass to escape the bus. Michal was transported by ambulance to the hospital, where she was treated for bilateral ruptured eardrums, a fractured left fibula, sprains to the bones of her right foot, shrapnel wounds to her back, and burns to her scalp.

296. As a direct and proximate result of the August 21, 1995 Terrorist Attack, Plaintiff Michal Louise Raveh suffered severe and permanent physical and psychological injuries, and as a result, she has past and future noneconomic damages, including physical and emotional pain and suffering, mental anguish, and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

297. Plaintiff Daniel Raveh is a citizen of the United States and a resident of Israel. He is the son of Michal Louise Raveh.

298. Plaintiff Ruth Raveh is a citizen of the United States and a resident of Israel. She is the daughter of Michal Louise Raveh.

299. As a result of the August 21, 1995 Terrorist Attack, and the injuries suffered by Michal Louise Raveh, Plaintiffs Daniel Raveh and Ruth Raveh have past and future noneconomic damages, including mental anguish, emotional pain and suffering, loss of solatium, loss of services, and economic loss. The injuries suffered by Michal Louise Raveh continue to have a lasting effect on her family and have taken a significant toll on their relationships.

## III. THE KFAR DAROM BUS BOMBING – NOVEMBER 20, 2000

300. On November 20, 2000, at approximately 7:30 a.m., a roadside bomb fashioned from a mortar shell exploded beside a bus carrying primarily schoolchildren from Kfar Darom. The bomb was detonated by three terrorists hidden in a nearby orchard using an electrical cable, who then fled into Palestinian Authority-controlled territory in Gaza. The explosion killed two people and injured nine others, including five children.

301. The attack was perpetrated by Fatah. Israeli authorities attributed the attack to Fatah-Tanzim and held the Fatah-controlled Palestinian Authority responsible. On July 8, 2019, the Jerusalem District Court found the Palestinian Authority and Fatah-Tanzim operatives liable for the attack.

### A. Plaintiff Tobi Sheila Hadad

302. Plaintiff Tobi Sheila Hadad is a citizen of the United States and resident of Israel. She is the mother of Rachel Zipora Reifen.

303. Rachel Zipora Reifen, a citizen of Israel, was eight years old and riding the bus to school when the roadside bomb exploded. Rachel suffered shrapnel wounds to her thigh and scalp. She was evacuated to the hospital, where she underwent a skin graft to treat her thigh injury and received stitches to her scalp.

304. As a result of the November 20, 2000 Terrorist Attack and the injuries suffered by Rachel Zipora Reifen, Plaintiff Tobi Sheila Hadad has past and future noneconomic damages, including mental anguish, emotional pain and suffering, loss of solatium, loss of services, and economic loss. The injuries suffered by Rachel Zipora Reifen continue to have a lasting effect on her mother and have taken a significant toll on their relationship.

## IV. THE FRENCH HILL BUS #25 SHOOTING – NOVEMBER 4, 2001

305. On the afternoon of November 4, 2001, a PIJ terrorist opened fire on Egged bus No. 25 with an M-16 rifle when it stopped at a traffic light on French Hill Junction. The attack killed two teenagers and injured 48 others.

306. The attack was perpetrated by PIJ. The shooter was killed at the scene by first responders and was identified as senior PIJ operative Hatem Yaqeen Ayash al-Shweiki. PIJ claimed responsibility for the attack later that day from its Damascus headquarters. This Court has previously found PIJ responsible for this attack and held Syria, Iran, and the IRGC liable for damages arising from it.[98]

### A. Plaintiffs The Itzkovitz Family

307. Plaintiff Gila Itzkovitz is a citizen of the United States and a resident of Israel.

308. On the afternoon of November 4, 2001, Gila, then 16 years old, was riding Egged Bus No. 25 home from school with her classmates when the PIJ terrorist opened fire on the bus. Gila heard the gunshots and shouted for the bus driver to keep moving, but he had already been shot. Passengers screamed in panic. Gila and a friend crouched together for cover, shielding their heads with schoolbags and praying as the shooting continued. Fragments of metal from the bus struck Gila's arms, causing scrapes and burns that barely registered amid the chaos. After what felt like hours, police officers and soldiers forced open the bus doors and

[98] Ben-Yishai v. Syrian Arab Republic, 642 F. Supp. 3d 110 (D.D.C. 2022) (finding PIJ responsible and Syria and Iran liable); Cohen v. Islamic Republic of Iran, Civil Action No. 17-1214 (JEB), 2019 U.S. Dist. LEXIS 115278 (D.D.C. July 11, 2019) (also holding IRGC liable).

pulled passengers out. Believing the attack was still ongoing, Gila fled the bus with her friend. They continued running until they reached another bus stop, where they boarded another bus. When Gila arrived home, she learned that one of her classmates had been killed in the attack. She attended her classmate's funeral later that evening.

309. As a direct and proximate result of the November 4, 2001 Terrorist Attack, Plaintiff Gila Itzkovitz suffered severe and permanent physical and psychological injuries, and as a result, she has past and future noneconomic damages, including physical and emotional pain and suffering, mental anguish, and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

310. Plaintiff Ira Marvin Schnall is a citizen of the United States and a resident of Israel. He is the father of Gila Itzkovitz.

311. Plaintiff Frances Nettie Schnall is a citizen of the United States and a resident of Israel. She is the mother of Gila Itzkovitz.

312. Plaintiff Mordechai Menachem Schnall is a citizen of the United States and a resident of New York. He is the brother of Gila Itzkovitz.

313. Plaintiff Adina Frid is a citizen of the United States and a resident of Israel. She is the sister of Gila Itzkovitz.

314. Plaintiff Allan Schnall is a citizen of the United States and a resident of New York. He is the brother of Gila Itzkovitz.

315. As a result of the November 4, 2001, Terrorist Attack, and the injuries suffered by Gila Itzkovitz, Plaintiffs Ira Marvin Schnall, Frances Nettie Schnall, Mordechai Menachem Schnall, Adina Frid, and Allan Schnall have past and future noneconomic damages, including mental anguish, emotional pain and suffering, loss of solatium, loss of services, and economic loss. The injuries suffered by Gila Itzkovitz continue to have a lasting effect on her family and have taken a significant toll on their relationships.

### B. Plaintiffs The Mordechai-Levy Family

316. Plaintiff Sarah Mordechai-Levy is a citizen of the United States and a resident of Israel.

317. On November 4, 2001, Sarah, then 16 years old, was riding the Egged Bus No. 25 home from school with her classmates when the PIJ terrorist opened fire on the bus. Fragments of metal from the bus struck Sarah's neck and arms. Sarah did not immediately seek treatment for her injuries. She attended her classmate's funeral that evening. Two days later, Sarah went to a medical clinic, where the metal fragments were removed.

318. As a direct and proximate result of the November 4, 2001 Terrorist Attack, Plaintiff Sarah Mordechai-Levy suffered severe and permanent physical and psychological injuries, and as a result, she has past and future noneconomic damages, including physical and emotional pain and suffering, mental anguish, and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

319. Plaintiff Shimon Mordechai is a citizen of the United States and a resident of Israel. He is the father of Sarah Mordechai-Levy.

320. Plaintiff Shirin Mordechai is a citizen of the United States and a resident of Israel. She is the mother of Sarah Mordechai-Levy.

321. Plaintiff David Mordechai is a citizen of the United States and a resident of Israel. He is the brother of Sarah Mordechai-Levy.

322. Plaintiff Ruth Nachmani is a citizen of the United States and a resident of Israel. She is the sister of Sarah Mordechai-Levy.

323. Plaintiff Yitzchak Mordechai is a citizen of the United States and a resident of Israel. He is the brother of Sarah Mordechai-Levy.

324. Plaintiff Channah Mordechai is a citizen of the United States and a resident of Israel. She is the sister of Sarah Mordechai-Levy.

325. Plaintiff Jonathan Mordechai is a citizen of the United States and a resident of Israel. He is the brother of Sarah Mordechai-Levy.

326. Plaintiff Benyamin Mordechai is a citizen of the United States and a resident of Israel. He is the brother of Sarah Mordechai-Levy.

327. Plaintiff Deborah Kalfa is a citizen of the United States and a resident of Israel. She is the sister of Sarah Mordechai-Levy.

328. Plaintiff Pnina Green is a citizen of the United States and a resident of Israel. She is the sister of Sarah Mordechai-Levy.

329. As a result of the November 4, 2001, Terrorist Attack, and the injuries suffered by Sarah Mordechai-Levy, Plaintiffs Shimon Mordechai, Shirin Mordechai, David Mordechai, Ruth Nachmani, Yitczhak Mordechai, Channah Mordechai, Jonathan Mordechai, Benyamin Mordechai, Deborah Kalfa, and Pnina Green, have past and future noneconomic damages, including mental anguish, emotional pain and suffering, loss of solatium, loss of services, and economic loss. The injuries suffered by Sarah Mordechai-Levy continue to have a lasting effect on her family and have taken a significant toll on their relationship.

**C. Plaintiffs The Steindler Family**

330. Plaintiff Shifra Steindler is a citizen of the United States and a resident of Israel.

331. On November 4, 2001, Shifra, then 16 years old, was riding the Egged Bus No. 25 home from school with her classmates when the PIJ terrorist opened fire on the bus. Fragments of metal from the bus struck Shifra's head and neck. She was transported to the hospital by ambulance, where physicians removed metal fragments from her neck. While lying in the emergency room, Shifra learned that her close friend and classmate, Shoshi, had been killed in the attack. She was discharged from the hospital just in time to attend Shoshi's funeral.

332. As a direct and proximate result of the November 4, 2001 Terrorist Attack, Plaintiff Shifra Steindler suffered severe and permanent physical and psychological injuries,

and as a result, she has past and future noneconomic damages, including physical and emotional pain and suffering, mental anguish, and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

333. Plaintiff Gerald Louis Markowitz is a citizen of the United States and a resident of Israel. He is the father of Shifra Steindler.

334. Plaintiff Estate of Deborah Esther Markowitz was a citizen of the United States and a resident of Israel. She is the mother of Shifra Steindler.

335. Plaintiff Michael Yitzchok Markowitz is a citizen of the United States and a resident of Israel. He is the brother of Shifra Steindler.

336. Plaintiff Rachael Markowitz is a citizen of the United States and a resident of Israel. She is the sister of Shifra Steindler.

337. Plaintiff Elimelech Yisrael Markowitz is a citizen of the United States and a resident of Israel. He is the brother of Shifra Steindler.

338. As a result of the November 4, 2001, Terrorist Attack, and the injuries suffered by Shifra Steindler, Plaintiffs Gerald Louis Markowitz, Estate of Deborah Esther Markowitz, Michael Yitzchok Markowitz, Rachael Markowitz, and Elimelech Yisrael Markowitz have past and future noneconomic damages, including mental anguish, emotional pain and suffering, loss of solatium, loss of services, and economic loss. The injuries suffered by Shifra Steindler continue to have a lasting effect on her family and have taken a significant toll on their relationship.

**D. Plaintiffs The Naveh Family**

339. Plaintiff Ora Nechama Naveh is a citizen of the United States and a resident of Israel.

340. On November 4, 2001, Ora, then 16 years old, was riding the Egged Bus No. 25 home from school with her classmates when the PIJ terrorist opened fire on the bus. Ora

immediately dropped to the floor of the bus for cover. Within moments, she found herself pinned beneath a pile of classmates. After the shooting ended, Ora learned that one of her classmates had been killed. After attending the funeral, Ora experienced an acute emotional crisis, shaking and crying uncontrollably, and was taken to the emergency room by her parents.

341. As a direct and proximate result of the November 4, 2001 Terrorist Attack, Plaintiff Ora Nechama Naveh suffered severe and permanent injuries, and as a result, she has past and future noneconomic damages, including emotional pain and suffering, mental anguish, and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

342. Plaintiff Mitchell Jay Rubinoff is a citizen of the United States and a resident of Israel. He is the father of Ora Nechama Naveh.

343. Plaintiff Aviva Chava Rubinoff was a citizen of the United States and a resident of Israel. She was the mother of Ora Nechama Naveh.

344. Plaintiff Chananel Yitzchak Rubinoff is a citizen of the United States and a resident of Israel. He is the brother of Ora Nechama Naveh.

345. Plaintiff Yosef Yair Rubinoff is a citizen of the United States and a resident of Israel. He is the brother of Ora Nechama Naveh.

346. Plaintiff Eliezer Zalman Rubinoff is a citizen of the United States and a resident of Israel. He is the brother of Ora Nechama Naveh.

347. Plaintiff Shoshana Leah Abramovich is a citizen of the United States and a resident of Israel. She is the sister of Ora Nechama Naveh.

348. As a result of the November 4, 2001 Terrorist Attack, and the injuries suffered by Ora Nechama Naveh, Plaintiffs Mitchell Jay Rubinoff, Aviva Chava Rubinoff, Chananel Yitzchak Rubinoff, Yosef Yair Rubinoff, Eliezer Zalman Rubinoff and Shoshana Leah Abramovich, have past and future noneconomic damages, including mental anguish, emotional

pain and suffering, loss of solatium, loss of services, and economic loss. The injuries suffered by Ora Nechama Naveh continue to have a lasting effect on her family and have taken a significant toll on their relationships.

### E. Plaintiffs The Lebowitz Family

349. Plaintiff Yissachar Zvi Lebowitz is a citizen of the United States and resident of Israel.

350. On November 4, 2001, Yissachar, then 9 years old, was riding the Egged Bus No. 25 home from school with his classmates when the PIJ terrorist opened fire on the bus.

351. As a direct and proximate result of the November 4, 2001 Terrorist Attack, Plaintiff Yissachar Zvi Lebowitz suffered severe and permanent injuries, and as a result, he has past and future noneconomic damages, including emotional pain and suffering, mental anguish, and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

352. Plaintiff Simon Bloch Lebowitz is a citizen of the United States and a resident of Israel. He is the father of Yissachar Zvi Lebowitz.

353. Plaintiff Rosalyn Pearl Last Lebowitz is a citizen of the United States and a resident of Israel. She is the mother of Yissachar Zvi Lebowitz.

354. As a result of the November 4, 2001 Terrorist Attack, and the injuries suffered by Yissachar Zvi Lebowitz, Plaintiffs Simon Bloch Lebowitz and Rosalyn Pearl Last Lebowitz have past and future noneconomic damages, including mental anguish, emotional pain and suffering, loss of solatium, loss of services, and economic loss. The injuries suffered by Yissachar Zvi Lebowitz continue to have a lasting effect on his family and have taken a significant toll on their relationships.

## V. THE BEN YEHUDA STREET BOMBINGS – DECEMBER 1, 2001

355. On December 1, 2001, at approximately 11:30 p.m., two Hamas suicide bombers detonated explosive devices on Ben Yehuda Street in downtown Jerusalem as part of a coordinated double suicide bombing. The bombs were packed with nails, screws, and methomyl, a poisonous pesticide, to maximize the blast's lethality. Eleven people were killed and over 170 were injured. Approximately fifteen minutes after the suicide bombings, a car bomb exploded on nearby Kook Street, timed to target first responders arriving at the scene.

356. The attack was perpetrated by Hamas. Hamas claimed responsibility for the double suicide bombing and the subsequent car bomb. The suicide bombers were identified as Hamas operatives Osama Muhammad Eid Baher and Nabil Mahmoud Jamil Halabiyah. This Court has previously found Hamas responsible for this attack and held Iran, Syria, and MOIS liable for damages arising from it.[99]

**A. Plaintiffs The Brill Family**

357. Plaintiff Baruch Yehuda Ziv Brill is a citizen of the United States and a resident of Colorado.

358. On the night of December 1, 2001, Baruch, then 16 years old, was spending time with his friends on Ben Yehuda Street when the two Hamas suicide bombers detonated their explosive devices. Baruch was severely injured in the blast and transported by ambulance to the hospital, where he underwent emergency surgery. He suffered multiple shrapnel wounds to his left arm, back, and chest; nails embedded in his left wrist and left leg; lacerations throughout his body; and a perforated left eardrum. Baruch remained hospitalized for one week before being discharged.

---

[99] Baxter v. Islamic Republic of Iran, No. 11-2133 (RCL), 2019 LX 31194 (D.D.C. Sep. 27, 2019) (finding Hamas responsible and holding Iran and MOIS liable); Kirschenbaum v. Islamic Republic of Iran, No. 08-cv-1814 (RCL), 2010 U.S. Dist. LEXIS 161862 (D.D.C. Dec. 15, 2010) (same); Baxter v. Syrian Arab Republic, No. 1:18-cv-1078-RCL, 2022 U.S. Dist. LEXIS 127993 (D.D.C. July 19, 2022) (also holding Syria liable).

359. As a direct and proximate result of the December 1, 2001 Terrorist Attack, Plaintiff Baruch Yehuda Ziv Brill suffered severe and permanent physical and psychological injuries, and as a result, he has past and future noneconomic damages, including physical and emotional pain and suffering, mental anguish, and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

360. Plaintiff Chaya Beili is a citizen of the United States and a resident of Israel. She is the mother of Baruch Yehuda Ziv Brill.

361. Plaintiff Shabtai Shabi Brill is a citizen of the United States and a resident of Israel. He is the father of Baruch Yehuda Ziv Brill.

362. Plaintiff Batya Carmit Yehoshua is a citizen of the United States and a resident of Israel. She is the sister of Baruch Yehuda Ziv Brill.

363. Plaintiff Abraham Aharon Niv Beili is a citizen of the United States and a resident of Israel. He is the brother of Baruch Yehuda Ziv Brill.

364. Plaintiff Noam Lev Beili is a citizen of the United States and a resident of New York. He is the brother of Baruch Yehuda Ziv Brill.

365. As a result of the December 1, 2001, Terrorist Attack, and the injuries suffered by Baruch Yehuda Ziv Brill, Plaintiffs Chaya Beili, Shabtai Shabi Brill, Batya Carmit Yehoshua, Abraham Aharon Niv Beili, Noam Lev Beili, have past and future noneconomic damages, including mental anguish, emotional pain and suffering, loss of solatium, loss of services, and economic loss. The injuries suffered by Baruch Yehuda Ziv Brill continue to have a lasting effect on his family and have taken a significant toll on their relationships.

**B. Plaintiffs The Almog Ben-Shochet Family**

366. Plaintiff Hagai Almog is a citizen of the United States and a resident of California.

367. On the night of December 1, 2001, Hagai, then 18 years old, was on Ben Yehuda Street with his friends and his girlfriend, Ayala, when the two Hamas suicide bombers detonated their explosive devices. The blast threw Hagai to the ground and struck him with shrapnel and burns. Paramedics placed him on a stretcher and into an ambulance. As the ambulance transported him to the hospital, the car bomb exploded approximately 100 meters away. At the hospital, physicians removed visible shrapnel from Hagai's body. Additional shrapnel remained embedded in his shoulder until it was removed during his military service.

368. As a direct and proximate result of the December 1, 2001 Terrorist Attack, Plaintiff Hagai Almog suffered severe and permanent physical and psychological injuries, and as a result, he has past and future noneconomic damages, including physical and emotional pain and suffering, mental anguish, and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

369. Plaintiff Efrayim Gavriel Ben-Shochet is a citizen of the United States and a resident of Israel. He is the brother of Hagai Almog.

370. Plaintiff Moshe Mendel Ben-Shochet is a citizen of the United States and a resident of Israel. He is the brother of Hagai Almog.

371. As a result of the December 1, 2001 Terrorist Attack, and the injuries suffered by Hagai Almog, Plaintiffs Efrayim Gavriel Ben-Shochet and Moshe Mendel Ben-Shochet have past and future noneconomic damages, including mental anguish, emotional pain and suffering, loss of solatium, loss of services, and economic loss. The injuries suffered by Hagai Almog continue to have a lasting effect on his family and have taken a significant toll on their relationships.

**C. Plaintiff Ayala Almog**

372. Plaintiff Ayala Almog is a citizen of the United States and a resident of California.

373. On the night of December 1, 2001, Ayala, then 17 years old, was on Ben Yehuda Street with her friends and her boyfriend, Hagai. She had just stepped around the corner when the two Hamas suicide bombers detonated their explosive devices. Ayala heard the blast and ran back toward the scene, searching for Hagai and her friends. She found Hagai wounded and accompanied him in the ambulance as paramedics rushed him to the hospital. During the ride, the car bomb on Kook street detonated, approximately 100 meters away.

374. As a direct and proximate result of the December 1, 2001 Terrorist Attack, Plaintiff Ayala Almog suffered severe and permanent injuries, and as a result, she has past and future noneconomic damages, including emotional pain and suffering, mental anguish, and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

## VI. THE HAIFA BUS NO. 16 BOMBING – DECEMBER 2, 2001

375. On December 2, 2001, at approximately 12:00 p.m., a Hamas suicide bomber boarded Egged bus No. 16 on Yad Labaim Street in downtown Haifa and detonated an explosive device concealed beneath his coat. The explosion killed fifteen people and injured 35 others.

376. The attack was perpetrated by Hamas. Hamas claimed responsibility for the attack later that day and identified the suicide bomber as Maher Khbeisheh, a member of Hamas's al-Qassam Brigades.

### A. Plaintiffs The Safiullin Family

377. Rassime Safiullin, a citizen of Israel, was killed in the December 2, 2001 Terrorist Attack.

378. Plaintiff Ali Safiulin is a citizen of the United States and a resident of California. He is the son of Rassime Safiulin.

379. Plaintiff Ravil Rasim Safiullin is a citizen of the United States and a resident of Washington. He is the son of Rassime Safiulin.

380. As a result of the December 2, 2001 Terrorist Attack, and the murder of Rassime Safiullin, Plaintiffs Ali Safiulin and Ravil Rasime Safiullin have past and future noneconomic damages, including mental anguish, emotional pain and suffering, loss of solatium, loss of services, and economic loss.

## VII. THE NISANIT-ELI SINAI ROAD SHOOTING – DECEMBER 2, 2001

381. On the morning of December 2, 2001, Baruch Zinger was driving on the road between Nissanit and Eli Sinai when two Hamas terrorists disguised as Israeli soldiers opened fire on his vehicle, critically wounding him. The terrorists then approached the car and fired additional shots at close range, killing Baruch. Israeli soldiers stationed nearby rushed to the scene, where they battled with the terrorists and ultimately neutralized both attackers.

382. The attack was perpetrated by Hamas. Hamas claimed responsibility for the attack later that day. The two gunmen were identified as Hamas operatives Maslimah Ibrahim Al-Araj and Jihad Hamdi al-Masri. Hamas published details of the operation with photographs of the terrorists wearing green Hamas headbands and holding Kalashnikov rifles and copies of the Quran.

### A. Plaintiff Yaara Cherniak

383. Plaintiff Yaara Cherniak is a citizen of the United States and a resident of Florida. She is the daughter of Baruch Zinger.

384. As a result of the December 2, 2001 Terrorist Attack, and the murder of Baruch Zinger, Plaintiff Yaara Cherniak has past and future noneconomic damages, including mental anguish, emotional pain and suffering, loss of solatium, loss of services, and economic loss.

## VIII. THE EMMANUEL BUS AMBUSH – DECEMBER 12, 2001

385. On December 12, 2001, at approximately 5:50 p.m., a roadside bomb detonated alongside Dan Bus No. 189 near the entrance to Emmanuel. The explosion blew out the windows and plunged the bus into darkness. The driver continued forward for approximately 200 meters before three Hamas terrorists positioned on a nearby hillside opened fire on the bus. One of the terrorists ran down the hillside and began firing at fleeing passengers and nearby cars while throwing hand grenades. Security personnel exchanged fire with the terrorists as rescue workers evacuated the injured. One of the terrorists was killed in the firefight, while the other two escaped. Ten people were killed in the attack, and thirty others were injured.

386. The attack was perpetrated by Hamas. Hamas claimed responsibility for the attack the following night and published a video of the deceased gunman, Assem Yusuf Muhammad Hamad Rihan, reading his will before the attack and identifying himself as a member of Hamas's al-Qassam Brigades.

**A. Plaintiffs The Pilant Family**

387. Plaintiff Andrew Phillip Pilant is a citizen of the United States and a resident of Israel.

388. On December 12, 2001, Andrew, then 40 years old, was riding home from work on Dan Bus No. 189 when the roadside bomb exploded. Andrew threw himself to the floor and attempted to call the police, but the call would not go through. Blood streamed down his face from cuts on his head. Andrew remained on the floor as gunshots sounded near the bus, too afraid to look out the shattered windows. Smoke began filling the bus, forcing the passengers to evacuate. Andrew climbed out through a broken window and fled the scene amid the continuing gunfire and chaos. Approximately one hour later, he received treatment from medical personnel for his head injuries.

389. As a direct and proximate result of the December 12, 2001 Terrorist Attack, Plaintiff Andrew Philip Pilant suffered severe and permanent physical and psychological

injuries, and as a result, he has past and future noneconomic damages, including physical and emotional pain and suffering, mental anguish, and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

390. Plaintiff Rebecca Phillips Goldman is a citizen of the United States and a resident of Israel. She is the wife of Andrew Philip Pilant.

391. Plaintiff Shlomit Chaya Pilant is a citizen of the United States and a resident of Israel. She is the daughter of Andrew Philip Pilant.

392. Plaintiff Yosef Mordechai Pilant is a citizen of the United States and a resident of Israel. He is the son of Andrew Philip Pilant.

393. Plaintiff David Menachem Pilant is a citizen of the United States and a resident of Israel. He is the son of Andrew Philip Pilant.

394. Plaintiff Levi Isaac Pilant is a citizen of the United States and a resident of Israel. He is the son of Andrew Philip Pilant.

395. Plaintiff Rachel Shoshana Connors is a citizen of the United States and a resident of Israel. She is the stepdaughter of Andrew Philip Pilant.

396. Plaintiff Elizabeth Anne Hastings Pilant is a citizen of the United States and a resident of Israel. She is the daughter of Andrew Philip Pilant.

397. Plaintiff Robert Elliott Hastings Pilant is a citizen of the United States and a resident of Israel. He is the son of Andrew Philip Pilant.

398. Plaintiff Samuel Philips Hastings Pilant is a citizen of the United States and a resident of Israel. He is the son of Andrew Philip Pilant.

399. Plaintiff Walter John Hastings Pilant is a citizen of the United States and a resident of Israel. He is the son of Andrew Philip Pilant.

400. As a result of the December 12, 2001 Terrorist Attack, and the injuries suffered by Andrew Philip Pilant, Plaintiffs Rebecca Phillips Goldman, Shlomit Chaya Pilant, Yosef

Mordechai Pilant, David Menachem Pilant, Levi Isaac Pilant, Rachel Shoshana Connors, Elizabeth Anne Hastings Pilant, Robert Elliott Hastings Pilant, Samuel Philips Hastings Pilant, and Walter John Hastings Pilant have past and future noneconomic damages, including severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of services, and economic loss. The injuries suffered by Andrew Philip Pilant continue to have a lasting effect on his family and have taken a significant toll on their relationships.

**B. Plaintiff Avrohom Eichenthal**

401. Plaintiff Avrohom Eichenthal is a citizen of the United States and a resident of Israel. He is the husband of Aliza Eichenthal.

402. Aliza Eichenthal, a citizen of Israel, was riding Dan Bus No. 189 home when the roadside bomb detonated alongside the bus. The blast shattered the window beside her, sending shards of glass into her back and knocking her from her seat to the floor. As she lay on the floor of the bus, she saw that the passenger seated in front of her had been killed. Gunfire erupted, and passengers began screaming and scrambling to escape. Aliza fled the bus without her belongings as the shooting continued. She attempted to return to retrieve them but was stopped by others because of the ongoing gunfire. When she was finally able to reenter the bus, she was unable to locate her belongings among the shattered glass, blood, and debris. Barefoot and bleeding, Aliza made her way to the entrance of Emmanuel while the attack continued and was evacuated by an Israeli military jeep. The following day, she sought treatment in the emergency room for the lacerations to her back and underwent a psychiatric evaluation.

403. As a result of the December 12, 2001, Terrorist Attack, and the injuries suffered by Aliza Eichenthal, Plaintiff Avrohom Eichenthal has past and future noneconomic damages, including mental anguish, emotional pain and suffering, loss of solatium, loss of services, and economic loss. The injuries suffered by Aliza Eichenthal continue to have a lasting effect on her husband and have taken a significant toll on their relationship.

## IX. THE CAFÉ MOMENT BOMBING – MARCH 9, 2002

404. On the night of March 9, 2002, a Hamas suicide bomber entered Café Moment in Jerusalem and detonated an explosive device. The explosion killed eleven people and injured 58 others.

405. The attack was perpetrated by Hamas. Hamas claimed responsibility for the attack later that day, and published a photo of the suicide bomber, identifying him as Fuad Ismail Muhammad al-Hurani, a member of Hamas's al-Qassam Brigades.

### A. Plaintiff Joseph Cohen

406. Plaintiff Joseph Cohen is a citizen of the United States and a resident of Israel.

407. On the night of March 9, 2002, Joseph Cohen, then 50 years old, was dining with a friend at Café Moment when the Hamas suicide bomber detonated his explosive device. The force of the blast lifted Joseph into the air, and shrapnel struck his face, knocking him unconscious. When Joseph regained consciousness, he was unable to see. He was carried into an ambulance, where he lost consciousness again, and was transported to the hospital. Joseph was admitted to the intensive care unit and underwent emergency surgery. As a result of the attack, Joseph suffered blunt chest trauma, three fractured ribs, two fractured teeth, shrapnel lacerations to his face, injuries to his spleen, and permanent damage to his vision and hearing.

408. As a direct and proximate result of the March 9, 2002 Terrorist Attack, Plaintiff Joseph Cohen suffered severe and permanent physical and psychological injuries, and as a result, he has past and future noneconomic damages, including physical and emotional pain and suffering, mental anguish, and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

## X. THE MATZUVA HIGHWAY AMBUSH – MARCH 12, 2002

409. On the morning of March 12, 2002, two PIJ terrorists disguised as Israeli soldiers infiltrated Israel from Lebanon. After killing a shepherd and his flock, the terrorists

concealed themselves in underbrush near Highway 70 outside Kibbutz Matzuva and opened fire on passing cars with M-16 rifles and hand grenades, killing four civilians. The terrorists then continued toward Kibbutz Matzuva, where they engaged Israeli soldiers in a gun battle, killing one soldier before they were neutralized.

410. The attack was perpetrated by PIJ and Hezbollah. Nearly two years later, PIJ claimed responsibility for the attack, identifying both attackers by name and stating it had delayed claiming responsibility for "security reasons." An Israeli investigation also uncovered evidence that Hezbollah had directly participated in the operation, including a cell phone recovered from one of the attackers that had been supplied through an espionage network operating on Hezbollah's behalf.

### A. Plaintiffs The Cohen Family

411. Judith Cohen, a citizen of Israel, was among the four civilians killed when PIJ terrorists opened fire on passing vehicles on Highway 70.

412. Plaintiff Ronen Cohen is a citizen of the United States and a resident of Israel. He is the husband of Judith Cohen.

413. Plaintiff Daniel Cohen is a citizen of the United States and a resident of Israel. He is the son of Judith Cohen.

414. As a result of the March 12, 2002 Terrorist Attack, and the murder of Judith Cohen, Plaintiffs Ronen Cohen and Daniel Cohen have past and future noneconomic damages, including mental anguish, emotional pain and suffering, loss of solatium, loss of services, and economic loss.

## XI. THE PARK HOTEL PASSOVER BOMBING – MARCH 27, 2002

415. On March 27, 2002, a Hamas suicide bomber disguised as a woman entered the Park Hotel in Netanya, where guests had gathered in the banquet hall to celebrate the beginning of the Jewish holiday of Passover. The bomber waited until approximately 250 people had

assembled before detonating an explosive belt. The explosion killed 30 people and injured approximately 140 others.

416. The attack was perpetrated by Hamas. Hamas claimed responsibility for the attack later that day, and released a video of the suicide bomber, Abd al-Baset Odeh, identifying himself as a member of Hamas's al-Qassam Brigades and reciting his will before the operation. This Court has previously found Hamas responsible for the attack and held Iran, Syria, and MOIS liable for damages arising from it.[100]

**A. Plaintiff Akiva Anachovich**

417. Plaintiff Akiva Anachovich is a citizen of the United States and a resident of New Jersey. He is the son of David and Frieda Anachovich.

418. David Anachovich and Frieda Anachovich, citizens of Israel, were celebrating Passover at the Park Hotel when the suicide bomber detonated his explosive belt in the banquet hall. David was critically injured in the explosion and transported to the hospital, where he later died of his wounds. Frieda suffered a blow to the pelvis that permanently impaired her mobility, and sustained damage to her hearing. Frieda died in 2015.

419. As a result of the March 27, 2002 Terrorist Attack, and the murder of David Anachovich and injuries suffered by Frieda Anachovich, Plaintiff Akiva Anachovich has past and future noneconomic damages, including mental anguish, emotional pain and suffering, loss of solatium, loss of services, and economic loss.

## XII. THE MAHANE YEHUDA MARKET BOMBING – APRIL 12, 2002

420. On April 12, 2002, at approximately 4:00 p.m., an AAMB suicide bomber detonated an explosive device concealed inside her purse next to the bus stop at the entrance

---

[100] Baxter v. Islamic Republic of Iran, No. 11-2133 (RCL), 2019 LX 31194 (D.D.C. Sep. 27, 2019) (finding Hamas responsible and holding Iran and MOIS liable); Baxter v. Syrian Arab Republic, No. 1:18-cv-1078-RCL, 2022 U.S. Dist. LEXIS 127993 (D.D.C. July 19, 2022) (also holding Syria liable).

of the Mahane Yehuda market in Jerusalem. The explosion killed six people and injured over 60 others.

421. The attack was perpetrated by Fatah/AAMB. AAMB claimed responsibility for the attack and published details about the operation, identifying the suicide bomber as Andalib Khalil Mohammad Suliman Al-Takatka.

**A. Plaintiffs The Hudja Family**

422. Plaintiff Shlomo Hudja is a citizen of the United States and a resident of Israel.

423. On April 12, 2002, Shlomo, then 45 years old, was shopping for groceries at the Mahane Yehuda market when the AAMB suicide bomber detonated her explosive device. The force of the blast hurled the decapitated upper half of the bomber's body into Shlomo, knocking him unconscious. When he regained consciousness, Shlomo fled the scene. As a result of the attack, Shlomo suffered hearing loss and continues to experience chronic back pain from the fall.

424. As a direct and proximate result of the April 12, 2002 Terrorist Attack, Plaintiff Shlomo Hudja suffered severe and permanent physical and psychological injuries, and as a result, he has past and future noneconomic damages, including physical and emotional pain and suffering, mental anguish, and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

425. Plaintiff Freida Alma Hudja is a citizen of the United States and resident of Israel. She is the wife of Shlomo Hudja.

426. Plaintiff Batya Hudja is a citizen of the United States and resident of Israel. She is the daughter of Shlomo Hudja.

427. Plaintiff Chana Fitusi is a citizen of the United States and resident of Israel. She is the daughter of Shlomo Hudja.

428. Plaintiff Rachel Leah Nehemia is a citizen of the United States and resident of Israel. She is the daughter of Shlomo Hudja.

429. Plaintiff Sara Uzan is a citizen of the United States and resident of Israel. She is the daughter of Shlomo Hudja.

430. Plaintiff Shabtai Hudja is a citizen of the United States and resident of Israel. He is the son of Shlomo Hudja.

431. Plaintiff Esther Hudja is a citizen of the United States and resident of Israel. She is the daughter of Shlomo Hudja.

432. Plaintiff Michal Hudja is a citizen of the United States and resident of Israel. She is the daughter of Shlomo Hudja.

433. Plaintiff Yael Hudja is a citizen of the United States and resident of Israel. She is the daughter of Shlomo Hudja.

434. Plaintiff Shmuel Hudja is a citizen and resident of Israel. He is the brother of Shlomo Hudja.

435. Plaintiff Estate of Nadia Canfi is a citizen and resident of Israel. She is the sister of Shlomo Hudja.

436. Plaintiff Nathan Hudja is a citizen and resident of Israel. He is the brother of Shlomo Hudja.

437. Plaintiff Tsiona Gerassi Hudja is a citizen and resident of Israel. She is the sister of Shlomo Hudja.

438. Plaintiff Zion Hudja is a citizen and resident of Israel. He is the brother of Shlomo Hudja.

439. Plaintiff Herzel Hudja is a citizen and resident of Israel. He is the brother of Shlomo Hudja.

440. As a result of the April 12, 2002, Terrorist Attack, and the injuries suffered by Shlomo Hudja, Plaintiffs Freida Alma Hudja, Batya Hudja, Chana Fitusi, Rachel Leah Nehemia, Sara Uzan, Shabtai Hudja, Esther Hudja, Michal Hudja, Yael Hudja, Shmuel Hudja, Estate Nadia Canfi, Nathan Hudja, Tsiona Gerassi Hudja, Zion Hudja, and Herzel Hudja, have past and future noneconomic damages, including mental anguish, emotional pain and suffering, loss of solatium, loss of services, and economic loss. The injuries suffered by Shlomo Hudja continue to have a lasting effect on his family and have taken a significant toll on their relationships.

## XIII. THE SHEFFIELD CLUB BOMBING – MAY 7, 2002

441. On the night of May 7, 2002, a Hamas suicide bomber carrying a suitcase packed with explosives and shrapnel entered the third floor of a building in Rishon Letzion's industrial zone that housed the Sheffield Club, an informal social club. At approximately 10:55 p.m., the bomber detonated an explosive belt, whose blast simultaneously triggered the explosives inside the suitcase. The explosion propelled some of the victims through the club's windows and onto cars in the parking lot three floors below. The blast killed fifteen people and injured sixty others.

442. The attack was perpetrated by Hamas. Hamas claimed responsibility for the attack later that night. The suicide bomber was identified as Muhammad Jamil Nabil Muammar, a member of Hamas's al-Qassam Brigades.

### A. Plaintiffs The Agababa Family

443. Dalya Massa, a citizen of Israel, received penetrating shrapnel wounds to her chest as a result of the May 7, 2002 Terrorist Attack. She was transported to the hospital, where she underwent emergency surgery to remove the shrapnel, but died of her wounds within a few hours.

444. Plaintiff Yehezkel Agababa is a citizen of the United States and a resident of Israel. He is the brother of Dalya Massa.

445. Plaintiff Menache Agababa is a citizen of the United States and a resident of Florida. He is the brother of Dalya Massa.

446. Plaintiff Yehuda Agababa is a citizen of the United States and a resident of Florida. He is the brother of Dalya Massa.

447. As a result of the May 7, 2002 Terrorist Attack, and the murder of Dalya Massa, Plaintiffs Yehezkel Agababa, Menache Agababa, and Yehuda Agababa have past and future noneconomic damages, including mental anguish, emotional pain and suffering, loss of solatium, loss of services, and economic loss.

## XIV. THE MEGIDDO JUNCTION BUS BOMBING – JUNE 5, 2002

448. On June 5, 2002, at approximately 7:15 a.m., a PIJ suicide bomber drove a vehicle packed with explosives alongside Egged Bus No. 830 near Megiddo Junction and detonated the bomb. The force of the explosion lifted the bus into the air and ignited its fuel tank, reducing the bus to charred metal. The attack killed seventeen people and injured more than forty others.

449. The attack was perpetrated by PIJ. PIJ claimed responsibility for the attack. The suicide bomber was identified as Hamza Arif Hassan al-Samudi, a member of PIJ's al-Quds Brigades.

### A. Plaintiffs The Carlin Family

450. Eyal Carlin, a citizen of Israel, was riding Bus No. 830 when the bomb detonated. He sustained a gaping twelve-inch-wound to his shin requiring skin grafts, along with burns on his face and arms, a broken nose, and a broken right heel.

451. Plaintiff Joseph Neil Carlin is a citizen of the United States and a resident of New York. He is the father of Eyal Carlin

452. Plaintiff Dina Hanna Daines is a citizen of the United States and a resident of New York. She is the sister of Eyal Carlin.

453. Plaintiff Adam Jonathan Carlin is a citizen of the United States and a resident of New York. He is the brother of Eyal Carlin.

454. As a result of the June 5, 2002 Terrorist Attack, and the injuries suffered by Eyal Carlin, Plaintiffs Joseph Neil Carlin, Dina Hanna Daines, and Adam Jonathan Carlin have past and future noneconomic damages, including mental anguish, emotional pain and suffering, loss of solatium, loss of services, and economic loss.

## XV. THE FRENCH HILL JUNCTION BUS STOP BOMBING – JUNE 19, 2002

455. On the morning of June 19, 2002, an AAMB suicide bomber ran up to a crowded bus stop at the French Hill Junction in Jerusalem and detonated an explosive device. The explosion killed six people and injured at least 50 others.

456. The attack was perpetrated by Fatah/AAMB. AAMB claimed responsibility for the attack. The suicide bomber was identified as AAMB operative Sa'id Wadah Hamih Awada. In *Sokolow v. PLO,* a jury in the Southern District of New York found that AAMB carried out this attack with the knowing, material support of the PLO and PA.[101]

### A. Plaintiffs The Desta Family

457. Plaintiff Esther Desta is a citizen of the United States and a resident of Israel. She is the mother of Nechama Rina Said and Shifra Bosmat Desta.

458. Plaintiff Nechama Rina Said is a citizen of the United States and a resident of Israel. She is the daughter of Esther Desta and sister of Shifra Bosmat Desta.

459. Plaintiff Shifra Bosmat Desta is a citizen of the United States and a resident of Israel. She is the daughter of Esther Desta and sister of Nechama Rina Said.

---

[101] Sokolow v. PLO, No. 04 CIVIL 00397 (GBD), 2015 LX 55845 (S.D.N.Y. Oct. 1, 2015).

460. On the morning of June 19, 2002, Esther, then 44 years old, was riding the bus with her two young daughters, Nechama, then 5, and Shifra, then 1, when the bomb detonated as the bus pulled up to the French Hill Junction stop. Esther was knocked unconscious. When she regained consciousness, the bus was filled with smoke, making it difficult to breathe. Esther evacuated the bus with her daughters, who were both in shock, and entrusted them to a bystander while she returned to assist the wounded because she was a registered nurse. She witnessed catastrophic injuries, including the terrorist's decapitated head, and used her stethoscope to make a tourniquet to help a man who had lost his leg. Nechama and Shifra also witnessed the bloody aftermath of the bombing as they were evacuated. When the ambulances arrived, a piece of burned human tissue fell into Esther's mouth, causing her to vomit. Several hours later, after returning home, Esther's husband took her to the emergency room for treatment.

461. As a direct and proximate result of the June 19, 2002 Terrorist Attack, Plaintiffs Esther Desta, Nechama Rina Said, and Shifra Bosma Desta suffered severe and permanent physical and psychological injuries, and as a result, they have past and future noneconomic damages, physical and emotional pain and suffering, mental anguish, and loss of enjoyment of life, loss of solatium, loss of services, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

## XVI. THE DAN BUS NO. 4 BOMBING – SEPTEMBER 19, 2002

462. On September 19, 2002, a Hamas suicide bomber boarded Dan Bus No. 4 and detonated an explosive belt as the bus traveled along Allenby Street in Tel Aviv near the city's Great Synagogue. The explosion killed six people and injured around 70 others.

463. The attack was perpetrated by Hamas. Hamas took responsibility for the attack. The suicide bomber was identified as Ayad Radad, a member of Hamas's al-Qassam Brigades.

This Court has previously found Hamas responsible for this attack and held Hamas, Iran, and MOIS liable for injuries arising from the attack.[102]

**A. Plaintiffs The Stern Family**

464. Plaintiff Estate of Aron Paul Stern was a citizen of the United States and resident of Israel.

465. Aron, then 70 years old, was riding Dan Bus No. 4, reading a newspaper when the bomb detonated. Aron was thrown into the air, and glass shards from the window embedded into his skin. When he looked up, he saw the bodies of two young men lying in front of him, and the bus driver slumped over the wheel. He saw that he was covered in blood. Despite being wounded himself, Aron helped other passengers out of the bus and onto ambulances before being taken to the hospital by ambulance himself. Aron sustained hearing loss in both ears, lacerations near his kidneys, and lacerations in his groin that required stitching.

466. As a direct and proximate result of the September 19, 2002 Terrorist Attack, Plaintiff Estate of Aron Paul Stern suffered severe and permanent physical and psychological injuries subsequent the Attack and prior to his death, and as a result, he suffered noneconomic damages, physical and emotional pain and suffering, mental anguish, and loss of enjoyment of life, and economic damages, including medical expenses, lost income, and loss of earning capacity.

467. Plaintiff Ron Joseph Stern is a citizen of the United States and a resident of Israel. He is the son and personal representative of the Estate of Aron Paul Stern.

468. As a result of the September 19, 2002 Terrorist Attack, and the injuries suffered by Aron Paul Stern, Plaintiff Ron Joseph Stern has past and future noneconomic damages,

[102] Sisso v. Islamic Republic of Iran, Civil Action No. 05-0394 (JDB), 2007 U.S. Dist. LEXIS 48627 (D.D.C. July 5, 2007).

including mental anguish, emotional pain and suffering, loss of solatium, loss of services, and economic loss.

## XVII. THE SONOL GAS STATION BOMBING – OCTOBER 27, 2002

469. On October 27, 2002, at approximately 11:30 a.m., Hamas suicide bomber approached the Sonol gas station near the entrance to the Israeli settlement of Ariel, where Israeli soldiers were waiting for transportation to their military base. Civilians and workers identified the bomber and wrestled him to the ground. As soldiers rushed over to assist, the terrorist detonated an explosive belt. The explosion killed three people and injured over 20 others.

470. The attack was perpetrated by Hamas. Hamas claimed responsibility for the attack later that day. The suicide bomber was identified as Muhammad Kazid al-Bustami.

### A. Plaintiffs The Neeman Family

471. Plaintiff Eyal Chaim Neeman is a citizen of the United States and a resident of Israel.

472. Eyal was waiting at the Sonol gas station for transportation to his military base when the suicide bomber detonated the explosive belt. Eyal sustained shrapnel wounds to his face, stomach, and left leg. He was transported to the hospital, where he underwent emergency surgery to remove the shrapnel from his left thigh. As a result of the injury, Eyal suffers permanent nerve damage to his left leg.

473. As a direct and proximate result of the October 27, 2002 Terrorist Attack, Plaintiff Eyal Chaim Neeman suffered severe and permanent physical and psychological injuries, and as a result, he has past and future noneconomic damages, physical and emotional pain and suffering, mental anguish, and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

474. Plaintiff Toby Etta Neeman is a citizen of the United States and a resident of Israel. She is the mother of Eyal Chaim Neeman.

475. Plaintiff Naamah Bracha Barshai is a citizen of the United States and a resident of Israel. She is the sister of Eyal Chaim Neeman.

476. Plaintiff Menachem Tzvi Neeman is a citizen of the United States and a resident of Israel. He is the brother of Eyal Chaim Neeman.

477. Plaintiff Yair Neeman is a citizen of the United States and a resident of Israel. He is the brother of Eyal Chaim Neeman.

478. Plaintiff Ronit Ne'eman-Chen is a citizen of the United States and a resident of Israel. She is the sister of Eyal Chaim Neeman.

479. Plaintiff Yishai Neeman is a citizen of the United States and a resident of Israel. He is the brother of Eyal Chaim Neeman.

480. Plaintiff Orit Neeman is a citizen of the United States and a resident of Israel. She is the sister of Eyal Chaim Neeman.

481. As a result of the October 27, 2002 Terrorist Attack, and the injuries suffered by Eyal Chaim Neeman, Plaintiffs Toby Etta Neeman, Naamah Bracha Barshai, Menachem Tzvi Neeman, Yair Neeman, Ronit Ne'eman-Chen, Yishai Neeman, and Orit Neeman, have past and future noneconomic damages, including mental anguish, emotional pain and suffering, loss of solatium, loss of services, and economic loss.

## XVIII. THE WORSHIPPERS' WAY AMBUSH – NOVEMBER 15, 2002

482. On the evening of November 15, 2002, a group of Jewish worshippers were walking home from prayer services at the Tomb of the Patriarchs in Hebron along Worshippers' Way, the road connecting the tomb to Kiryat Arba. At approximately 7:15 p.m., three PIJ terrorists opened fire on an Israeli Border Police jeep escorting the worshippers, killing all four officers inside. Rescue personnel, soldiers, and civilian emergency responders

rushed to the scene but came under sustained gunfire and grenade attacks as they attempted to evacuate the wounded and engage the terrorists. The firefight lasted approximately ninety minutes before the terrorists were neutralized. In total, the attack and ensuing gun battle killed twelve people, including civilians and security personnel, and injured fifteen others.

483. The attack was perpetrated by PIJ. PIJ took responsibility for the attack later that evening. The three attackers were identified as members of the PIJ's al-Quds Brigades.

**A. Plaintiffs The Goldberg Family**

484. Plaintiff Naphtali Goldberg is a citizen of the United States and a resident of Israel.

485. On November 15, 2002, Naphtali, then 32 years old, was a volunteer with Kiryat Arba's civil emergency team. While at home, he received an alert on his beeper notifying him of the attack and immediately responded to the scene to assist the wounded and help neutralize the terrorists. During the exchange of gunfire, Naphtali was shot in the thigh. A tourniquet was applied to his leg, but because the firefight was still underway, it took approximately one hour before he could be transported to the hospital. He remained hospitalized for ten days and underwent two surgeries.

486. As a direct and proximate result of the November 15, 2002 Terrorist Attack, Plaintiff Naphtali Golderg suffered severe and permanent physical and psychological injuries, and as a result, he has past and future noneconomic damages, including physical and emotional pain and suffering, mental anguish, and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

487. Plaintiff Shulamit Moriya Goldberg is a citizen and resident of Israel. She is the wife of Naphtali Goldberg.

488. Plaintiff Tamar Shalem Goldberg is a citizen and resident of Israel. She is the daughter of Naphtali Goldberg.

489. Plaintiff Amizur Shlomo Goldberg is a citizen and resident of Israel. He is the son of Naphtali Goldberg.

490. Plaintiff Gilad Goldberg is a citizen and resident of Israel. He is the son of Naphtali Goldberg.

491. Plaintiff Neriya Goldberg is a citizen and resident of Israel. He is the son of Naphtali Goldberg.

492. Plaintiff Ronald Goldberg is a citizen of the United States and resident of Israel. He is the father of Naphtali Goldberg.

493. Plaintiff Libby Goldberg is a citizen of the United States and resident of Israel. She is the mother of Naphtali Goldberg.

494. Plaintiff Chaim Goldberg is a citizen of the United States and resident of Israel. He is the brother of Naphtali Goldberg.

495. Plaintiff Chaya Rivka Tsour is a citizen of the United States and resident of Israel. She is the sister of Naphtali Goldberg.

496. Plaintiff Avrohom Yitzchok Goldberg is a citizen of the United States and resident of New York. He is the brother of Naphtali Goldberg.

497. Plaintiff Sara Shifra Friedman is a citizen of the United States and resident of Israel. She is the sister of Naphtali Goldberg.

498. Plaintiff Moshe Goldberg is a citizen of the United States and resident of Israel. He is the brother of Naphtali Goldberg.

499. Plaintiff Peretz Goldberg is a citizen of the United States and resident of Israel. He is the brother of Naphtali Goldberg.

500. Plaintiff Devora Hadas Nager-Goldberg is a citizen of the United States and a resident of Israel. She is the sister of Naphtali Goldberg.

501. As a result of the November 15, 2002, Terrorist Attack, and the injuries suffered Naphtali Goldberg, Plaintiff Shulamit Moriya Goldberg, Tamar Shalem Goldberg, Amizur Shlomo Goldberg, Gilad Goldberg, Neriya Goldberg, Ronald Goldberg, Libby Goldberg, Chaim Goldberg, Chaya Rivka Tsour, Avrohom Yitzchok Goldberg, Sara Shifra Friedman, Moshe Goldberg, Peretz Goldberg, and Devora Hadas Nager-Goldberg have past and future noneconomic damages, including mental anguish, emotional pain and suffering, loss of solatium, loss of services, and economic loss.

**B. Plaintiffs The Yelin Family**

502. Plaintiff Baruch Yitschack Yelin is a citizen of the United States and a resident of Israel.

503. Baruch, then 38 years old, was a volunteer with Kiryat Arba's civil emergency team. After receiving the alert on his beeper about the terrorist attack, he rushed to the scene to assist the wounded and neturalize the terrorists. During the firefight, Baruch sustained a gunshot wound to the upper left side of his back, third-degree burns, and shrapnel wounds from a grenade. He was transported ambulance to the hospital, where his burns required a skin graft.

504. As a direct and proximate result of the November 15, 2002 Terrorist Attack, Plaintiff Baruch Yitschak Yelin suffered severe and permanent physical and psychological injuries, and as a result, he has past and future noneconomic damages, including physical and emotional pain and suffering, mental anguish, and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

505. Plaintiff Orly Yelin is a citizen and resident of Israel. She is the wife of Baruch Yitschak Yelin.

506. Plaintiff Kfir Yelin is a citizen and resident of Israel. He is the son of Baruch Yitschak Yelin.

507. Plaintiff Moriya Yelin is a citizen and resident of Israel. She is the daughter of Baruch Yitschak Yelin.

508. Plaintiff Hadar Yelin is a citizen and resident of Israel. He is the son of Baruch Yitschak Yelin.

509. Plaintiff Naama Yelin is a citizen of the United States and resident of Israel. She is the sister of Baruch Yitschak Yelin.

510. Plaintiff Avital Yelin Liwanag is a citizen of the United States and resident of Canada. She is the sister of Baruch Yitschak Yelin.

511. Plaintiff Shlomit Yelin-Arber is a citizen of the United States and resident of Israel. She is the sister of Baruch Yitschak Yelin.

512. As a result of the November 15, 2002, Terrorist Attack, and the injuries suffered by Baruch Yitschak Yelin, Plaintiff Orly Yelin, Kfir Yelin, Moriya Yelin, Hadar Yelin, Naama Yelin, Avital Yelin Liwanag, and Shlomit Yelin-Arber, have past and future noneconomic damages, including mental anguish, emotional pain and suffering, loss of solatium, loss of services, and economic loss.

**C. Plaintiffs The Noked Family**

513. Plaintiff Estate of Ayal Chaim Noked was a citizen of the United States and a resident of Israel.

514. Ayal was a paramedic and volunteer with Hebron's civil emergency team. After receiving an alert about the attack while in a command jeep, he immediately drove to the scene. Upon arriving, he found injured civilians and soldiers lying in pools of blood. Ayal exchanged gunfire with the terrorists while repeatedly running toward the wounded, moving them to safety and providing first aid. Ayal died of cancer in 2011.

515. As a direct and proximate result of the November 15, 2002 Terrorist Attack, Plaintiff Estate Ayal Chaim Noked, prior to his death, suffered severe and permanent physical

and psychological injuries, and as a result, he sustained noneconomic damages, including physical and emotional pain and suffering, mental anguish, and loss of enjoyment of life, and economic damages, including medical expenses, lost income, and loss of earning capacity.

516. Plaintiff Einat Noked is a citizen and resident of Israel. She is the wife and personal representative of Ayal Chaim Noked.

517. Plaintiff Neta Nechama Cohen is a citizen and resident of Israel. She is the daughter of Ayal Chaim Noked.

518. Plaintiff Baruch Noked is a citizen and resident of Israel. He is the son of Ayal Chaim Noked.

519. Plaintiff Avishag Nitzan is a citizen and resident of Israel. She is the daughter of Ayal Chaim Noked.

520. Plaintiff Binyamin Elkana Noked is a citizen and resident of Israel. He is the son of Ayal Chaim Noked.

521. Plaintiff Atara Etinger is a citizen and resident of Israel. She is the daughter of Ayal Chaim Noked.

522. Plaintiff Talya Loulai is a citizen and resident of Israel. She is the daughter of Ayal Chaim Noked.

523. Plaintiff Evelyn Lourie is a citizen of the United States and a resident of Israel. She is the mother of Ayal Chaim Noked.

524. Plaintiff Shani Louri is a citizen of the United States and a resident of Israel. She is the sister of Ayal Chaim Noked.

525. Plaintiff Tamar Rachel Beinhacker is a citizen of the United States and a resident of Israel. She is the sister of Ayal Chaim Noked.

526. Plaintiff Shai Lourie is a citizen of the United States and a resident of Israel. He is the brother of Ayal Chaim Noked.

527. As a result of the November 15, 2002, Terrorist Attack, and the injuries suffered by Ayal Chaim Noked, Plaintiffs Einat Noked, Neta Nechama Cohen, Baruch Noked, Avishag Nitzan, Binyamin Elkana Noked, Atara Etinger, Talya Loulai, Evelyn Lourie, Shani Louri, Tamar Rachel Beinhacker, and Shai Lourie, have past and future noneconomic damages, including mental anguish, emotional pain and suffering, loss of solatium, loss of services, and economic loss.

**D. Plaintiff Michal Amseli**

528. Plaintiff Michal Amseli is a citizen of the United States and a resident of Israel. She is the wife of Ouri Amseli.

529. Ouri Amseli, an Israeli citizen, was a volunteer in Kiryat Arba's civil emergency team. After receiving an alert on his beeper about the attack, he immediately grabbed his rifle and responded to the scene to assist the wounded and neutralize the terrorists. During the firefight, a grenade exploded near Ouri, and shrapnel struck his hand. He was subsequently transported to the hospital. As a result of his injuries, Ouri lost most of the sensation in his arm, continues to experience severe pain in his hand, and is unable to fully use or lift his arm.

530. As a result of the November 15, 2002 Terrorist Attack and the injuries suffered by Ouri Amseli, Plaintiff Michal Amseli has past and future noneconomic damages, including mental anguish, emotional pain and suffering, loss of solatium, loss of services, and economic loss.

## XIX. THE BEIT SHE'AN ELECTION ATTACK – NOVEMBER 28, 2002

531. On November 28, 2002, the Likud political party in Israel was holding its primary elections at its headquarters in Beit She'an. As people waited in line to vote, two AAMB terrorists threw hand grenades into the plaza surrounding the polling station before entering and opening fire with automatic weapons at close range on the crowd the polling

station. The attack killed six people and injured thirty others before the terrorists were neutralized.

532. The attack was perpetrated by Fatah/AAMB. AAMB claimed responsibility for the attack later that day. The attackers were identified as AAMB operatives Omar Muhammad Awwad Abu al-Rub and Youssef Muhammad Ragheb Abu al-Rub.

**A. Plaintiffs The Levi Family**

533. Plaintiff Jacky Levi is a citizen and resident of Israel. He is the husband of Bat-Zion Levi.

534. Plaintiff Bat-Zion Levi is a citizen of the United States and a resident of Israel. She is the wife of Jacky Levi.

535. On November 28, 2002, Jacky was serving as a campaign manager at the Likud polling station when the AAMB terrorists launched the attack. Jacky shouted for everyone to get down before shrapnel from one of the grenades struck his hand. When the shooting began, he hurried to an attic, pulling a man suffering from shock with him. Fearing that the terrorists would find them, Jacky eventually returned downstairs. After the shooting ceased, he saw the bodies of the terrorists and dead and wounded civilians and immediately began evacuating the injured. Only then did Jacky realize that a bullet had grazed his leg and that blood was streaming from the wound. Despite his injuries, he remained at the scene, helping load wounded victims into vehicles for transport to the hospital before he himself was transported for medical treatment.

536. Bat-Zion was driving to the polling station with her children to vote when the AAMB terrorists began launching the attack. As she pulled into the parking lot of the Likud headquarters, she heard gunfire and screaming coming from the polling station. Bat-Zion backed out of the parking lot in panic and waited for the shooting to end before returning to look for her husband. She found Jacky wounded and witnessed injured victims being evacuated

from the scene. Bat-Zion helped Jacky and other wounded victims into her vehicle before handing her keys to another person to drive them to the hospital while she took her children home. She suffered lasting psychological injuries from hearing the gunfire and screams, fearing for her husband's safety, and witnessing the bloody aftermath.

537. As a direct and proximate result of the November 28, 2002 Terrorist Attack, including the trauma she experienced during the attack and the injuries suffered by her husband, Jacky Levi, Plaintiff Bat-Zion Levi suffered severe and permanent injuries, and as a result, she has past and future noneconomic damages, including emotional pain and suffering, mental anguish, loss of enjoyment of life, loss of solatium, loss of services, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

538. As a result of the November 28, 2002 Terrorist Attack and the injuries suffered by Bat-Zion Levi, Plaintiff Jacky Levi has past and future noneconomic damages, including mental anguish, emotional pain and suffering, loss of solatium, loss of services, and economic loss.

## XX. THE HAIFA BUS NO. 37 ATTACK – MARCH 5, 2003

539. On March 5, 2003, a Hamas suicide bomber boarded Egged Bus No. 37, which was filled with university students on their way to Haifa University. At approximately 2:15 p.m., as the bus made its way along Moriah Boulevard in Haifa, the bomber detonated an explosive device. The explosion killed seventeen people and injured 53 others.

540. The attack was perpetrated by Hamas. Hamas claimed responsibility for the attack. The suicide bomber was identified as Mahmoud Imran Salim al-Qawasmeh, a member of Hamas’s al-Qassam Brigades. This Court has previously found Hamas responsible for this

attack and held Iran, Syria, and MOIS liable for damages arising from injuries related to the attack.[103]

### A. Plaintiff Rachel Oshrat Shaked

541. Plaintiff Rachel Oshrat Shaked is a citizen of the United States and a resident of Israel. She is the sister of Eliyahu Laham.

542. Eliyahu Laham, a citizen of Israel, was riding Egged Bus No. 37 to visit his grandfather in the hospital when the bomb detonated. He was among the seventeen killed in the explosion.

543. As a result of the March 5, 2003 Terrorist Attack and the murder of Eliyahu Laham, Plaintiff Rachel Oshrat Shaked has past and future noneconomic damages, including mental anguish, emotional pain and suffering, loss of solatium, loss of services, and economic loss.

## XXI. THE MIKE'S PLACE BOMBING – APRIL 30, 2003

544. On April 30, 2003, two Hamas suicide bombers approached Mike's Place, a beachfront pub on the Tel Aviv Promenade near the U.S. Embassy. At approximately 12:45 a.m., one bomber detonated his explosive vest outside the pub's entrance, killing three people and injuring over 50 others. As first responders arrived at the scene, the second bomber attempted to detonate his explosive device but failed to do so due to a malfunction and fled the scene.

545. The attack was perpetrated by Hamas. Hamas claimed responsibility for the attack several hours later. The suicide bombers were identified as Asif Muhammad Hanif and Omar Khan Sharif, two British nationals recruited by Hamas to carry out the operation. This

---

[103] Baxter v. Islamic Republic of Iran, No. 11-2133 (RCL), 2019 LX 31194 (D.D.C. Sep. 27, 2019) (finding Hamas responsible and holding Iran and MOIS liable); Baxter v. Syrian Arab Republic, No. 1:18-cv-1078-RCL, 2022 U.S. Dist. LEXIS 127993 (D.D.C. July 19, 2022) (also holding Syria liable).

Court has previously found Hamas responsible for this attack and held Iran, Syria, and MOIS liable for damages arising from injuries related to the attack.[104]

### A. Plaintiffs The Ganzman Family

546. Plaintiff Gal Ganzman is a citizen of the United States and a resident of Israel.

547. On the night of the attack, Gal was working at Mike's Place, which he co-owned with his brother, Assaf Ganzman. He was pouring a drink for a customer when the first suicide bomber detonated his explosive device. Gal saw a flash of light to his left and heard a high-pitched pop. He initially believed a fight had broken out and immediately jumped over the bar to respond, but when he stepped outside, he realized it was a bomb. Gal saw bodies scattered on the ground, and people staggering and bleeding. When he looked back toward the bar, he saw the bomber's body against the door, missing his waist and legs. Gal rushed back inside to search for his girlfriend, Dominique, who worked as a waitress at the bar. When he could not find her, he went back out and looked at the injured on the ground. Dominique was lying among them, still conscious but missing her left forearm. He ran to her side and attempted to slow the bleeding by tying straps from a handbag nearby around her arm. Gal stayed with Dominique until the paramedics took her into the ambulance. She died on the way to the hospital. Gal was also taken to the hospital and suffered from tinnitus and temporary hearing loss from the explosion.

548. As a direct and proximate result of the April 30, 2003 Terrorist Attack, Plaintiff Gal Ganzman suffered severe and permanent physical and psychological injuries, and as a result, he has past and future noneconomic damages, including emotional pain and suffering, mental anguish, and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

---

[104] Baxter v. Islamic Republic of Iran, No. 11-2133 (RCL), 2019 LX 31194 (D.D.C. Sep. 27, 2019) (finding Hamas responsible and holding Iran and MOIS liable); Baxter v. Syrian Arab Republic, No. 1:18-cv-1078-RCL, 2022 U.S. Dist. LEXIS 127993 (D.D.C. July 19, 2022) (also holding Syria liable).

549. Plaintiff Arie Ganzman is a citizen of the United States and a resident of Israel. He is the father of Gal Ganzman.

550. Plaintiff Zvia Ganzman is a citizen of the United States and a resident of Israel. She is the mother of Gal Ganzman.

551. Plaintiff Assaf Ganzman is a citizen of the United States and a resident of Israel. He is the brother of Gal Ganzman.

552. Plaintiff Alma Ganzman Eitan is a citizen of the United States and a resident of Canada. She is the sister of Gal Ganzman.

553. As a result of the April 30, 2003 Terrorist Attack, and the injuries suffered by Gal Ganzman, Plaintiffs Arie Ganzman, Zvia Ganzman, Assaf Ganzman, and Alma Ganzman Eitan have past and future noneconomic damages, including mental anguish, emotional pain and suffering, loss of solatium, loss of services, and economic loss.

**B. Plaintiffs The Faudem Family**

554. Plaintiff Joshua Gabe Faudem is a citizen of the United States and a resident of Israel.

555. At the time of the attack, Joshua, then 40 years old, was filming live music at Mike's Place for a documentary about the everyday lives of young Israelis. When the bomb detonated, Joshua threw himself over his girlfriend to shield her from the blast. After regaining his bearings, he led her to a rear storeroom away from the immediate aftermath before returning to assist the wounded. He then realized that his camera was still recording and began documenting the scene around him. Joshua and his girlfriend eventually made their way through pools of blood, dismembered body parts, and human remains to evacuate the building. As they exited, Joshua saw the bodies of several of his friends, as well as the mangled remains of the suicide bomber. Joshua and his girlfriend were transported by ambulance to the hospital.

After the attack, Joshua completed his documentary, titled *Blues by the Beach*, focusing on the bombing at Mike's Place.

556. As a direct and proximate result of the April 30, 2003 Terrorist Attack, Plaintiff Joshua Gabe Faudem suffered severe and permanent injuries, and as a result, he has past and future noneconomic damages, including emotional pain and suffering, mental anguish, and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

557. Plaintiff Arlene Faudem is a citizen of the United States and a resident of …She is the mother of Joshua Gabe Faudem.

558. Plaintiff Emily Beth Faudem is a citizen of the United States and a resident of Hungary. She is the sister of Joshua Gabe Faudem.

559. Plaintiff Michele Faye Faudem Ershler is a citizen of the United States and a resident of Michigan. She is the sister of Joshua Gabe Faudem.

560. As a result of the April 30, 2003 Terrorist Attack, and the injuries suffered Joshua Gabe Faudem, Plaintiffs Arlene Faudem, Emily Beth Faudem, and Michele Faye Faudem Ershler have past and future noneconomic damages, including mental anguish, emotional pain and suffering, loss of solatium, loss of services, and economic loss.

**C. Plaintiff Orly Coffey**

561. Plaintiff Orly Coffey is a citizen of the United States and a resident of California.

562. Orly was celebrating her boyfriend Rick's birthday at Mike's Place with friends when the bomb exploded. Human tissue was blown onto her. Orly threw herself to the ground. When she looked up, she saw flames and a woman lying on the floor covered in blood. Although Orly wanted to assist the wounded, she was told that paramedics were on their way. She then fled the bar with Rick.

563. As a direct and proximate result of the April 30, 2003 Terrorist Attack, Plaintiff Orly Coffey suffered severe and permanent injuries, and as a result, she has past and future noneconomic damages, including emotional pain and suffering, mental anguish, and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

**D. Plaintiff Bruce Howard Mazer**

564. Plaintiff Bruce Howard Mazer is a citizen of the United States and a resident of Missouri.

565. Bruce was at Mike's Place with Orly Coffey celebrating his friend Rick's birthday when the bomb exploded. He saw a bright orange flash followed by a loud pop. At first, Bruce believed someone had set off a firework, but when he turned, he saw the devastation and froze in shock. Although he wanted to help the wounded, Bruce had no medical training and did not know what to do. Shortly after the explosion, he received a telephone call from a friend urging him to leave the bar. As Bruce evacuated, he slipped repeatedly on blood and bodies covering the floor.

566. As a direct and proximate result of the April 30, 2003 Terrorist Attack, Plaintiff Bruce Howard Mazer suffered severe and permanent injuries, and as a result, he has past and future noneconomic damages, including emotional pain and suffering, mental anguish, and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

**E. Plaintiff Zohar Saar**

567. Plaintiff Zohar Saar is a citizen of the United States and resident of Israel.

568. Zohar was celebrating her friend Rick's birthday at Mike's Place with Orly Coffey and Bruce Howard Mazer. Moments before the explosion, she stepped outside the pub. The force of the blast lifted Zohar into the air and hurled her between two parked cars. Her

right leg was bleeding profusely. She crawled toward the sidewalk until collapsing against a tree, where she began to feel faint and cold. Zohar was transported to the hospital, where she underwent surgery to repair damage to the muscles, tendons, and veins in her right leg. Because of the damage to her knee, her right leg is now shorter than her left, leaving her with permanent mobility impairments.

569. As a direct and proximate result of the April 30, 2003 Terrorist Attack, Plaintiff Zohar Saar suffered severe and permanent physical and psychological injuries, and as a result, she has past and future noneconomic damages, including physical and emotional pain and suffering, mental anguish, and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

**F. Plaintiff Judith Eileen Buchman-Ziv**

570. Plaintiff Judith Eileen Buchman-Ziv is a citizen of the United States and resident of Florida.

571. Judith was performing live music at Mike's Place on the night of the attack. When the bomb detonated, she saw a flash of light and heard a loud sound. Judith immediately realized the bar had been the target of a terrorist attack, and ran into the bathroom to hide. After several minutes, she evacuated the bar, slipping through blood and human remains on her way out. She saw body parts scattered across the tables where patrons had been sitting moments earlier and, as she approached the exit, saw the suicide bomber's torso hanging from the rafters. After reaching safety, Judith went to a nearby restaurant to remove pieces of human tissue from her clothing. She then located a volunteer with a religious organization that recovers human remains after terrorist attacks and directed him to where she had placed the tissue so it could be buried in accordance with Jewish law.

572. As a direct and proximate result of the April 30, 2003 Terrorist Attack, Plaintiff Judith Eileen Buchman-Ziv suffered severe and permanent injuries, and as a result, she has

past and future noneconomic damages, including emotional pain and suffering, mental anguish, and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

## XXII. THE EGGED BUS NO. 6 BOMBING – MAY 18, 2003

573. On May 18, 2003, a Hamas suicide bomber disguised as a religious Jew boarded Egged Bus No. 6 at the French Hill Junction bus stop. At approximately 5:45 a.m., the bomber detonated an explosive belt packed with small iron balls and projectiles. The explosion killed seven passengers and injured over 20 others.

574. The attack was perpetrated by Hamas. Hamas claimed responsibility for the attack. The suicide bomber was identified as Bassem Jamal Darwish Takruri, a member of Hamas's al-Qassam Brigades.

### A. Plaintiff Adina Dabach

575. Plaintiff Adina Dabach is a citizen of the United States and a resident of California. She is the sister of Roni Israeli.

576. Roni Israeli, a citizen of Israel, was among the seven passengers killed in the May 18, 2003 suicide bombing.

577. As a result of the May 18, 2003 Terrorist Attack, and the murder of Roni Israeli, Plaintiff Adina Dabach has past and future noneconomic damages, including mental anguish, emotional pain and suffering, loss of solatium, loss of services, and economic loss.

## XXIII. THE SHMUEL HANAVI BUS BOMBING – AUGUST 19, 2003

578. On August 19, 2003, a Hamas suicide bomber disguised as an Orthodox Jew boarded Egged Bus No. 2 in Jerusalem. The bus was primarily filled with Jewish worshippers returning from the Western Wall. At approximately 9:00 p.m., as the bus drove through the ultra-orthodox neighborhood of Shmuel Hanavi, the bomber detonated an explosive device packed with ball bearings. The explosion killed twenty-three people and injured over 130.

579. The attack was perpetrated by Hamas. Hamas claimed responsibility for the attack and the suicide bomber was identified as Ra'ed Abd al-Hamid Misk, a member of Hamas's al-Qassam Brigades. This Court has previously found Hamas responsible for this attack and held Iran, Syria, and MOIS liable for damages arising from injuries related to the attack.[105]

**A. Plaintiff Faiga Zvia Lieberman**

580. Plaintiff Faiga Zvia Lieberman is a citizen of the United States and a resident of New York. She is the sister of Semuel Walner.

581. Semuel Walner, a citizen of Israel, was among the twenty-three people killed in the August 19, 2003 suicide bombing.

582. As a result of the August 19, 2003 Terrorist Attack, and the murder of Semuel Walner, Plaintiff Faiga Zvia Lieberman has past and future noneconomic damages, including mental anguish, emotional pain and suffering, loss of solatium, loss of services, and economic loss.

## XXIV. THE MAXIM RESTAURANT BOMBING – OCTOBER 4, 2003

583. On October 4, 2003, a PIJ suicide bomber entered Maxim Restaurant, a beachfront restaurant in Haifa co-owned by Jews and Arabs and widely regarded as a symbol of coexistence. At approximately 2:10 p.m., after dining at the restaurant, the bomber detonated an explosive belt packed with metal fragments. The explosion killed twenty-one people and injured sixty others. Among those killed were four children, including a two-month-old baby.

584. The attack was perpetrated by PIJ. PIJ claimed responsibility for the attack and the suicide bomber was identified as Hanadi Jaradat, a member of PIJ's al-Quds Brigades.

**A. Plaintiffs The Almog Family**

---

[105] Baxter v. Islamic Republic of Iran, No. 11-2133 (RCL), 2019 LX 31194 (D.D.C. Sep. 27, 2019) (finding Hamas responsible and holding Iran and MOIS liable); Baxter v. Syrian Arab Republic, No. 1:18-cv-1078-RCL, 2022 U.S. Dist. LEXIS 127993 (D.D.C. July 19, 2022) (also holding Syria liable).

585. Plaintiff Oran Almog is a citizen of the United States and a resident of Israel.

586. Plaintiff Orly Almog is a citizen and resident of Israel. She is the mother of Oran Almog.

587. Plaintiff Adi Almog is a citizen and resident of Israel. She is the sister of Oran Almog.

588. On October 4, 2003, Oran, then 10 years old, was dining at Maxim restaurant with his family when the PIJ suicide bomber stood behind Oran's father and grandfather and detonated the bomb. The blast killed Oran's father, Moshe; his grandparents; his cousin; and his eight-year-old brother, Tomer. Oran, Orly, and Adi, then 3 years old, were all severely injured and rushed to the hospital. Oran was immediately intubated, placed on mechanical ventilation for more than ninety-six hours, and kept under sedation for six days. He lost his left eye and suffered devastating injuries to his right eye, leaving him blind. Oran also sustained catastrophic injuries to his chest and left arm, multiple facial fractures and lacerations, traumatic brain and pancreatic injuries, fractures to his ribs and left forearm, and a partial tear of his ulnar nerve, and permanent disfigurement from shrapnel wounds to his face, ears, and head. Since the attack, he has undergone numerous surgeries to treat his injuries.

589. As a direct and proximate result of the October 4, 2003 Terrorist Attack, Plaintiff Oran Almog suffered severe and permanent physical and psychological injuries, and as a result, he has past and future noneconomic damages, including physical and emotional pain and suffering, mental anguish, and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity. In addition, as a result of the injuries sustained by his mother, Orly Almog, and his sister, Adi Almog, and the deaths of his father, Moshe Almog, and his brother, Tomer Almog, Plaintiff Oran Almog has sustained additional noneconomic damages, including mental anguish, emotional pain and suffering, loss of solatium, loss of services, and economic loss.

590. As a result of the October 4, 2003 Terrorist Attack, and the injuries suffered by Oran Almog, Plaintiffs Orly Almog and Adi Almog have past and future noneconomic damages, including mental anguish, emotional pain and suffering, loss of solatium, loss of services, and economic loss.

**B. Plaintiff Nimmer Mattar**

591. Plaintiff Nimmer Mattar is a citizen of the United States and a resident of New Jersey. He became a United States in 2004, after the Maxim Resaturant Bombing.[106] He is the brother of Sharbel Mattar.

592. Sharbal Mattar, a citizen of Israel, was among the twenty-one killed in the October 4, 2003 suicide bombing.

593. As a result of the October 4, 2003 Terrorist Attack, and the murder of Sharbel Mattar, Plaintiff Nimmer Mattar has past and future noneconomic damages, including mental anguish, emotional pain and suffering, loss of solatium, loss of services, and economic loss.

## XXV. THE EGGED BUS NO. 19 BOMBING – JANUARY 29, 2004

594. On January 29, 2004, shortly before 9:00 a.m., an AAMB suicide bomber boarded Egged Bus No. 19 and detonated an explosive device at the corner of Arlozorov and Gaza Street in Jerusalem. The blast tore off the back half of the roof and blew out every window. The explosion killed eleven people and injured over fifty others.

595. The attack was perpetrated by AAMB. AAMB claimed responsibility for the attack, and the attacker was identified as Ali Yusuf Jaara, a PA police officer. In *Sokolow v. PLO,* a jury found the PLO and PA liable for damages arising from the attack.[107]

**A. Plaintiff Nili Choman**

[106] Because Plaintiff Nimmer Mattar was not a U.S. citizen at the time of the Maxim Restaurant Bombing, he does not assert a claim under 18 U.S.C. § 1605A. The Anti-Terrorism Act, however, permits a plaintiff who became a U.S. citizen after the underlying terrorist attack, but before filing suit, to assert claims under 18 U.S.C. § 2333. Acccordingly, Plaintiff Nimmer Mattar asserts only ATA claims.

[107] Sokolow v. PLO, No. 04 CIVIL 00397 (GBD), 2015 LX 55845 (S.D.N.Y. Oct. 1, 2015).

596. Plaintiff Nili Choman is a citizen of the United States and a resident of Israel. She is the sister of Anat Darom.

597. Anat Darom, a citizen of Israel, was riding Bus No. 19 to the Hebrew University for class when the AAMB suicide bomber detonated his explosive device. She was among the eleven killed in the explosion.

598. As a result of the January 29, 2004 Terrorist Attack, and the murder of Anat Darom, Plaintiff Nili Choman has past and future noneconomic damages, including mental anguish, emotional pain and suffering, loss of solatium, loss of services, and economic loss.

## XXVI. THE ASHDOD PORT BOMBINGS – MARCH 14, 2004

599. On March 14, 2004, two suicide bombers infiltrated Israel from Gaza inside a double-walled container transferred through the Karni Border Crossing. At approximately 4:30 p.m., the bombers detonated explosive devices at the Ashdod Port; one inside the port and the other near the port's entrance gate. The bombs detonated within two minutes of each other. The explosions killed ten people and injured sixteen.

600. The attack was jointly perpetrated by AAMB and Hamas. AAMB and Hamas claimed joint responsibility for the attack, and the attackers were identified as AAMB operative Nabil Masoud and Hamas operative Mahmoud Zuhair Salem.

### A. Plaintiff Gabriel Assouline

601. Plaintiff Gabriel Assouline is a citizen of the United States. He is the brother of Daniel Assouline.

602. Daniel Assouline, a citizen of Israel, was a crane mechanic at the Ashdod Port. He was among the ten killed in the March 14, 2004 suicide bombings.

603. As a result of the March 14, 2004 Terrorist Attack, and the murder of Daniel Assouline, Plaintiff Gabriel Assouline has past and future noneconomic damages, including

mental anguish, emotional pain and suffering, loss of solatium, loss of services, and economic loss.

## XXVII. THE MORAG ROADSIDE AMBUSH – JANUARY 12, 2005

604. On January 12, 2005, three PIJ terrorists planted IEDs alongside a road near the Morag settlement in the Gaza Strip. At approximately 9:30 a.m., an Israeli military jeep drove over one of the explosives. As the blast erupted, two of the terrorists moved toward the road and opened fire on the jeep and one other vehicle. The attack killed one civilian, Gideon Rivlin, who was an electronic fence technician riding in the passenger seat of the military jeep on his way to fix the fence around Morag, and injured three soldiers.

605. The attack was perpetrated by PIJ. PIJ claimed responsibility for the attack and the two gunmen were identified as Shaker Jamal Joudah and Alaa Hamdi Hassan al-Shaer, both members of the PIJ's al-Quds Brigades.

### A. Plaintiffs The Rivlin Family

606. Plaintiff Simcha Rivlin is a citizen of the United States and a resident of Israel. She is the wife of Gideon Rivlin.

607. Plaintiff Assaf Rivlin is a citizen of the United States and a resident of Israel. He is the son of Gideon Rivlin.

608. Plaintiff Gilad Baruch Rivlin is a citizen of the United States and a resident of Israel. He is the son of Gideon Rivlin.

609. As a result of the January 12, 2005 Terrorist Attack and the murder of Gideon Rivlin, Plaintiffs Simcha Rivlin, Assaf Rivlin, and Gilad Baruch Rivlin have past and future noneconomic damages, including mental anguish, emotional pain and suffering, loss of solatium, loss of services, and economic loss.

## XXVIII. THE AYTA ASH-SHAAB MISSILE ATTACK – AUGUST 2, 2006

610. On August 2, 2006, during the Second Lebanon War, Israeli paratrooper forces were conducting operations targeting Hezbollah military infrastructure in the Lebanese village of Ayta ash-Shaab. The forces entered a house that came under sustained gunfire from Hezbollah terrorists for several hours. At approximately 7:45 p.m., Hezbollah terrorists fired three anti-tank missiles at the house, killing Israeli Sgt. Adi Cohen and wounding four other soldiers.

611. The attack was perpetrated by Hezbollah. Hezbollah news outlets and officials reported that Hezbollah was conducting attacks on Israeli forces in Ayta al-Shaab on the day of the attack, and multiple Hezbollah anti-tank operatives confirmed their participation in such attacks. Israeli intelligence reports also confirmed that the missile that killed Sgt. Cohen was a Hezbollah anti-tank missile.

612. This Court has previously held Iran and Syria liable for damages arising from Hezbollah attacks during the Second Lebanon War.[108]

**A. Plaintiffs The Nachmani Family**

613. Plaintiff Matan Eliav Nachmani is a citizen of the United States and a resident of Israel.

614. During the Second Lebanon War, Matan, then 21 years old, was serving as a Combat Medic in Israel's Paratrooper Brigade. On August 2, 2006, Matan and his unit were conducting operations in Ayta ash-Shaab under heavy Hezbollah fire. Matan was inside the house when Hezbollah fired three anti-missiles at it. Matan rendered medical aid to the wounded soldiers and carried Sgt Cohen's body to the evacuation team. He remained in Ayta ash-Shaab for two more days following the attack, during which time he felt lonely and hollow as he struggled to process the death of his fellow soldier and the events he had witnessed.

[108] See *Kaplan v. Central Bank of the Islamic Republic of Iran*, 55 F. Supp. 3d 189 (D.D.C. 2014); *Lelchook v. Syrian Arab Republic,* No. 16-01550 (RC/RMM), 2019 U.S. Dist. LEXIS 88658 (D.D.C. Jan. 31, 2019).

615. As a direct and proximate result of the August 2, 2006 Terrorist Attack, Plaintiff Matan Eliav Nachmani suffered severe and permanent injuries, and as a result, he has past and future noneconomic damages, including emotional pain and suffering, mental anguish, and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

616. Plaintiff Ariel Benaya Nachmani is a citizen of the United States and a resident of Israel. He is the brother of Matan Eliav Nachmani.

617. Plaintiff Rachel Rivka Raz is a citizen of the United States and a resident of Israel. She is the sister of Matan Eliav Nachmani.

618. Plaintiff Amichai Tzion Nachmani is a citizen of the United States and a resident of Israel. He is the brother of Matan Eliav Nachmani.

619. Plaintiff Talia Bracha Nachmani is a citizen of the United States and a resident of Israel. She is the sister of Matan Eliav Nachmani.

620. As a result of the August 2, 2006, Terrorist Attack, and the injuries suffered by Matan Eliav Nachmani, Plaintiffs Ariel Benaya Nachmani, Rachel Rivka Raz, Amichai Tzion Nachmani, and Talia Bracha Nachmani, have past and future noneconomic damages, including mental anguish, emotional pain and suffering, loss of solatium, loss of services, and economic loss.

## XXIX. THE HERMESH ROAD SHOOTING – MAY 30, 2023

621. On May 30, 2023, at approximately 11:30 a.m., Meir Yitzhak Tamari was driving home on Road 585 in the northern West Bank. Shortly before the intersection leading to the entrance of Hermesh, Meir was shot by PIJ gunmen firing from a passing car. The gunmen fled the scene. Although severely wounded, Meir continued driving until he reached Hermesh, where he was evacuated to the hospital by emergency personnel. Mr. Tamari died of his wounds hours later.

622. The attack was perpetrated by PIJ and Fatah/AAMB. The Rapid Response Squad of the Tulkarem Battalion, a joint PIJ-Fatah terrorist organization, claimed responsibility for the attack. Israeli military and intelligence statements later implicated several PIJ operatives in the attack, and senior PIJ operative Ahmad Barakat was identified as the principal perpetrator. PIJ publicly praised the attack, characterizing it as a continuation of the "path of resistance."

**A. Plaintiff Tal Tamari Levy**

623. Plaintiff Tal Tamari Levy is a citizen of the United States and a resident of Israel. She is wife of Meir Yitzhak Tamari.

624. As a result of the May 30, 2023 Terrorist Attack, and the murder of Meir Yitzhak Tamari, Plaintiff Tal Tamari Levy has past and future noneconomic damages, including severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of services, and economic loss. The injuries suffered by Meir Tamari continue to have a lasting effect on his wife.

## CLAIMS FOR RELIEF

### COUNT I: ACTION FOR DAMAGES – GENERAL
### Against the FSIA Defendants, On Behalf of All Plaintiffs Except for Plaintiff Nimmer Mattar[109]
### (Under 28 U.S.C. § 1605A(c))

625. Plaintiffs incorporate the allegations of the preceding paragraphs as though fully set forth below.

626. Defendant Iran is, and was at all relevant times, a designated State Sponsor of Terrorism within the meaning of § 1605A(h)(6).

[109] As alleged above, Plaintiff Nimmer Mattar became a U.S. citizen after the attack and therefore does not assert a claim under § 1605A.

627. Defendants IRGC and MOIS are political subdivisions of Iran, and Banks Melli and Saderat are agencies and instrumentalities of Iran and are treated as the State of Iran for purpose of bringing suit under 28 U.S.C. § 1603(a).

628. Defendant Syria was at all relevant times a designated State Sponsor of Terrorism within the meaning of § 1605A(h)(6) and remained so designated within the six-month period preceding the filing of this action.

629. The FSIA Defendants knowingly or intentionally provided substantial, material support (as defined in 18 U.S.C. § 2339A) to Hamas, Hezbollah, PIJ, and Fatah/AAMB, which facilitated and caused the Terrorist Attacks that killed or injured Plaintiffs and their family members.

630. The FSIA Defendants armed, funded, trained, directed, aided, abetted, conspired, and acted in concert with the FTO Defendants and Fatah/AAMB in sponsoring and carrying out acts of extrajudicial killing in the Terrorist Attacks and are therefore directly liable and vicariously responsible for their actions.

631. Plaintiffs herein were injured as the result of the Terrorist Attacks. All Plaintiffs were nationals of the United States or the immediate relatives of nationals of the United States at the time of the Attack, and thus, are entitled to bring claims under § 1605A(c).

632. The Plaintiffs suffered severe harm, including personal injury, emotional distress, mental anguish, pain and suffering, loss of companionship and society, loss of solatium and consortium, and loss of services as a direct and proximate cause of the actions of the FSIA Defendants.

633. Defendants IRGC, MOIS, Bank Melli, and Bank Saderat, acting on their own as well as agents of the Islamic Republic of Iran, performed acts within the scope of their agency which also caused the injuries to Plaintiffs within the meaning of 28 U.S.C. § 1605A.

634. The conduct of the FSIA Defendants was criminal in nature, outrageous, extreme, wanton, willful, malicious, and constitutes a threat to the public warranting an award of punitive damages under 28 U.S.C. § 1605A.

635. Defendants FSIA are therefore jointly and severally liable for the full amount of Plaintiffs' noneconomic damages, solatium, pain and suffering, and punitive damages under 28 U.S.C. § 1605A(c), jointly and severally, in an amount to be determined herein.

**COUNT II: PERSONAL INJURY – ASSAULT AND BATTERY**
**Against the FSIA Defendants, On Behalf of All Plaintiffs Present at the Terrorist Attacks**
**(Under 28 U.S.C. § 1605A(c))**

636. Plaintiffs incorporate the allegations of the preceding paragraphs as though fully set forth below.

637. The FSIA Defendants provided material support for acts of extrajudicial killing (within the definition of 28 U.S.C. § 1605A(h)) to terror organizations and operatives who injured Plaintiffs in the Terrorist Attacks identified in the foregoing paragraphs.

638. The FSIA Defendants intended to and did cause great harmful or offensive contact, and fear and apprehension such contact, to the Plaintiffs present at the scene of the Terrorist Attacks.

639. These willful, wrongful, and intentional acts constitute a violent assault and battery upon the bodies and minds of the Plaintiffs present at the scene of the Terrorist Attacks.

640. As a direct and proximate result of the willful, wrongful, and intentional acts of the FSIA Defendants, Plaintiffs identified in the foregoing paragraphs were injured and endured severe physical injuries, extreme mental anguish, pain and suffering, and economic losses.

641. Plaintiffs' compensatory damages include, but are not limited to, their severe physical injuries, extreme mental anguish, pain and suffering, solatium, and any economic losses determined by the trier of fact.

642. The FSIA Defendants' conduct was criminal, outrageous and extreme, wanton and willful, malicious, and constitutes a threat to the public warranting an award of punitive damages under 28 U.S.C. § 1605A(c).

**COUNT III: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**Against the FSIA Defendants, On Behalf of U.S. Citizen Plaintiffs Except for Plaintiff Nimmer Mattar**
**(Under 28 U.S.C. § 1605A(c))**

643. Plaintiffs incorporate the allegations of the preceding paragraphs as though fully set forth below.

644. The FSIA Defendants provided material support for acts of extrajudicial killing to terror organizations and operatives with the intent that these organizations and operatives would carry out attacks that would cause Plaintiffs severe emotional distress.

645. The FSIA Defendants intentionally inflicted emotional distress on Plaintiffs by intending to terrorize, and in fact terrorizing, Plaintiffs, causing them severe emotional distress.

646. This included terrorizing Plaintiffs who were present at the scene of the Terrorist Attacks and Plaintiffs whose immediate family members were injured in the Terrorist Attacks.

647. As a direct and proximate result of the willful, wrongful, and intentional acts of the FSIA Defendants, Plaintiffs identified in the foregoing paragraphs were injured and endured extreme mental anguish, pain and suffering, and economic losses.

648. Plaintiffs' compensatory damages include, but are not limited to, extreme mental anguish, pain and suffering, solatium, and any economic loss determined by the trier of fact.

649. The FSIA Defendants' conduct was criminal, outrageous and extreme, wanton and willful, malicious, and constitutes a threat to the public warranting an award of punitive damages under 28 U.S.C. § 1605A(c).

**COUNT IV: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

**Against the FSIA Defendants, On Behalf of Non-U.S. Citizen Plaintiffs**
**(Under District of Columbia Law or Israeli Law)**

650. Plaintiffs incorporate the allegations of the preceding paragraphs as though fully set forth below.

651. The family member Plaintiffs of individuals identified in the foregoing paragraphs as injured or killed as a result of the FSIA Defendants' provision of material support for acts of extrajudicial killing have suffered severe emotional distress, extreme mental anguish, and severe physical manifestations, as well as loss of solatium and other harms to be set forth to the trier of fact.

652. The FSIA Defendants' material support for extrajudicial killing were intended to inflict severe emotional distress on Plaintiffs.

653. Family member Plaintiffs who are U.S. citizens bring claims pursuant to 28 U.S.C. § 1605A's federal cause of action, § 1605A(c), as set forth in the Count III.

654. District of Columbia District Courts are split over whether to apply D.C. law, the law of non-U.S. national plaintiffs' domiciles, or the law of the place of the attack to intentional infliction of emotional distress claims brought by plaintiffs who are not nationals of the United States. The issue is currently on appeal to the Court of Appeals for the District of Columbia in *Roberts v. Islamic Republic of Iran*, No. 23-cv-7106.

655. Accordingly, family member Plaintiffs who are not U.S. nationals bring claims pursuant to District of Columbia law or Israeli law.

656. The family member Plaintiffs who are not U.S. nationals bring claims for all possible damages, including for pain and suffering, emotional distress, economic losses, and punitive damages, as set forth below.

**District of Columbia Law**

657. District of Columbia law provides for intentional infliction of emotional distress claims, including punitive damages. The family member Plaintiffs who are not U.S. nationals

accordingly bring claims for intentional infliction of emotional distress, including punitive damages, under District of Columbia law.

658. As set forth in detail above, the Iran Defendants' conduct was intentional and reckless, necessarily causing the family member Plaintiffs severe emotional distress.

**Israeli Law**

659. Family member Plaintiffs who are citizens of the State of Israel but not the United States also bring claims under Israeli law, including Articles 35-36 of the Civil Wrongs Ordinance ("CWO") providing causes of action for both negligent conduct and intentional harms.

660. Plaintiffs bring these claims against the Iran Defendants under three theories of liability espoused by Israeli law: primary liability, secondary liability, and vicarious liability.

661. The FSIA Defendants knowingly, willfully, recklessly (and certainly negligently) caused and assisted the above-described attacks, which are acts of terrorism that a reasonably prudent person would not have committed or abetted.

662. The FSIA Defendants had a duty not to knowingly, willfully, recklessly (and certainly negligently) cause, assist, and provide material support for the above-described attacks.

663. As a direct and proximate result of the willful, knowing, reckless, and negligent acts of the Iran Defendants, Plaintiffs identified in the foregoing paragraphs suffered extreme mental anguish, pain and suffering, loss of solatium, and economic harm.

664. Israeli law provides for damages for economic loss, pain and suffering, mental anguish, bereavement damages (*i.e.*, solatium), and punitive damages.

665. Plaintiffs' compensatory damages include, but are not limited to, economic losses, pain and suffering, extreme mental anguish, and solatium.

666. Punitive damages under Israeli law stems from the American rule of punitive damages. The FSIA Defendants' conduct was criminal, outrageous, extreme, wanton, willful, malicious, and a threat to the public, warranting an award of punitive damages against the FSIA Defendants pursuant to Israeli law.

**Other foreign or U.S. States' laws**

667. To the extent necessary, the non-U.S. national Plaintiffs bring claims for relief under the laws of other countries or U.S. States, for the same injuries and damages described above.

**COUNT V: ACTION FOR INTERNATIONAL TERRORISM**
**Against the FTO Defendants, On Behalf of the Plaintiffs Injured by the FTO Defendants**
**(Under 18 U.S.C. § 2333(a))**

668. Plaintiffs incorporate the allegations of the preceding paragraphs as though fully set forth below.

669. The actions of the FTO Defendants described herein constituted "acts of international terrorism" as defined in § 2331 of the ATA.

670. As defined § 2331, the actions of the FTO Defendants as described herein constituted violent acts and acts dangerous to human life that are a violation of the criminal laws of the United States, which were intended to intimidate or coerce the civilian population of Israel or influence the policy of the Israeli government by intimidation or coercion, and occurred outside the territorial jurisdiction of the United States.

671. Section 2333(a) of the ATA provides that "[a]ny national of the United States injured in his or her person, property, or business by reason of an act of international terrorism . . . may sue therefor in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees."

672. The ATA "does not specifically require that a plaintiff suffer physical harm prior to filing suit."[110] As this Court has repeatedly held, injuries consisting mental anguish and emotional pain and suffering are cognizable under the ATA.[111] Accordingly, immediate family members of terrorism victims may bring claims for their own emotional injuries caused by the attack.

673. The Terrorist Attacks were the proximate cause of Plaintiffs' injuries, and the injuries were foreseeable results of those events.

674. Accordingly, the FTO Defendants have primary liability for Plaintiffs' injuries and are liable for Plaintiffs' damages.

**COUNT VI: CIVIL LIABILITY FOR AIDING AND ABETTING**
**Against FTO Defendant Hezbollah, On Behalf of the Plaintiffs Injured by Hamas, PIJ, and AAMB**
**(Under 18 U.S.C. §§ 2333(a) and 2333(d)(2))**

675. Plaintiffs incorporate the allegations of the preceding paragraphs as though fully set forth below.

676. Hamas and PIJ were each designated an FTO on October 8, 1997, and remain so-designated.

677. AAMB was designated an FTO on March 27, 2002, and remains so-designated.

678. The attacks committed alleged herein were acts of international terrorism as defined by 18 U.S.C. § 2331(1).

679. Hezbollah aided and abetted (within the meaning of 18 U.S.C. § 2333(d)(2)) Hamas, PIJ, and AAMB, who were the persons (within the meaning of 18 U.S.C. § 2333(d)(1) and 1 U.S.C. § 1) that committed some of the acts of international terrorism set forth herein,

[110] Biton v. Palestinian Interim Self-Gov't Auth., 310 F. Supp. 2d 172, 182 (D.D.C. 2004).

[111] See, e.g., Hurst v. Socialist People's Libyan Arab Jamahiriya, 474 F. Supp. 2d 19, 30 (D.D.C. 2007).

including through financial support, military training, intelligence sharing, strategic planning, the provision of weapons, and other forms of assistance and encouragement described above.

680. Hezbollah assisted Hamas, PIJ, and AAMB knowingly and was generally aware of its role in their illegal and tortious conduct.

681. The assistance Hezbollah knowingly or intentionally provided to Hamas, PIJ, and AAMB was substantial.

682. The Terrorist Attacks described herein which were committed by Hamas, PIJ, and AAMB were the natural and foreseeable consequence of Hezbollah's assistance to Hamas, PIJ, and AAMB.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiffs pray that this Court:

(a) Accept jurisdiction over this action;

(b) Enter judgment for all Plaintiffs against the FSIA Defendants, jointly and severally, for compensatory damages, including, but not limited to, physical injury, extreme mental anguish, pain and suffering, economic losses, and solatium, in amounts to be determined at trial;

(c) Enter judgment for all Plaintiffs against the FSIA Defendants, jointly and severally, for punitive damages in an amount to be determined at trial;

(d) Enter judgment against the FTO Defendants, jointly and severally, and in favor of all Plaintiffs for compensatory damages in amounts to be determined at trial;

(e) Enter judgment against the FTO Defendants, jointly and severally, and in favor of each plaintiff for treble damages pursuant to 18 U.S.C. § 2333(a);

(f) Enter judgment against the FTO Defendants, jointly and severally, and in favor of all Plaintiffs for any and all costs sustained in connection with the prosecution of this action, including attorneys' fees, pursuant to 18 U.S.C. § 2333(a);

(g) Enter judgment for all Plaintiffs against the FSIA Defendants, jointly and severally, for Plaintiffs' costs and attorney's fees;

(h) Enter judgment against the FSIA Defendants, jointly and severally, for prejudgment interest; and

(i) Grant such other and further relief as the Court finds just and equitable.

Dated: August 25, 2026

Respectfully submitted,

*/s/ Gavriel Mairone*
Gavriel Mairone
DC Bar No. 156461
Oceane Maher (*pro hac vice* forthcoming)
MM~LAW LLC
875 North Michigan Avenue, Suite 3100
Chicago IL 60611
Docket@mm-law.com
CTlaw@mm-law.com
Oceane@mm-law.com
Telephone: (312) 253-7444
Fascsimile: (312) 275-8590

*Counsel for Plaintiffs*